Chessie Thacher (SBN 296767)
    cthacher@aclunc.org
Hannah Kieschnick (SBN 319011)
    hkieschnick@aclunc.org
Angelica Salceda (SBN 296152)
    asalceda@aclunc.org
Shilpi Agarwal (SBN 270749)
    sagarwal@aclunc.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone:    (415) 621-2493
Facsimile:    (415) 255-1478

Anthony Prince (SBN 202892)
    princelawoffices@yahoo.com
General Counsel, California Homeless Union
LAW OFFICES OF ANTHONY D. PRINCE
2425 Prince Street, Suite 100
Berkeley, CA 94705
Telephone: (510) 301-1472

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DESIREE MARTINEZ, FRESNO HOMELESS UNION, FAITH IN THE VALLEY, and ROBERT MCCLOSKEY,

        Plaintiffs,

v.

THE CITY OF FRESNO,

        Defendant.

CASE NO.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Desiree "Dez" Martinez, Fresno Homeless Union, Faith in the Valley, and Robert McCloskey (collectively, "Plaintiffs") bring this case against the City of Fresno ("Fresno" or "City") for deprivation of rights enshrined in federal and state law, and allege as follows.

## INTRODUCTION

1.      Fresno has a severe housing crisis, a growing population of unhoused residents, and a long history of mistreating its unhoused community.  Despite the lack of readily available shelter beds, the City deems encampments where houseless people live a "public nuisance" and targets these locations for abatement with frequent dismantling, or "sweeps."  The City often carries out this abatement activity by destroying precious belongings and life-saving items without due process and by deploying excessive force to make people pack up and move to a new location—sometimes only a few blocks away.  Plaintiffs regularly frequent such encampments to share resources, offer support, document conditions, and, in the case of the Fresno Homeless Union, represent and organize unhoused people in defense of their rights and for permanent housing.  Plaintiffs also regularly show up at sweeps on public property to provide representation, legal support, and critical assistance or, simply, to observe, document, and report on the City's actions.

2.      As recently amended, Section 10-616 of the Fresno Municipal Code addressing administrative nuisance abatements ("the Ordinance")[1] represents the City's latest unlawful efforts directed at unhoused people.  But the Ordinance also signals a new, more sinister approach: the criminalization of concerned citizens and reporters trying to address or alleviate the unhoused community's plight.  The recent amendments impose high administrative fines and misdemeanor sanctions for "unauthorized entry" into an area—such as a public park where unhoused people are living—"while an abatement is in progress."  The Ordinance fails, however, to define what activities constitute "the work of abatement" and is woefully vague as to what stage in the long and traumatic process of an encampment sweep, Plaintiffs, advocates, representatives, unhoused individuals, journalists, and other members of the public will be barred entry or face sanctions.

3.      By punishing the type of advocacy, speech, expressive conduct, and association that Plaintiffs engage in before and during an encampment sweep, the Ordinance threatens to restrict or chill

---

[1] A true and correct copy of the amended and adopted Ordinance is attached hereto as Exhibit A.

fundamental rights protected under the United States and California Constitutions.  The Ordinance further contravenes California statutory law because it purports to evade liability for wrongful acts that occur during nuisance abatement.

4.     Public scrutiny is essential to government accountability.  This Ordinance provides the City with a potent tool to hide its misconduct away from public view and then avoid liability for any wrongdoing, thereby increasing the risk of harm to all those involved in a sweep or other abatement activity at an encampment.  This Complaint seeks declaratory and injunctive relief to enjoin enforcement of the Ordinance.

### JURISDICTION AND VENUE

5.     The Court has original jurisdiction over this action pursuant 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over California constitutional and statutory claims.  Plaintiffs' state law claims are related to their federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

6.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)–(c) because Defendant City of Fresno is within this District and all events giving rise to Plaintiffs' claims occurred in the District.  For the same reason, venue is also proper in this Court pursuant to Local Rule 120(d) of the Local Rules of Practice for the United States District Court, Eastern District of California. The relief that Plaintiffs seek is within this Court's power to grant.

### PARTIES

7.     Plaintiff **DESIREE "DEZ" MARTINEZ** is a California resident who lives in Fresno, CA.  She is an advocate, founder of the Fresno-based groups Homeless in Fresno and We Are Not Invisible, and the president of the Fresno Homeless Union.  As the Fresno Homeless Union's lead organizer, Ms. Martinez regularly visits encampments, organizing residents and distributing food, hygiene supplies, and other needed aid to unhoused people.  She also attends encampment sweeps to represent and assist people targeted by those sweeps and to document how law enforcement, abatement officers, and other city workers and contractors conduct their official business.  Whenever possible, Ms. Martinez tries to "livestream" encampment sweeps and other abatement activity.  She then posts her

video recordings on the "Homeless in Fresno" Facebook page that she administers, which has a reported 14,000 followers.  These recordings form the basis for her advocacy work to educate the wider community about the City's treatment of unhoused people.  On the Homeless in Fresno Facebook page, Ms. Martinez also shares political messages about Fresno's housing crisis, information about the Fresno Homeless Union, updates on shelter bed availability, stories of evictions, and news regarding community meals and other assistance for anyone in need.  Over the last two years, Ms. Martinez has pushed ceaselessly for improved living conditions for unhoused people, setting up safe protest camps, organizing overnight vigils and rallies at City Hall, and communicating with City leadership.  Ms. Martinez conducts much of her advocacy work wearing clothes bearing the name "California Homeless Union" and "We Are Not Invisible" and drives a truck emblazoned with the latter message.  Ms. Martinez submitted public comments in opposition to the Ordinance explaining the negative and chilling impact on her advocacy, speech, associational rights, and other protected conduct.

8.  Plaintiff **FRESNO HOMELESS UNION** ("Homeless Union" or "the Union") is an unincorporated association of unhoused and housing-insecure families, individuals, and advocates.  It is a member local of the California Homeless Union/Statewide Organizing Council and is affiliated with the National Union of the Homeless.  The Union's mission is to organize, represent, and serve Fresno's unhoused community.  The majority of its officers and members live in homeless encampments. Through the City's practice of clearing encampments and because of the Ordinance's prohibition on entry to observe, document, and assist during encampment sweeps, Fresno continues to directly interfere with the Union's survival, ability to represent its members, and other fundamental activities.  The Homeless Union provided public comments in opposition to the Ordinance explaining the negative and chilling impact on its advocacy, speech, associational rights, and other protected conduct.  The Union brings this lawsuit on behalf of itself and on behalf of its members.

9.  Plaintiff **FAITH IN THE VALLEY** is a non-profit organization located in the Central Valley.  It is a federated member of PICO California, the largest faith-based community organizing network in California, as well as the National Faith in Action Network.  Faith in the Valley uses grassroots organizing and advocacy to address problems of equity encompassing safe and decent housing, jobs and poverty, environmental justice, parks, and police accountability.  This work is led by

volunteer leaders who are among the people most impacted by these issues, including low-wage workers, immigrants, and the formerly incarcerated. Faith in the Valley organizers regularly attend the City's encampment sweeps; spearhead mass public comments advocating for affordable housing and an end to sweeps; lead rallies and listening sessions to push elected officials to address Fresno's housing crisis; and work to educate City residents about Fresno's practices. The conditions that Faith in the Valley organizers observe during sweeps and the relationships that they build with unhoused people set the course of its work. Through the City's practice of clearing homeless encampments and because of the Ordinance's prohibition on entry to observe, document, and assist during encampment sweeps, Fresno continues to directly interfere with the mission of Faith in the Valley. Faith in the Valley provided public comments in opposition to the Ordinance explaining the negative and chilling impact on its advocacy, speech, associational rights, and other protected conduct.

10.    Plaintiff **ROBERT MCCLOSKEY** is a California resident who lives in Fresno County, CA. Mr. McCloskey is a reporter for Community Alliance, a monthly newspaper that has been published in Fresno since 1996 and has published multiple articles on the City's actions and policies regarding housing and homelessness in the Fresno area.[2] Mr. McCloskey is also an advocate for unhoused individuals in Fresno. As a reporter and an advocate, Mr. McCloskey has observed the City sweep numerous homeless encampments and has advocated on behalf of unhoused individuals during those sweeps and before the City Council. During sweeps, Mr. McCloskey regularly interviews unhoused people and City officials, turning his investigatory work into articles that describe the conditions and conduct he observes. Mr. McCloskey also assists unhoused people during sweeps, documenting mistreatment and helping to preserve their belongings. Mr. McCloskey provided public comments in opposition to the Ordinance explaining the negative and chilling impact on his advocacy, speech, associational rights, and other protected conduct.

11.    Defendant **City of Fresno** is a charter city and municipal corporation duly created and existing under the Constitution and laws of the State of California. The City is responsible for amending, approving, and adopting the Ordinance set forth at Section 10-616 of Fresno's Municipal

---

[2] *See, e.g.*, Bob McCloskey, *Public Funds to Shelter the Unhoused: Crossroads on the Money Trail*, Community Alliance (May 3, 2021, updated Feb. 10, 2022), https://tinyurl.com/5r8ut7t9.

Code.  Through its agents, including the Mayor, City Council, City Attorney, Code Enforcement, Police Department, Police Chief, and other agents and contractors, it will enforce the challenged Ordinance and will issue citations and prosecute alleged violations thereunder.

**FACTUAL ALLEGATIONS**

A.    **Fresno's Housing Crisis**

12.    Fresno is facing a housing and displacement crisis that has been decades in the making. Growing economic inequality and lack of affordable housing make finding safe, secure housing far out of reach for many.  The City estimates that, at present, 5,200 people in the Fresno-Madera region lack housing, and, of this total, 4,200 people live within Fresno City limits.  Plaintiffs and others familiar with the situation on the ground believe that the number of people lacking stable housing is vastly higher than the City's estimates.  There is, however, no dispute that the crisis is growing.  Recent reports to the City Council indicate that, since 2019, the number of unhoused people in the region has increased 60%.

13.    Surveys conducted as a part of Fresno's comprehensive "Here to Stay Public Comment Report," which was discussed during Fresno's Anti-Displacement Task Force Meeting on December 16, 2021, indicate that the main reasons for displacement include rising rents, evictions, foreclosures, natural disasters, condo conversions, and neighborhood or domestic violence.  The Here to Stay Report also observes that those most at risk of displacement are "aging adults, people with disabilities, young adults, veterans and people returning home from institutionalization, farmworkers and people with documentation challenges, third-generation Black households, Southeast Asian residents, and community advocates."  Of the displaced persons surveyed in Fresno, the report revealed that "people between the ages of 45 and 54 were over three times more likely to have been displaced"; that "Non-binary, Questioning, Queer, and Transgender respondents were 300% more likely to have experienced displacement"; and that "people who identified as mixed race, or 'other' were nearly 400% more likely to have been displaced."  Significantly, "39.3% of all survey respondents indicated that they had children."

14.    And yet, despite the evident and desperate need, Fresno lacks sufficient affordable housing options, permanent supportive housing, space in transitional facilities, and temporary beds in shelters.  The City candidly recognizes that it has more unhoused persons than services or beds.  For

1  Fresno's more than 4,000 unhoused persons, government reports indicate that the City has only 1,500

2  beds.  The City's shelters regularly turn people away for lack of space.

3          15.      As a result of Fresno's housing crisis, many people have nowhere to live but in tents and

4  other makeshift shelters in public parks, on public sidewalks, and in other public spaces.  Recently, the

5  City estimated that there are 64 "encampments" and 479 "shanties" in the area.  The conditions at some

6  of these locations are both unsanitary and unsafe, presenting increased risks of violence, sexual assault,

7  and health problems.  Persons who identify as female are particularly vulnerable without secure housing.

8  Lacking housing can also make it more challenging to pursue educational opportunities, find good work,

9  and access social and mental health services or treatments for substance use issues.  COVID-19 has

10  exacerbated many of these problems and made houselessness all the more dangerous.

11          **B.      Fresno's Long-Standing Hostility Toward the Unhoused Community**

12          16.      Like many local governments across California, Fresno has attempted to address its

13  housing and displacement crisis by proposing policies that often fail to respect the dignity and humanity

14  of unhoused people.  These polices have subjected unhoused persons to a host of discriminatory

15  practices, prohibiting them from moving freely in public spaces; ejecting them from public

16  accommodations; surveilling, policing, and criminalizing them; fining them exorbitant sums for

17  engaging in basic activities (like sitting, resting, and sleeping outside or having personal belongings in

18  public); and banishing them to remote, often dangerous, areas with challenging access to vital resources

19  like food, water, public transportation, and health care.

20          17.      The rhetoric that public officials use to justify these policies and practices is often

21  dehumanizing.  Officials describe unhoused people as a threat to public safety and a form of blight that

22  needs to be "swept up," disappeared, and excluded from the public places where housed people gather.

23  Official narratives treat unhoused people less as neighbors and constituents, and more as scapegoats for

24  a host of dynamic and complex urban challenges.  Rarely do these narratives include in the public

25  dialogue the voices, perspectives, and interests of people who have been displaced.

26          18.      Encampment sweeps are an outgrowth of these dehumanizing practices.  Despite

27  Fresno's acknowledged lack of sufficient affordable housing and temporary shelter beds, the City has

28  long pursued systematic sweeps and other abatement activities in which law enforcement, abatement

---

COMPLAINT FOR DECLARATORY                    7                    Case No.: _____
AND INJUNCTIVE RELIEF

officers, and other city workers and contractors force involuntarily unhoused residents to leave their resting and sleeping places by threatening criminal citation, arrest, and destruction or seizure of property.  These sweeps have taken place with little to no notice.  In some instances, these sweeps have also been carried out with unreasonable time demands for unhoused persons to pack up precious and vital belongings.  City officials have been known to take and destroy tents, bedding, clothing, phones, medicine, food, mobility devices, identifying documents, birth certificates, EBT cards, and even pets and the ashes of loved ones.  The destruction is particularly cruel given that many unhoused people suffer from physical ailments and mobility issues and are directed to dismantle their shelters only to move to a different location around the block.

19.    In 2006, Fresno's manner of conducting encampment sweeps, especially its practice of confiscating and destroying the belongings of unhoused people, formed the basis of a successful class action lawsuit against the City.  Specifically, in *Kincaid v. City of Fresno*, No. 1:06-cv-01445-LJO-SKO, a group of unhoused persons alleged that City officials "regularly engage[d] in what amount to raids of areas where homeless people live, during which defendants intentionally and indiscriminately take and destroy personal property owned by homeless people in the area and immediately destroy that property."[3]

20.    The *Kincaid* plaintiffs obtained injunctive relief to stop the City from "seizing the personal property of homeless persons without lawful cause and from immediately destroying any property that it seize[d]"[4] and, later, a favorable settlement.  Part of the lawsuit's success was due to the facts that the plaintiffs marshalled in declarations by unhoused people, advocates, and reporters, who were able to witness the sweeps and other abatement activities from a near vantage point.  As a result of their proximity to the sweeps, witnesses provided the court with compelling evidence that the City was violating the constitutional rights of unhoused people.  One independent reporter, for example, attested that he had observed city workers toss unhoused peoples' tents, bulging with their belongings, straight into a dumpster on numerous occasions.  His testimony, accompanied by photographs, contravened the

---

[3] Complaint ¶ 2, *Kincaid v. City of Fresno*, No. 1:06-cv-01445-LJO-SKO (E.D. Cal. Oct. 17, 2006), ECF No. 1 at 2.

[4] Statement of Decision & Findings re: Plaintiffs' Application for a Preliminary Injunction ¶ 31, *Kincaid* (Dec. 8, 2006), ECF No. 91 at 83.

City's narrative about what happens during sweeps.[5]  Others who were present at the sweeps explained how officers had used force to clear an area[6] and how the presence of advocates and organizers had once saved an unhoused person from being run over by a bulldozer.[7]

21.    Under the terms of the *Kincaid* settlement agreement, the City agreed to provide between three and seven days notice before conducting a sweep and agreed to not destroy personal property during any sweep.[8]  Sustained reports of un-noticed property destruction and other unlawful practices in connection with the City's sweeps and other abatement activity have, however, persisted over the last decade, and many of the problems raised in that litigation still occur today.  For example, on February 21, 2020, when Lewis Dewane Brown, an unhoused person, allegedly did "not pack[] fast enough" during an encampment sweep where he had resided for more than one year, he was brutally beaten.[9] Unhoused people who witnessed this beating were cowed and stunned, fleeing the area that day with whatever they could carry on their backs so that they could avoid a similarly violent interaction with law enforcement.  Ms. Martinez was not present during the beating of Mr. Brown, and in later describing this incident, a Homeless Union member said that law enforcement officers clearly felt that they "could do that to anybody" so long as organizers and advocates like Ms. Martinez or reporters like Mr. McCloskey were not there to document and speak out.

22.    At the start of this year, the City began sending out a police-led Homeless Assistance Response Team ("HART") to serve as "compassionate, responsive, lawful and effective outreach leading unsheltered individuals and families to take the first step off the streets and into a new future." But already HART has had problems.  In one instance, on a morning in February 2022, Mr. McCloskey

---

[5] Decl. of Mike Rhodes, *Kincaid* (Oct. 17, 2006), ECF No. 14; *see also* Mike Rhodes, *Fresno Homeless Attacked and Insulted by City Workers*, Street Spirit (July 2006), https://www.thestreetspirit.org/July2006/demolished.htm.

[6] Decl. of Logan Siler, *Kincaid* (Nov. 6, 2006), ECF No. 56.

[7] Decl. of Liza Apper, *Kincaid* (Oct. 17, 2006), ECF No. 15.

[8] Settlement Agreement Between Plaintiffs & the Plaintiff Class & Defendants, *Kincaid* (June 5, 2008), ECF No. 304-2.

[9] This incident is the subject of a separate, pending civil rights lawsuit against the City and other defendants: *Brown v. City of Fresno*, No. 1:22-cv-00216-JLT-SAB (E.D. Cal. filed Feb. 21, 2022); *see also* Mike Rhodes, *Police Brutality Will Be Put on Trial in Fresno*, Community Alliance (Mar. 1, 2022), https://tinyurl.com/262h9azt.

---

COMPLAINT FOR DECLARATORY                    9                Case No.: _____
AND INJUNCTIVE RELIEF

was driving along F Street outside Poverello House, which provides daily meals, social services, and temporary shelter for those in need, when he saw a HART officer interacting with an unhoused person during a sweep. Mr. McCloskey observed the officer aggressively tell a man to get up and then kick the pillow where that man's head was lying. Mr. McCloskey documented this incident, spoke with the officer, and then wrote to the Mayor's Office about it. Due to Mr. McCloskey's advocacy, City officials have since reportedly pledged to reform HART to prevent this sort of misconduct. Mr. McCloskey has also repeatedly documented the City's use of heavy machinery to clear encampments while unhoused persons are still nearby the machinery—just as his own news editor had done in the *Kincaid* litigation 15 years ago.

23. In another instance, on March 9, 2022, at an abatement sweep along the Fresno Canal between South Clovis Avenue, East Huntington Avenue, and East Tulare Avenue, which was partially attended by the Mayor and a Councilmember, abatement officers and city workers placed the belongings of the people who were being displaced into large black garbage bags, promising to deliver or store these items for safekeeping. But the workers did not label these items with the names of the individuals to whom they belonged and thus it would have been nearly impossible for those individuals to recover their property. Ms. Martinez and Mr. McCloskey were both on site at the time documenting this conduct. Despite Ms. Martinez's pleading with the workers to label the items, they appeared unwilling to do so. The bags were only labeled after Ms. Martinez got tape and a pen from a city worker and labeled them herself.

24. The City generally performs sweeps and other abatement activity on a near-weekly basis in publicly visible areas where the unhoused reside. As demonstrated by the *Kincaid* litigation and in light of the City's continuing abuses, reporters, advocates, and organized unhoused persons themselves are all fundamental to documenting and shining a light on official wrongdoing during this abatement activity. The Supreme Court has long recognized the necessity of such watchdogs: "many governmental processes operate best under public scrutiny."[10]

25. Just the presence of public observers at a location where an abatement sweep is taking place—including from the moment law enforcement, abatement officers, and other city workers and

---

[10] *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986).

contractors begin to interact with unhoused persons—is credited by the unhoused community and others with de-escalating conflict, compelling workers to act with greater care, and ensuring that proper procedures are followed with a reasonable amount of time given to pack up.  Indeed, as at least one Homeless Union member and unhoused person has observed: "these people would walk over us without Dez.  When she is there, she gets out her camera and they behave.  If someone's looking at you, you act different."  But the Ordinance, by cordoning people off from sweeps and other abatement activity, will have a negative and chilling impact on much of this protected advocacy, speech, expressive conduct, and association, and will interfere with other protected conduct as well, such as unhoused individuals' right to move freely in public spaces like encampments.  It will also likely increase the risk of harm to those targeted by the sweeps.

C. **Encampments Serve as a Symbol and a Sanctuary, Where Advocates and Homeless Union Members Play an Important Role**

26.    Despite the hardships that unhoused people endure, they also form meaningful "street families."  These families gather not only to find and create safer shelter, but also to pool resources and exchange food, water, and information.  Having such tight bonds helps people to provide mutual security, and—like any community—generally take care of one another.

27.    While unhoused people may form encampments to survive and stay safe, they also do so to send a powerful collective message about the housing crisis in Fresno and to visually demonstrate their lived struggle with housing insecurity.  Unhoused individuals, including members of the Homeless Union, send this message by, among other things, donning We Are Not Invisible and Homeless Union apparel in protest of the City's policies, particularly during sweeps.  They also reside and gather in and around public parks and other open spaces that are purposefully conspicuous to the public and City leaders.  Some of these public places include, but are not limited to, Pilibos Park, Roeding Park, and Chukchansi Park and even the public sidewalks in front of Poverello House, an area that the City tends to sweep daily.

28.    The locations where unhoused people choose to gather and find shelter constitute and convey a political statement about housing that cannot, and should not, be ignored.  Moreover, the tents that unhoused persons erect in these locations also convey a message recognized, both by the public and

numerous courts, as playing a symbolic role in protests.[11]  The fact that the City's treatment of its

unhoused population is one of the most pressing issues of concern, and a frequent focus of

demonstrations in Fresno, also provides significant context for these collective symbolic efforts.[12]

29.    Showing up and speaking at the site of an encampment furthers this powerful message

about Fresno's housing crisis.  Plaintiffs, Union members, and other advocates, organizers, and

unhoused people come together to convey solidarity with the unhoused and to protest the City's

dehumanizing treatment of the unhoused community.  Plaintiffs are frequently present in the

encampments organizing residents in support of the residents' own interests, sharing food, water, prayer,

rides, assistance, and information.  Plaintiffs also gather to break bread, which, like the tent, is a well-

recognized symbol of shared humanity dating back to biblical times.  As one member of the Homeless

Union puts it, "If we have it, we give it.  The broader community stereotypes you when you're

homeless.  They think you're the lowest.  We fight that by trying to build community, by cooking for

one another."  Mutual aid is also especially symbolic.  As another Union member who comes to

encampments during sweeps to help, to be seen, and to be heard, says: "If you don't speak up and

visualize who you are, they'll just walk around you.  I come out to see how people are and to help them.

If you don't speak up, you'll be unheard."

30.    Plaintiffs, as well as other advocates, organizers, and Union members in the community,

are instrumental in addressing the housing crisis in Fresno.  Ms. Martinez, for example, has been able to

build trust over many years by advocating on behalf of her unhoused neighbors and family.  As lead

organizer for the Homeless Union, she regularly visits encampments to distribute food, hygiene supplies,

and other essential aid to houseless people.  She also regularly connects unhoused people with City

services, directing people to shelter beds and free meal gatherings.  Other advocates and organizers

share this mission and sense of purpose.  One regular visitor to Fresno's encampments has publicly

---

[11] *See, e.g.*, *Watters v. Otter*, 955 F. Supp. 2d 1178, 1182 (D. Idaho 2013) ("Occupy Boise's tent city is a political protest of income inequality.  As such, it is express conduct covered by the First Amendment."); *cf. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293–94 (1984) (assuming without deciding that "symbolic tents [] may be expressive and part of the message delivered by [a] demonstration").

[12] *See, e.g.*, Cassandra Garibay, *'Urgency Isn't There.'  Fresno Renters, Unhoused Call on City to Address Housing Crisis Now*, The Fresno Bee (Mar. 4, 2022, updated Mar. 9, 2022), https://tinyurl.com/82srtcw2.

---

COMPLAINT FOR DECLARATORY                        12                    Case No.: _____
AND INJUNCTIVE RELIEF

explained the relationship as follows: the unhoused "people trust us . . . because we treat them like people and human beings."  Advocates, organizers, and Union members assist over the long term by reminding individuals of their civil rights, providing rides to medical and social-services appointments, and, as explained above, coming together to share meals, information, and other resources.

31.     Many advocates and organizers, including leaders and volunteers with Faith in the Valley, are motivated to do this work because their faith compels them to do so.  Faith in the Valley believes that "a different, better future is possible for the Central Valley . . . .  A future in which everyone is included, treated as sacred, has a chance to thrive and live a healthy, decent life."[13]  To make this future a reality, Faith in the Valley works directly with Fresno's unhoused persons, centering them in the organization's faith-led activism.  An outreach worker and advocate with Christ Helping Hands Ministry echoed a similar sentiment in public comments, explaining that she builds "relationships with [her] friends on these streets" through prayer and encouragement.  Because of her faith, this advocate states that she is willing to "assist[] with whatever needs to get done," including giving rides and even paying for motel rooms when individuals are displaced.  Similarly, a pastor from Fresno's Big Red Church publicly emphasized that, "Our church depends on advocates like Dez Martinez to live out our very basic commitment to our faith" and "treat our unhoused neighbors with . . . human dignity."

32.     The unhoused community echoes the importance of having trusted representatives, organizers, and advocates on site during sweeps, which are long and traumatic events, because that is "when they're needed most."  Known advocates and Homeless Union organizers provide a familiar face and are reliable defenders of those threatened with or experiencing a sweep.  They help to prevent escalation of aggressive abatement actions and the harm that often arises therefrom, and they also assist with communications between the targets of sweeps and the law enforcement, abatement officers, and other city workers and contractors conducting such sweeps and other abatement activity.  In particular, abatement crews typically start their work while unhoused individuals are still present at a site and gathering their belongings.  Crews often forcefully hurry and threaten them, disregarding their physical safety and seizing and destroying vital possessions, including personal documents, family memorabilia,

---

[13] *See* "Our Vision," Faith in the Valley, *available at* https://faithinthevalley.org/ (last accessed Mar. 16, 2022).

and life-saving medicines.  Union representatives, advocates, and others also help to protest, object to, and document any inhumane or unlawful treatment they witness.

33.     Not everyone can play the role of advocate or representative; only those who respect the organizing of unhoused people themselves and who have taken the time to build long-term, trusting relationships can play this role.  As one unhoused person pleaded with the City Council when discussing encampment sweeps: "If you guys take [our union representatives and advocates] away, we have nobody" because the City-run or -supported "programs don't listen."  Another Homeless Union member put it similarly, stating: when Ms. Martinez is not present, abatement crews come "with no warning and throw your stuff on the back of a trash truck—that tells you what they feel about you."  In other words, unhoused individuals want and need to be able to associate with the representatives and advocates of their choice, not the City's.

34.     Despite their vehement opposition to encampment sweeps, organizers, advocates, and reporters like Ms. Martinez, Mr. McCloskey, the Fresno Homeless Union, and volunteers of Faith in the Valley do not interfere with the legitimate functions of law enforcement, abatement officers, and other city workers and contractors.  Nor do they endanger anyone by being present during sweeps.  Instead, they increase public safety and reduce the risk of harm to all involved.  In addition to protecting the personal belongings and physical wellbeing of unhoused individuals and defusing potential negative interactions, advocates, organizers, and reporters make sweeps safer by witnessing and documenting official actions.  Plaintiffs want to continue playing this vital role during sweeps.  But the Ordinance, by cordoning people off from sweeps and other abatement activity, will have a negative and chilling impact on much of this protected advocacy, speech, expressive conduct, and association, and will interfere with other protected conduct as well, such as unhoused individuals' right to move freely in public spaces like encampments.

### D.    **Events Taking Place Just Prior to Amendment of the Ordinance**

35.     On January 4, 2022, Ms. Martinez learned that the City had directed several individuals, including a military veteran, who were living in makeshift shelters near the corner of Kings Canyon and South Clovis Avenue to pack up and leave the site.  The City had reportedly done so without offering any space in a shelter.  Ms. Martinez arrived at the location to find these individuals congregated in a

1  parking lot a short distance away.  She discovered that they had lost many of their belongings during the

2  site sweep and other abatement activity.  Although the abatement activity still seemed to be "taking

3  place," the site did not appear to be off-limits or behind any clearly demarcated barrier.

4      36.     As Ms. Martinez almost always does when monitoring sweeps and other abatement

5  activity, she used her cell phone to record what was happening.  Ms. Martinez approached an officer

6  with the Fresno Police Department to discuss the problematic manner in which the sweep had occurred.

7  During their discussion, which remained respectful and friendly at all times, Ms. Martinez noted that

8  semi-trucks had been allowed to park at the same location for an extended period of time, which she

9  believed to be a code violation.  She further pointed out the unfairness that "people get to park all the

10  time, but people don't get to live."  The officer suggested that Ms. Martinez raise her question with the

11  code enforcement officers onsite at the time.

12      37.     When Ms. Martinez approached the two men whom the officer had identified, they

13  refused to acknowledge who was in charge and both refused to speak with her so long as she was

14  recording their interaction.  Ms. Martinez attempted to engage the men further, at which point recorded

15  video footage shows that one of the men—later identified as Howard Lacy—laid his hands on Ms.

16  Martinez and covered her camera, forcefully stating, "we don't talk to the press."  Mr. Lacy was then

17  issued a Notice to Appear for misdemeanor battery under Penal Code § 242.  On information and belief,

18  Mr. Lacy is a City employee who has worked in some capacity for the Fresno Code Enforcement

19  Department for approximately 17 years.

20      **E.     The Proposed Ordinance and the Community Outcry Opposing It**

21      38.     On January 5, 2022, the day after the incident between Ms. Martinez and Mr. Lacy, the

22  City Attorney initiated legislative action to propose amending Section 10-616 at the upcoming City

23  Council meeting scheduled for January 13, 2022.[14]  Section 10-616 of the Fresno Municipal Code had

24  last been amended 20 years earlier in 2002.

25      39.     At the January 13, 2022 City Council Meeting, the City Attorney introduced an early

26  version of the Ordinance "to clarify limits on access to restricted areas where abatements are taking

27

28  ────────────────
[14] *See* City of Fresno Legislation Details (With Text) File # ID 22-98, *available at*
https://tinyurl.com/mwsmtzm7 (last accessed Mar. 16, 2022).

place." Prior to the proposed amendments, Section 10-616 had permitted only a "Director" to enter private property to abate a nuisance and also prohibited persons from interfering with this work or "any necessary act preliminary to or incidental to such work . . . ." Section 10-616 previously had not included an explicit reference to public property, created a restricted area, required authorization to enter such an area, or imposed criminal or civil penalties for an unauthorized entry.

40. The City Attorney's proposed amendments sought to extend the Director's authority to all "city employees or a contractor retained by the City" who were conducting nuisance abatement on both private and public property. The amendments also sought to allow "city employees or a retained contractor" to "designate a restricted area by erecting a barrier or cordon off an area of public or private property where an abatement is taking place." In addition, the amendments added new penalties for violations, stating that any violation would be "punishable either as a misdemeanor for intentional violations, or as an administrative citation with administrative penalty of up to $250 . . . ."

41. Numerous concerned citizens, advocates, and reporters, including Ms. Martinez, Mr. McCloskey, Fresno Homeless Union members, and Faith in the Valley organizers, provided public comments opposing the proposed amendments at the January 13, 2022 Council meeting. They explained the important roles that advocates and representatives for the unhoused, as well as other witnesses, serve during encampment sweeps to help de-escalate conflict, save personal property, and document abuses of authority. Many speakers, especially those from the unhoused community, commented that the work of advocates, representatives, and observers made them feel safer and bridged gaps in service that the City seemed unwilling or unable to provide, thereby constituting a great benefit to the City.

42. Plaintiffs and others told Councilmembers that, if the amendments were adopted, they feared they would be criminalized for providing compassionate and vital assistance, which they performed as an extension of their political beliefs, religious faith, and civic values. The speakers expressed confusion around the vagueness of what it means for "an abatement" to be "taking place" in the context of an encampment sweep. Speakers worried that they could be punished for trying to access a location to retrieve personal property, to help others safely pack up their belongings, or to assist their "street family" with other needs and information-sharing. Such confusion appears well-founded.

Section 10-616's pre-amendment language had made clear that the statute applies to "the work of abatement" as well as the performance of "any necessary act preliminary to or incidental to such work," and the proposed amendments failed to clarify whether the City was claiming authority to cordon off areas during "preliminary" and "incidental" abatement work and what such work might include during an encampment sweep.

43.     After public comment closed, Councilmembers and the City Attorney discussed the Council's concerns and questions "regarding discretion on the severity of penalties."  The Council thereafter continued discussion of the Ordinance to its next meeting.

44.     The City Council convened again on January 27, 2022, and a revised version of the proposed Ordinance appeared on the Consent Calendar.  Although Section 10-616 previously had not mentioned an "occupied location" or any type of "advocate," the revision that appeared in the January 27 version used these terms to clearly implicate encampment sweep activity.  This revision read: "Subject to particular restrictions mandated by safety concerns or emergency procedures, prior to any abatement taking place at an occupied location, those persons authorized to provide services to the occupants or advocate on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured as provide herein."

45.     Statements by Councilmembers suggest that they considered this revision as a way of protecting advocates for the unhoused community.  But this proposed "safety valve" did not quell concerns.  Among other issues, the new language appeared to single out for special treatment an undefined category of advocates who needed to be vetted for authorization in some unspecified way, inviting arbitrary and discriminatory enforcement by city workers and abatement officers.

46.     Public comments by Ms. Martinez, Mr. McCloskey, and Faith in the Valley, as well as many others, explained why the proposed Ordinance remained an overbroad, "anti-Dez," anti-advocate measure that risked impairing important work and restricting protected activities through the threat of criminal sanctions.  They reemphasized the important role that advocates, representatives, Union organizers, and witnesses serve during encampment sweeps to ensure fair treatment of unhoused people, a role which serves to increase public safety—not compromise it.  As an example, one unhoused person told the Council about the destruction that she had experienced and witnessed during the encampment

sweeps, bemoaning the loss of precious items, including the ashes of a loved one, as well as her belief

that the encampment sweeps were safer when witnesses were present and cameras rolling.

47.     In addition, speakers for the Homeless Union read aloud a letter opposing the Ordinance.

That letter, together with a further submission from the Regional Advisor of Faith in the Valley, now

comprise the City Council's official "Email / eComment Report," a true and correct copy of which is

available in the City's public records.[15]   The Homeless Union's letter expressly stated that the Ordinance

violated, on its face, state and federal constitutional law and advised the Council that, if the Ordinance

were to pass as proposed, all available legal remedies would be pursued, "including application for a

temporary restraining order and preliminary injunction barring its enforcement."

48.     At the next City Council meeting on February 10, 2022, the Ordinance was reintroduced.

Many members of the public, again spoke against the Ordinance, including unhoused persons, advocates

for the unhoused community like Ms. Martinez, Mr. McCloskey, and representatives of Faith in the

Valley and the Homeless Union, students, a pastor, a church volunteer, a professor, and numerous

others.  Their message to the City Council echoed prior comments in opposition to the Ordinance,

explaining that the proposed amendments risked criminalizing people who provide vital assistance when

the City's processes and services fall short.  In particular, the speakers expressed renewed concerns that

the Ordinance was so vague and overbroad that, to avoid criminal sanctions and financial penalties, they

would have to restrain themselves from exercising their fundamental rights and engaging in important

and protected activities during sweeps, like associating with and advocating for unhoused community

members and observing and documenting law enforcement, abatement officers, and other city workers

and contractors performing their duties in public.

49.     After public comment on the Ordinance closed, the City Attorney discussed a revision

performed at the direction of the Council, whereby the word "authorized" was deleted from the

following sentence: "Subject to particular restrictions mandated by safety concerns or emergency

procedures, prior to any abatement taking place at an occupied location, those persons ~~authorized~~ to

---

[15] Fresno City Council, Email / eComment Report re: File ID 22-200, 1-C, *available at*
https://tinyurl.com/fxdwwv76 (last accessed Mar. 16, 2022).

provide services to the occupants or advocate on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured as provided herein."

50.     Despite removing the word "authorized" from this particular sentence, the proposed amendments still contained fatal flaws.  The amendments, for example, continued to include provisions regarding "authorization" that would allow city employees and contractors to arbitrarily decide who to permit, exclude, or punish for entering an abatement area.  Specifically, the amendments read: "No person shall enter the restricted area without express authorization from city employees or contractor [sic] on site conducting the abatement."

51.     In addition, the amendments still purported to grant some sort of special, early authorized access to those persons—and only those persons—who were "providing services to the occupants or advocating on their behalf" even though those persons, and the public, already should have had the right to move freely on public property that was not yet secured.  This "prior to" period also compounded the ambiguity as to what it meant for an abatement to be "taking place," when that abatement activity was supposed to start and end, and what size area it was supposed to cover.  The amendments still also contained the preamble—"subject to particular restrictions mandated by safety concerns or emergency procedures," which rendered the remainder of that paragraph's protection illusory.  Lastly, the amendments continued to impose penalties for "unauthorized entry" as "a misdemeanor for intentional violations" or as an administrative citation resulting in fines of up to $250.  The City Council voted to adopt the Ordinance as amended.

52.     The Ordinance came up for a final vote at the City Council meeting held on February 17, 2022.  Once again, Ms. Martinez, Mr. McCloskey, Faith in the Valley, Homeless Union members, and others provided public comments opposing the Ordinance.  These statements reprised Plaintiffs' prior fears about the Ordinance's overbreadth and vagueness and their concern that the Ordinance would penalize their protected rights to provide representation, aid, advocate, speak, observe, record, and move freely.  The Ordinance nonetheless passed as an item on the Consent Calendar.  The Mayor did not take specific action following the Council's vote and thus, by operation of the Fresno City Charter § 605(d), the Ordinance was approved on February 28.  The Ordinance has an effective date of March 31.

//

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
**State-Created Danger**
**(Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)**

53.  Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

54.  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Substantive Due Process protects against government action that "affirmatively place[s] the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (alteration in original) (internal quotation marks, citation omitted).

55.  The Ordinance gives the City the power to completely cut off public access to what it designates an "area . . . where an abatement is taking place" absent "express authorization" from law enforcement, abatement officers, and other city employees and contractors.  By restricting the ability of advocates, representatives, journalists, and concerned members of the public to observe and record City officials sweeping encampments and by preventing them from providing otherwise lawful assistance or representation, the City affirmatively places unhoused members of the Fresno Homeless Union and other unhoused individuals in known or obvious danger.  Public scrutiny is an important deterrent to excessive use of force and property destruction.  Without the safeguards of accountability and transparency and without witnesses on hand, there will be greater risk of escalated conflict, severe physical abuse, injury, and death.

56.  Cutting off Plaintiffs from their unhoused community and cutting off unhoused people from their advocates and Union representatives with whom they wish to associate, will also likely lead to unsafe conditions by increasing the likelihood that life-sustaining items, such as tarps, tents, blankets, medicines, and mobility devices, will be destroyed.  As described *supra*, advocates, representatives, and other eyewitnesses serve as a powerful deterrent against abuse.  The Ordinance removes that deterrent.  By design, the Ordinance shields from public scrutiny the City's abatement sweeps and removes from the scene those witnesses who would otherwise protect the rights and property of those most directly and

negatively impacted by sweeps—opening the door to more frequent, aggressive, and ultimately destructive abatements.

57.     By conducting abatement sweeps at homeless encampments without the watchful eyes of Union representatives, advocates, and other would-be witnesses, the City will act in reckless disregard for unhoused individuals' safety, affirmatively placing members of the Fresno Homeless Union and other unhoused individuals in known or obvious danger.

**SECOND CLAIM FOR RELIEF**
**State-Created Danger**
**(Article I, Section 7 of the California Constitution)**

58.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

59.     Article I, section 7 of the California Constitution provides that a "person may not be deprived of life, liberty, or property without due process of law."  Substantive Due Process protects against government action that affirmatively places an individual in a position of danger that he or she would not have otherwise faced.

60.     The Ordinance gives the City the power to completely cut off public access to what it designates an "area . . . where an abatement is taking place" absent "express authorization" from law enforcement, abatement officers, and other city employees and contractors.  By restricting the ability of advocates, representatives, journalists, and concerned members of the public to observe and record City officials sweeping encampments and by preventing them from providing otherwise lawful assistance or representation, the City affirmatively places unhoused members of the Fresno Homeless Union and other unhoused individuals in known or obvious danger.  Public scrutiny is an important deterrent to excessive use of force and property destruction.  Without the safeguards of accountability and transparency and without witnesses on hand, there will be greater risk of escalated conflict, severe physical abuse, injury, and death.

61.     Cutting off Plaintiffs from their unhoused community and cutting off unhoused people from their advocates and Union representatives with whom they wish to associate, will also likely lead to unsafe conditions by increasing the likelihood that life-sustaining items, such as tarps, tents, blankets, medicines, and mobility devices, will be destroyed.  As described *supra*, advocates, representatives, and

other eyewitnesses serve as a powerful deterrent against abuse.  The Ordinance removes that deterrent. By design, the Ordinance shields from public scrutiny the City's abatement sweeps and removes from the scene those witnesses who would otherwise protect the rights and property of those most directly and negatively impacted by sweeps—opening the door to more frequent, aggressive, and ultimately destructive abatements.

62.    By abating conducting abatement sweeps at homeless encampments without the watchful eyes of Union representatives, advocates, and other would-be witnesses, the City will act in reckless disregard for unhoused individuals' safety, affirmatively placing members of the Fresno Homeless Union and other unhoused individuals in known or obvious danger.

**THIRD CLAIM FOR RELIEF**
**Violation of Freedom of Speech and Assembly**
**(First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

63.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

64.    The First Amendment, as applied to state and local government agencies and officials by the Fourteenth Amendment, prohibits government entities from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . . ."  The First Amendment protects the rights to advocate and protest, observe and record public officials engaged in the public discharge of their duties, and assemble and engage in expressive association.  The Ordinance is substantially overbroad on its face and impermissibly burdens these protected speech, expressive conduct, and associational rights.

65.    The Ordinance applies to homeless encampments located in public places historically associated with the free exercise of speech and expressive activities, such as parks, sidewalks, and streets.  These places are considered traditional public forums.

66.    The government's right to limit protected First Amendment activity in a traditional public forum "is sharply circumscribed" for both content-based and content-neutral restrictions.  *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1988) (internal quotation marks, citation omitted).

67.    The Ordinance is an unconstitutional content-based regulation of speech and expression. Although facially content neutral, the Ordinance was adopted for a content-based purpose: the City's

"disagreement" with advocates' and representatives' exercise of their First Amendment speech, expression, and associational rights, including to protest, observe, and record officials sweeping encampments in public. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 166, 164 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. The Ordinance is not narrowly tailored to further a government interest.

68.     Even if considered content neutral, the Ordinance violates the First Amendment as an unreasonable time, place, and manner restriction that impermissibly burdens protected speech, expression, and associational rights in a public forum. A time, place, and manner restriction for a public forum must be narrowly tailored to serve a significant government interest, leave open ample alternative channels for expression, and—where, as here, the restriction requires advance governmental authorization—not delegate overly broad discretion to officials. *Kaahumanu v. Hawaii*, 682 F.3d 789, 802–03 (9th Cir. 2012). The Ordinance fails to satisfy these requirements. By requiring "express authorization" to enter an area subject to abatement, including a homeless encampment located in a traditional public forum like a park or a sidewalk, the Ordinance delegates overly broad discretion to law enforcement, abatement officers, and city workers. The Ordinance is also not narrowly tailored because it burdens substantially more speech, expressive conduct, and association than necessary and does not leave open alternative channels for expression.

69.     Under the prior restraint doctrine, "a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials." *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (internal quotation marks, citation omitted). The Ordinance is an unconstitutional prior restraint because it requires advance "express authorization" to enter an abatement area, including when that area is in a traditional public forum, and vests law enforcement, abatement officers, and other city workers and contractors with sweeping discretion to arbitrarily suppress speech, expression, and associational rights. Such limitless discretion inherently creates an unacceptable risk of viewpoint discrimination, regardless of whether or how it is in fact exercised. *Kaahumanu*, 682 F.3d at 806.

70.     The City is violating or imminently will violate the First Amendment by enforcing the Ordinance against protected speech, expressive conduct, and association.

71.     When abatement sweeps occur, Plaintiffs would like to continue their protected First Amendment speech, expression, and association in areas—including homeless encampments located in traditional public forums—where they would likely be excluded under the Ordinance.  The City's actions have and will continue to chill, deter, and infringe Plaintiffs' First Amendment free speech, expression, and associational rights in a traditional public forum.

**FOURTH CLAIM FOR RELIEF**
**Violation of Freedom of Speech and Assembly**
**(Article I, Sections 2 and 3 of the California Constitution)**

72.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

73.     The California Constitution, Article I, section 2 prohibits laws that "restrain or abridge liberty of speech or press."  The liberty of speech provision in California's Constitution "is at least as broad as and in some way is broader than the comparable provision of the federal Constitution's First Amendment."  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 958–59 (2002) (internal quotation marks, citations omitted).  The California Constitution, Article I, section 3 protects the right to "assemble freely to consult for the common good."

74.     The standards for evaluating whether a regulation is content based and whether a content-based regulation is constitutional are similar under federal and state law.  *See Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1155–56 (9th Cir. 2003).  As under the United States Constitution, the Ordinance is a content-based regulation of protected speech, expressive conduct, and association that is not narrowly tailored to serve a compelling state interest.

75.     The standard for evaluating time, place, and manner restrictions on protected speech and assembly rights in a public forum is similar under federal and state law.  *Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019) (citing *Dulaney v. Mun. Court*, 11 Cal. 3d 77, 84–85 (1974)); *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 48 Cal. 4th 446, 456–57 (2010)) (freedom of speech); *Chambers v. Mun. Court*, 65 Cal. App. 3d 904, 908 (1977) (right to freely assemble and associate).  As under the United States Constitution, the Ordinance is not a reasonable

time, place, and manner restriction on protected speech, expressive conduct, and association in a traditional public forum under the California Constitution.  By requiring "express authorization" to enter an area subject to abatement, including a homeless encampment located in a traditional public forum like a park or sidewalk, the Ordinance delegates overly broad discretion to law enforcement, abatement officers, and other city workers and contractors.  The Ordinance is also not narrowly tailored because it burdens substantially more speech, expressive conduct, and association than necessary and does not leave open alternative channels for expression.

76.     The standard for evaluating the validity of a prior restraint is similar under federal and state law.  *See Molinaro v. Molinaro*, 33 Cal. App. 5th 824, 832 (2019).  A law cannot condition the free exercise of liberty of speech rights on the "unbounded discretion" of government officials.  *People v. Fogelson*, 21 Cal. 3d 158, 166 (1978).  The Ordinance is an unconstitutional prior restraint because it requires advance "express authorization" to enter an abatement area, including when that area is in a traditional public forum, and vests law enforcement, abatement officials, and other city workers and contractors with sweeping discretion to arbitrarily suppress speech, expressive conduct, and associational rights.  Such "unbounded discretion" creates an unacceptable risk that officials will "base their determination on the content of the ideas sought to be expressed." *Id.* at 166 (internal quotation marks, citation omitted).

77.     The City is violating or imminently will violate Article I, sections 2 and 3 of the California Constitution by enforcing the Ordinance against protected speech, expressive conduct, and association.

78.     When abatement sweeps occur, Plaintiffs would like to continue their protected First Amendment speech, expression, and association in areas—including homeless encampments located in traditional public forums—where they would likely be excluded under the Ordinance.  The City's actions have and will continue to chill, deter, and infringe Plaintiffs' liberty of speech, expressive conduct, and associational rights in a traditional public forum.

//

//

//

## FIFTH CLAIM FOR RELIEF
### Substantive Due Process—Void for Vagueness
### (Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)

79.     Plaintiffs incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

80.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  To satisfy Substantive Due Process, a municipal ordinance must be sufficiently definite to provide adequate notice of the conduct proscribed and sufficient guidelines for officials so that arbitrary and discriminatory enforcement does not occur.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  When First Amendment rights are at stake, an even greater degree of specificity is required to ensure that ambiguity does not chill protected speech and expression.  *Id.* at 253–54.

81.     The Ordinance fails to provide adequate notice of the conduct proscribed because it relies on ambiguous and undefined terms.  Section (b)(1) of the Ordinance prohibits unauthorized entry into a "restricted area" "where an abatement is taking place" and "while an abatement is in progress."  The Ordinance fails to define what activities constitute abatement, when that abatement activity "is in progress," and how wide a perimeter will be established around "where" abatement is "taking place."  The restriction on entry is particularly vague because the pre-amendment language in section (b) makes clear that the statute applies to "the work of abatement" as well as "any necessary act preliminary to or incidental to such work"—an application so broad as to have no limits at all.

82.     In addition, under the Ordinance, persons shall not "obstruct, impede or interfere with any officer, employee, contractor or authorized representative of the city" engaged in that boundless range of abatement work—but "obstruct, impede, or interfere" is likewise not defined.  Moreover, while the Ordinance purports to allow limited access "prior to an area being secured" to "persons providing services to the occupants or advocating on their behalf," the Ordinance conditions that access on vague "particular restrictions mandated by safety concerns or emergency procedures."  It also does not explain how this category of persons will be identified or why they, or anyone else, would need statutory permission to any public area that has not yet been "secured"—further compounding the ambiguity of when an abatement is "taking place."  Finally, although the type of punishment varies depending on

1  whether the violation is "intentional," the Ordinance fails to clarify the difference between "intentional"

2  and unintentional violations.

3       83.     Furthermore, the Ordinance fails to provide adequate guidelines or standards so as to

4  prevent arbitrary and discriminatory enforcement.  For example, although the Ordinance vests law

5  enforcement, abatement officers, and other city workers and contractors with discretionary authority to

6  create a restricted abatement area "[t]o protect [] health and safety," the Ordinance provides no guidance

7  on when a restriction will protect health and safety or what standards guide that determination.  In

8  addition, the Ordinance mandates "express authorization from city employees or contractor[s] on site" to

9  enter a restricted area but does not explain how to obtain authorization or what standards will guide

10  whether authorization is granted.  And, as explained *supra*, the Ordinance provides no clarity on who

11  will determine who is a "person[] providing services to the occupants or advocating on their behalf"

12  entitled to some preliminary but undefined access and how those unidentified officials will make that

13  determination.  Thus, under the Ordinance, law enforcement, abatement officers, and other city workers

14  and contractors will be able to arbitrarily decide who to authorize, exclude, and punish for entering an

15  abatement area.

16       84.     The Ordinance should therefore be declared unconstitutionally vague on its face in

17  violation of Substantive Due Process protections under the Fourteenth Amendment to the U.S.

18  Constitution.

19  **<u>SIXTH CLAIM FOR RELIEF</u>**
   **Substantive Due Process—Void for Vagueness**

20  **(Article I, Section 7 of the California Constitution)**

21       85.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though

22  fully set forth herein.

23       86.     Article I, section 7 of the California Constitution provides that a "person may not be

24  deprived of life, liberty, or property without due process of law."  To satisfy Substantive Due Process, a

25  municipal ordinance must be sufficiently definite to provide adequate notice of the conduct proscribed

26  and provide sufficient guidelines for officials so that arbitrary and discriminatory enforcement does not

27  occur. *Williams v. Garcetti*, 5 Cal. 4th 561, 567–68 (1993).  When First Amendment rights are at stake,

28

an even greater degree of specificity is required to ensure that ambiguity does not chill protected speech. *Franklin v. Leland Stanford Junior Univ.*, 172 Cal. App. 3d 322, 347 (1985).

87.    The Ordinance fails to provide adequate notice of the conduct proscribed because it relies on ambiguous and undefined terms.  Section (b)(1) of the Ordinance prohibits unauthorized entry into a "restricted area" "where an abatement is taking place" and "while an abatement is in progress."  The Ordinance fails to define what activities constitute abatement, when that abatement activity "in progress," and how wide a perimeter will be established around "where" abatement is "taking place."  The restriction on entry is particularly vague because the pre-amendment language in section (b) makes clear that the statute applies to "the work of abatement" as well as "any necessary act preliminary to or incidental to such work"—an application so potentially broad as to have no limits at all.

88.    In addition, under the Ordinance, persons shall not "obstruct, impede or interfere with any officer, employee, contractor or authorized representative of the city" engaged in that boundless range of abatement work—but "obstruct, impede, or interfere" is not defined either.  Moreover, while the Ordinance purports to allow limited access "prior to an area being secured" to "persons providing services to the occupants or advocating on their behalf," the Ordinance conditions that access on vague "particular restrictions mandated by safety concerns or emergency procedures."  It also does not explain how this category of persons will be identified or why they, or anyone else, would need statutory permission to a public area that has not yet been "secured"—further compounding the ambiguity of when an abatement is "taking place."  Finally, although the type of punishment varies depending on whether the violation is "intentional," the Ordinance fails to clarify the difference between "intentional" and unintentional violations.

89.    Furthermore, the Ordinance fails to provide adequate guidelines or standards so as to prevent arbitrary and discriminatory enforcement.  For example, although the Ordinance vests law enforcement, abatement officers, and other city workers and contractors with discretionary authority to create a restricted abatement area "[t]o protect [] health and safety," the Ordinance provides no guidance on when a restriction will protect health and safety or what standards guide that determination.  In addition, under the Ordinance, "No person shall enter the restricted area without express authorization from city employees or contractor[s] on site conducting the abatement."  But the Ordinance does not

explain the process for obtaining express authorization or the standards for weighing whether to grant

such authorization.  Thus, under the Ordinance, law enforcement, abatement officers, and other city

workers and contractors will be able to arbitrarily decide who to authorize, exclude, and punish for

entering an abatement area.

90.     The Ordinance should therefore be declared unconstitutionally vague on its face in

violation of Substantive Due Process protections under Article I, section 2 of the California Constitution.

**SEVENTH CLAIM FOR RELIEF**
**Right to Free Movement and Travel**
**(Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)**

91.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though

fully set forth herein.  Even before the adoption of the U.S. Constitution, residents of all states have

"possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within

the limits of their respective states, to move at will from place to place therein, and to have free ingress

thereto and egress therefrom . . . ."  *United States v. Wheeler*, 254 U.S. 281, 293 (1920).  The

fundamental right to travel and to "peacefully dwell," although not explicitly enumerated in the U.S.

Constitution, has been consistently recognized by the courts and has been found to be embedded within

the Commerce Clause and the Privileges and Immunities, Due Process, and Equal Protection Clauses of

the Fourteenth Amendment.  Although sometimes referred to in shorthand fashion as a "right to travel"

or "right to freedom of movement," this fundamental right encompasses not only both intrastate and

interstate travel, but also the right to remain, free from disturbance, in the place where one has arrived.

92.     Because the right of freedom of movement is a fundamental right, under the Equal

Protection Clause of the Fourteenth Amendment to the U.S. Constitution, any ordinance restricting

exercise of that right is "presumptively invidious" and is invalid unless the government can prove the

restriction has been "precisely tailored to serve a compelling governmental interest."  *Plyler v. Doe*, 457

U.S. 202, 216–17 (1982).

93.     By requiring "express authorization" to enter an abatement area in a public place, the

Ordinance interferes with the right to move freely and is not precisely tailored to serve a compelling

interest.

//

**EIGHTH CLAIM FOR RELIEF**
**Right to Free Movement and Travel**
**(Article I, Sections 7 and 24 of the California Constitution)**

94.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

95.    The California Constitution, Article I, sections 7 and 24, protects the right to travel and freedom of movement.  "[T]he right to intrastate travel (which includes intramunicipal travel) is a basic human right . . . . implicit in the concept of a democratic society . . . ."  *In re White*, 97 Cal. App. 3d 141, 148 (1979).  "This personal liberty consists in the power of locomotion, of changing situation or moving one's person to whatever place one's inclination may direct, without imprisonment or restraint."  *Id.* at 149 (citation omitted).

96.    Because the right of freedom of movement is a fundamental right, under the Equal Protection Clause of the California Constitution, any ordinance restricting exercise of that right "should be regarded with skepticism.  If available alternative means exist which are less violative of the constitutional right and are narrowly drawn so as to correlate more closely with the purposes contemplated, those alternatives should be used."  *Id.* at 150.

97.    By requiring "express authorization" to enter an abatement area in a public place, the Ordinance interferes with the right to move freely.  There are available alternative means that further and are more closely correlated with the City's interests in health and safety that are less violative of the right of freedom of movement.

**NINTH CLAIM FOR RELIEF**
**Preemption**
**(Article XI, Sections 5 and 7 of the California Constitution)**

98.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

99.    The California Constitution, Article XI, section 7, provides that a "city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  Under the "home rule" doctrine, Article XI, section 5 reserves to charter cities, such as Fresno, the right to adopt and enforce ordinances that conflict with general state laws so long as the subject of the regulation is a "municipal affair" rather than one of "statewide concern."

100. There is an actual or genuine conflict between the California Government Tort Claims Act and the Ordinance. "A conflict between state law and an ordinance exists if the ordinance duplicates or is coextensive therewith, is contradictory or inimical thereto, or enters an area either expressly or impliedly fully occupied by general law." *Am. Fin. Servs. Ass'n v. City of Oakland*, 34 Cal. 4th 1239, 1251 (2005). The California Government Tort Claims Act prohibits a public entity from enacting an ordinance "expanding its statutory immunities." *Societa per Azioni de Navigazione Italia v. City of Los Angeles*, 31 Cal. 3d 446, 463 (1982). The Ordinance expands its statutory immunity by immunizing the City's officers, agents, contractors, and employees from "personal liability for any damage occurred or alleged to have be[en] incurred as a result of any act required, permitted or authorized to be done or performed in the discharge of his duties pursuant to" the Ordinance.

101. The Ordinance impacts a subject of statewide concern rather than purely municipal affairs because liability under the California Government Tort Claims Act "is a matter of general state concern." *Id.* (internal quotation marks, citation omitted).

102. Because the Ordinance conflicts with state law that regulates a subject of statewide concern, Section (c) of the Ordinance is preempted and void.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request the following relief:

1. Declare that Fresno Municipal Code Section 10-616 violates the First and Fourteenth Amendments of the U.S. Constitution; and Article I, sections 2 and 3 of the California Constitution;

2. Declare that the Fresno Municipal Code Section 10-616 is void and unenforceable under the Fourteenth Amendment of the U.S. Constitution; and Article I, sections 7 and 24 of the California Constitution;

3. Declare that the Fresno Municipal Code Section 10-616 is void because it conflicts with the California Government Tort Claims Act and is thus preempted under Article XI, sections 5 and 7 of the California Constitution;

4. Issue a preliminary and permanent injunction prohibiting the City from enforcing Fresno Municipal Code Section 10-616; prohibiting the City from issuing any administrative citations or from prosecuting any criminal sanctions under Section 10-616; and further directing the City to cease all

efforts to conduct nuisance abatements pursuant to Section 10-616 until a lawful authorizing ordinance is adopted;

     5.    Award Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, Cal. Civ. Code § 52, and Cal. Civ. Proc. Code § 1021.5;

     6.    Order such other and further relief that the Court deems just and proper.

Dated:      March 16, 2022          Respectfully submitted,

                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, INC.

                        ***/s/ Chessie Thacher***
                        Chessie Thacher (SBN 296767)
                        Hannah Kieschnick (SBN 319011)
                        Angelica Salceda (SBN 296152)
                        Shilpi Agarwal (SBN 270749)

                        CALIFORNIA HOMELESS UNION STATEWIDE ORGANIZING COUNCIL LAW OFFICES OF ANTHONY D. PRINCE

                        ***/s/ Anthony Prince*** **(authorized March 16, 2022)**
                        Anthony Prince (SBN 202892)

                        *Attorneys for Plaintiffs*

# EXHIBIT A



BILL NO. _____ B-2 _____

ORDINANCE NO. __ 2022-002 __

AN ORDINANCE OF THE CITY OF FRESNO, CALIFORNIA, AMENDING SECTION 10-616 OF THE FRESNO MUNICIPAL CODE

SECTION 1. Section 10-616 of the Fresno Municipal Code is amended to read

SECTION 10-616. ADMINISTRATIVE ABATEMENT.

(a)  Abatement of the nuisance may in the discretion of the Director be performed by city forces or by a contractor retained pursuant to the provisions of this Code.

(b)  [City employees or a contractor retained by the City] The Director may enter upon private [or public] property to abate the nuisance pursuant to the provisions of this article. No person shall obstruct, impede or interfere with any officer, employee, contractor or authorized representative of the city whenever such person is engaged in the work of abatement, pursuant to the provisions of this article, or in performing any necessary act preliminary to or incidental to such work or authorized or directed pursuant to this article.

[(1) To protect the health and safety of the public and city employees while an abatement is in progress, city employees or a retained contractor may designate a restricted area by erecting a barrier or cordon off an area of public or private property where an abatement is taking place. No person shall enter the restricted area without express authorization from city employees or contractor on site conducting the abatement.

1 of 3



      (2)    Subject to particular restrictions mandated by safety concerns or emergency procedures, prior to any abatement taking place at an occupied location, those persons providing services to the occupants or advocating on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured as provided herein;

    (3) Unauthorized entry into the restricted area or other violation of this section shall be punishable either as a misdemeanor for intentional violations, or as an administrative citation with administrative penalty of up to $250 pursuant to Section 1-308, at the election of the City Attorney; prior to any person being cited for either a misdemeanor or administrative citation, first a verbal warning shall be provided to vacate the area with opportunity to comply.]

(c)    No officer, agent, [contractor] or employee of the city shall be personally liable for any damage incurred or alleged to be incurred as a result of any act required, permitted or authorized to be done or performed in the discharge of his duties pursuant to this article.

(d)    The Director may charge an hourly fee, as established in the Master Fee Schedule, for the enforcement of this ordinance.

(e)    Upon completion of the abatement, the costs of abatement may be collected under the provisions of Chapter 1, Article 5 of this Code.

SECTION 2.  This ordinance shall become effective and in full force and effect at 12:01 a.m. on the thirty-first day after its final passage.

\* \* \* \* \* \* \* \* \* \* \* \* \*



STATE OF CALIFORNIA   )
COUNTY OF FRESNO    ) ss.
CITY OF FRESNO      )

I, TODD STERMER, City Clerk of the City of Fresno, certify that the foregoing ordinance was adopted by the Council of the City of Fresno, at a regular meeting held on the ____17th____ day of ____February____ 2022.

AYES    :Soria, Karbassi, Arias, Chavez, Bredefeld, Esparza
NOES    :None
ABSENT  :Maxwell
ABSTAIN :None

Mayor Approval: _____ N/A _____, 2022
Mayor Approval/No Return: _____ February 28th _____, 2022
Mayor Veto: _____ N/A _____, 2022
Council Override Veto: _____ N/A _____, 2022

TODD STERMER, CMC
City Clerk

BY: _____  3/2/2022
    Deputy                      Date

APPROVED AS TO FORM:
DOUGLAS T. SLOAN
City Attorney

BY: _____  3/1/22
    Christina Roberson        Date
    Assistant City Attorney

February 18, 2022

Council Adoption: 02/17/2022
Mayor Approval:
Mayor Veto:
Override Request:

TO:        JERRY DYER

FROM      TODD STERMER, CMC
          City Clerk

SUBJECT:  TRANSMITTAL OF COUNCIL ACTION FOR APPROVAL OR VETO

At the City Council meeting of February 17, 2022 Council adopted the attached Bill No. B-2, Ordinance No. 2022-002, entitled **\*\*\*BILL No. 2 (Re-intro'd 2/10/2022) (For Adoption) - Amending Administrative Abatement, FMC section 10-616, to clarify limits on access to restricted areas where abatements are taking place (Subject to Mayor's Veto).** Item 1-B, File ID 22-316, by the following vote:

| | | |
|---|---|---|
| Ayes | : | Soria, Karbassi, Arias, Chavez, Bredefeld, Esparza |
| Noes | : | None |
| Absent | : | Maxwell |
| Abstain | : | None |

Please indicate either your formal approval or veto by completing the following sections and executing and dating your action. Please file the completed memo with the Clerk's office on or before February 28, 2022. In computing the ten day period required by Charter, the first day has been excluded and the tenth day has been included unless the 10th day is a Saturday, Sunday, or holiday, in which case it has also been excluded. Failure to file this memo with the Clerk's office within the required time limit shall constitute approval of the ordinance, resolution or action, and it shall take effect without the Mayor's signed approval.

**APPROVED /NO RETURN:** _____

**VETOED** for the following reasons: (Written objections are required by Charter; attach additional sheets if necessary.)

_____
_____

_____          Date: _____

Jerry Dyer, Mayor
**COUNCIL OVERRIDE ACTION:**          Date: _____
Ayes      :
Noes      :
Absent    :
Abstain   :

CITY CLERK COPY