Chessie Thacher (SBN 296767)
  cthacher@aclunc.org
Hannah Kieschnick (SBN 319011)
  hkieschnick@aclunc.org
Angelica Salceda (SBN 296152)
  asalceda@aclunc.org
Shilpi Agarwal (SBN 270749)
  sagarwal@aclunc.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478

*Attorneys for Plaintiffs*

Anthony Prince (SBN 202892)
  princelawoffices@yahoo.com
General Counsel, California Homeless Union
LAW OFFICES OF ANTHONY D. PRINCE
2425 Prince Street, Suite 100
Berkeley, CA 94705
Telephone: (510) 301-1472

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

DESIREE MARTINEZ, FRESNO HOMELESS UNION, FAITH IN THE VALLEY, and ROBERT MCCLOSKEY,

        Plaintiffs,

v.

THE CITY OF FRESNO,

        Defendant.

Case No. 1:22-cv-00307-DAD-SAB

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Judge:     Judge Drozd
Date:      May 17, 2022
Time:      9:30 a.m.
Courtroom: 5

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................3

INDEX OF DECLARATIONS ..............................................................................................7

INTRODUCTION ..................................................................................................................8

STATEMENT OF FACTS ......................................................................................................9

I.      Fresno's Housing and Displacement Crisis ..............................................................9

II.     Plaintiffs Document the City's Sweeps and Assist, Organize, and Protect the Unhoused .......9

III.    Fresno's Long-Standing Hostility Toward the Unhoused Community ....................11

IV.     Encampments Provide a Stage for Community, Expressive Acts, and Collective Action ......13

V.      Advocates, Union Members, and Reporters Play a Vital Role During Sweeps ......14

VI.     Events Leading up to the Ordinance and its Adoption by the City Council ...........16

ARGUMENT .......................................................................................................................17

I.      The Ordinance Exposes Plaintiffs to State-Created Danger and, Without an Injunction, Plaintiffs Are Likely to Suffer Imminent and Irreparable Harm ...............18

II.     Plaintiffs Are Likely to Succeed on the Merits of All Their Claims ......................21

        A.      The Ordinance unconstitutionally restricts protected expression and activity. ............21

                1.      The Ordinance interferes with First Amendment expression ...........21

                2.      The Ordinance is unconstitutional as either a content-based restriction or an unreasonable time, place, and manner restriction and prior restraint ..................24

                3.      The Ordinance is content based and fails strict scrutiny .................24

                4.      Even if content neutral, the Ordinance unreasonably burdens protected expression and activity..................26

        B.      The Ordinance is void for vagueness because it lacks specificity and standards..........29

        C.      The Ordinance is preempted because it conflicts with state law that regulates a subject of statewide concern ...................30

III.    The Balance of Equities and Public Interest Favor an Injunction ...........................31

CONCLUSION......................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................ 17

*Am. Fin. Servs. Ass'n v. City of Oakland*,
   34 Cal. 4th 1239 (2005) ....................................................................... 31

*Askins v. U.S. Dep't of Homeland Sec.*,
   899 F.3d 1035 (9th Cir. 2018) .......................................................... 22, 24

*Bay Area Peace Navy v. United States*,
   914 F.2d 1224 (9th Cir. 1990) .......................................................... 27, 28

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009) ............................................................... 26

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*,
   573 F. Supp. 2d 1291 (C.D. Cal. 2008) ................................................ 32

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .............................................................................. 25

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ........................................................... 21, 27

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
   235 F. Supp. 3d 1132 (E.D. Cal. 2017) .................................................. 9

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ........................................................... 18, 20

*Edge v. City of Everett*,
   929 F.3d 657 (9th Cir. 2019) ................................................... 26, 29, 30

*Elrod v. Burns*,
   427 U.S. 347 (1976) ......................................................................... 18, 20

*Forsyth Cnty. v. Nationalist Movement*,
   505 U.S. 123 (1992) .............................................................................. 28

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   11 F.4th 1266 (11th Cir. 2021) ........................................................ 28, 29

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   901 F.3d 1235 (11th Cir. 2018) ............................................................ 23

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ................................................................ 29

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ................................................................................................ 27

*Galvin v. Hay*,
    374 F.3d 739 (9th Cir. 2004) ................................................................................... 28

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................................ 29

*Haggis v. City of Los Angeles*,
    22 Cal. 4th 490 (2000) ............................................................................................ 31

*Helbach v. City of Long Beach*,
    50 Cal. App. 2d 242 (1942) ..................................................................................... 31

*Hoye v. City of Oakland*,
    653 F.3d 835 (9th Cir. 2011) ................................................................................... 26

*In re White*,
    97 Cal. App. 3d 141 (1979) ..................................................................................... 27

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ............................................................................ 22, 31

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) ............................................................................ 21, 26

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) ................................................................................. 18

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ................................................................................................ 27

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ................................................................................... 32

*Leiserson v. City of San Diego*,
    184 Cal. App. 3d 41 (1986) ..................................................................................... 22

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................................................ 32

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ................................................................................................ 23

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ................................................................................................ 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................ 31

*Nunez by Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) ................................................................. 32

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)................................................................. 24, 25, 26

*Sausalito/Marin Cnty. Chapter of Cal. Homeless Union v. City of Sausalito*,
  522 F. Supp. 3d 648 (N.D. Cal. 2021) ........................................................ 18

*Societa per Azioni de Navigazione Italia v. City of Los Angeles*,
  31 Cal. 3d 446 (1982) ................................................................. 31

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................. 20

*Spence v. State of Wash.*,
  418 U.S. 405 (1974) ................................................................. 23

*Thomas v. Chicago Park Dist.*,
  534 U.S. 316 (2002) ................................................................. 28

*United Farm Workers v. U.S. Dep't of Labor*,
  509 F. Supp. 3d 1225 (E.D. Cal. 2020) ........................................................ 32

*United States v. Baugh*,
  187 F.3d 1037 (9th Cir. 1999) ................................................................. 22, 24, 29

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................. 21

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ................................................................. 25

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ................................................................. 18, 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................. 25

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ................................................................. 24, 25, 26

*Watters v. Otter*,
  955 F. Supp. 2d 1178 (D. Idaho 2013) ........................................................ 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................. 17

**Statutes**

Cal. Const. art. XI .................................................................................................................... 30

Cal. Penal Code § 148 ............................................................................................................... 27

Cal. Penal Code § 409.5 ............................................................................................................ 22

Cal. Penal Code § 409.7 ............................................................................................................ 22

**Rules**

Fed. R. Civ. P. 65 ..................................................................................................................... 32

**Other Authorities**

Cal. Sen., Third Reading for 2021 Cal. S.B. 98 ....................................................................... 22

## INDEX OF DECLARATIONS

1.  Declaration of Desiree "Dez" Martinez ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

2.  Declaration of Robert McCloskey ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

3.  Declaration of Alexandra Alvarado ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

4.  Declaration of Cindy Piombino ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

5.  Declaration of Crystal Sanchez ISO Plaintiffs' Mot. Prelim. Injunction

6.  Declaration of Estevan Hernandez ISO Plaintiffs' Mot. Prelim. Injunction

7.  Declaration of Rosemary Juarez-Deleon ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

8.  Declaration of Fred Valdez ISO Plaintiffs' Mot. Prelim. Injunction with Exhibits

## INTRODUCTION

Public scrutiny is a powerful antidote to the abuse of power. It is also essential to accountability. This lawsuit seeks to enjoin the recent efforts by the City of Fresno (the "City" or "Fresno") to hide from public view, intensify its misconduct, and then avoid liability for wrongdoing.

Fresno, one of many places plagued by a severe housing crisis, has a long history of mistreating its unhoused community. Despite the lack of available shelter, the City deems homeless encampments a "public nuisance" and targets these locations for frequent dismantling, or "sweeps." This so-called abatement can be chaotic, with city law enforcement, staff, and contractors showing up early in the morning on little to no notice, rushing people to pack and leave, and then trashing what people are unable to salvage immediately. Plaintiffs Dez Martinez, Fresno Homeless Union, Faith in the Valley, and Robert McCloskey (collectively, "Plaintiffs") attend the City's abatement sweeps to provide aid, representation, and support. Plaintiffs also monitor, document, and report on the City's actions. Their watchful eyes have proven essential to protecting the people and property targeted by sweeps.

But Fresno is now cracking down on Plaintiffs' efforts. The City recently amended Section 10-616 of the Fresno Municipal Code (the "Ordinance") to impose criminal sanctions and fines for "unauthorized entry" into areas "while an abatement is in progress."[1] By implementing this kind of buffer zone, the Ordinance improperly allows city staff and contractors to prohibit speech, expression, association, and even movement in public areas, where the City's ability to restrict such protected activity is most limited. Moreover, the Ordinance's unconstitutionally vague language about when and where it applies invites discriminatory enforcement. The Ordinance further contravenes well-established state law by purporting to immunize from liability the city staff and contractors involved in abatements.

Without the specter of scrutiny or liability, city staff and contractors are likely to engage in more frequent, aggressive, and destructive sweeps. The Ordinance thus exposes Plaintiffs and the unhoused community to state-created dangers and threatens them with immediate and irreparable harm. It also violates, on its face, fundamental rights protected under the United States and California Constitutions. Plaintiffs therefore respectfully urge the Court to protect them from harm, vindicate their rights, and advance the public interest by issuing a preliminary injunction against enforcement of the Ordinance.

---

[1] Fresno, Cal., Am. Ord. 2022-02, § 1 (eff. Mar. 31, 2022); *see also* Complaint, Ex. A, ECF No. 1.

## STATEMENT OF FACTS

### I. Fresno's Housing and Displacement Crisis

Fresno is facing a severe housing and displacement crisis exacerbated by growing income inequality and a lack of affordable housing. The City estimates that, at present, 5,200 people in the Fresno-Madera region lack housing, and, of this total, 4,200 people live within Fresno City limits. Plaintiffs and others familiar with the situation on the ground believe this number is an underestimate. Martinez Decl. ¶ 11. But there is no dispute that the crisis is growing. Even the City acknowledges that, since 2019, the number of unhoused persons in the region has more than doubled.[2]

Despite the evident and desperate need, Fresno lacks sufficient emergency shelter bed options, space in transitional housing, and permanent supportive housing. The City acknowledges that it has more unhoused persons than services or beds, reporting just 1,500 beds for more than 4,000 unhoused persons.[3] As a result, the City's shelters regularly turn people away, and many people have nowhere to live but in tents and other makeshift shelters in public parks, on sidewalks, and in other public spaces. Hernandez Decl. ¶¶ 3–4; Juarez-Deleon Decl. ¶¶ 3, 5–6, 9, 11–12; Valdez Decl. ¶¶ 2, 5. The City recently estimated that there are 64 "encampments" and 479 "shanties" in the area.[4]

### II. Plaintiffs Document the City's Sweeps and Assist, Organize, and Protect the Unhoused

Plaintiffs are dedicated advocates, organizers, reporters, and organizations. They are committed to holding the City accountable by monitoring and reporting on the manner in which the City treats its unhoused residents. And they fear that the Ordinance will chill or prevent their important advocacy, organizing, monitoring, and reporting.

Ms. Martinez is the founder of the Fresno-based group We Are Not Invisible, and the president of the Fresno Homeless Union ("Homeless Union" or "Union"). Martinez Decl. ¶¶ 2–3. As the Union's lead organizer, she regularly visits encampments, organizing residents and distributing needed aid to

---

[2] *See* Fresno City Council Workshop, *Summary of 2021 Homeless Services Investments* at 5–6 (Jan. 13, 2022), https://tinyurl.com/bddk8299. The Court may take judicial notice of documents, like this Fresno City Council presentation, that are "matters of the public record." *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1152 (E.D. Cal. 2017).

[3] *See* Fresno City Council Workshop, *Introducing the City's Homeless Assistance Response Team* at 4 (Jan. 27, 2022), https://tinyurl.com/4u48e4wu (hereinafter "*HART Report*").

[4] *See HART Report* at 5.

unhoused people. *Id.* ¶ 4. She also attends encampment sweeps—often wearing clothes representing the Union and We Are Not Invisible—to represent and assist people targeted by those sweeps and to document how city law enforcement, staff, and contractors conduct their official business. *Id.* ¶¶ 4, 6, 19, 22. She frequently "livestreams" sweeps and other abatement activity to a Facebook page called "Homeless in Fresno" that she administers, which has a reported 14,000 followers. *Id.* ¶¶ 7–8.

The Fresno Homeless Union is an unincorporated association of unhoused and housing-insecure individuals, organizers, and representatives. *Id.* ¶ 3. Formed in 2021, it is a member local of the California Homeless Union and is affiliated with the National Union of the Homeless. Sanchez Decl. ¶¶ 2, 5. Most of its officers and members live in homeless encampments. *Id.* ¶ 3. The Union's mission is to organize, represent, and support Fresno's unhoused community with the goal of achieving actual, durable, and permanent housing for all. *Id.* ¶ 6. It accomplishes this mission by organizing unhoused individuals in encampments so that members are able to advocate for their own interests and provide each other with mutual aid and protection. *Id.* ¶¶ 8–9. The Union also sends its organizers and officers into encampments during sweeps and other abatement activity in order to maintain solidarity and provide critical representation and assistance. *Id.* ¶ 10. In addition, the Union generates and also shares content on its social media pages to expose the abuses that occur during encampment sweeps and to highlight the key role that the Union plays during such sweeps. *Id.* ¶ 9

Faith in the Valley is a non-profit organization that uses grassroots faith-based organizing and advocacy to address problems of equity. Alvarado Decl. ¶ 2. In recent years, Faith in the Valley has focused its work on the housing and homelessness crisis in Fresno. *Id.* ¶¶ 2, 18. Its community organizers and volunteers attend the City's encampment sweeps and other abatement activity; spearhead mass public comments advocating for affordable housing and an end to sweeps; and lead rallies and events to push the City to address Fresno's housing crisis and to educate residents about the City's practices. *Id.* ¶¶ 3–5, 7, 16. The conditions that Faith in the Valley organizers observe during sweeps and the relationships that they build with unhoused people set the course of its advocacy. *Id.* ¶¶ 7, 17.

Mr. McCloskey is the homelessness and housing beat reporter for Community Alliance. McCloskey Decl. ¶ 1. He regularly publishes articles on the City's actions and policies regarding homelessness and housing. *Id.* He is also an advocate for unhoused individuals in Fresno. *Id.* ¶ 3. As

both a reporter and advocate, Mr. McCloskey frequently attends encampments sweeps. *Id.* ¶¶ 2–3. During sweeps, he interviews unhoused people and City officials, turning his investigatory work into articles that describe the conditions and conduct he observes. *Id.* ¶¶ 4, 8, 13–15. He also assists unhoused people by documenting mistreatment and helping to protect their belongings. *Id.* ¶¶ 9–13.

### III. Fresno's Long-Standing Hostility Toward the Unhoused Community

Fresno has attempted to address its housing and displacement crisis by proposing policies that often fail to respect the dignity and humanity of unhoused people. The rhetoric that public officials use to justify these policies and practices can be dehumanizing. They describe unhoused people as a threat to public safety and a form of blight that needs to be "swept up" and excluded from public places where housed people gather. Official narratives treat unhoused people less as neighbors and constituents, and more as scapegoats for a host of dynamic and complex urban challenges. Rarely do these narratives include in the public dialogue the voices and interests of people who have been displaced. Encampment sweeps are an outgrowth of these dehumanizing practices. The City has long pursued systematic sweeps and other abatement activities that force unhoused residents to leave their resting and sleeping places or risk criminal citation, arrest, and destruction of property.

In 2006, Fresno's inhumane manner of conducting encampment sweeps gave rise to a successful lawsuit. Specifically, in *Kincaid v. City of Fresno*, a group of unhoused persons obtained injunctive relief, and then a settlement, to stop the City from intentionally and indiscriminately taking and destroying their personal property.[5] The *Kincaid* lawsuit was successful in part because unhoused people, advocates, and reporters were able to provide the court with detailed evidence about encampment sweeps and other abatement activities that they witnessed from near vantage points. One independent reporter attested that he had observed city staff toss unhoused peoples' tents, bulging with their belongings, straight into a dumpster.[6] Other witnesses explained to the court how police officers had used force to clear an area[7] and how advocates' presence had saved an unhoused person from being

---

[5] Statement of Decision re: Preliminary Injunction ¶ 31, *Kincaid v. City of Fresno*, No. 1:06-cv-01445-LJO-SKO (E.D. Cal. Dec. 8, 2006) (hereinafter "*Kincaid*"), ECF No. 91 at 83.

[6] Decl. of Mike Rhodes, *Kincaid* (Oct. 17, 2006), ECF No. 14.

[7] Decl. of Logan Siler, *Kincaid* (Nov. 6, 2006), ECF No. 56.

run over by a bulldozer.[8] Forced to reckon with the unlawfulness of these practices, the City settled the case and agreed to provide notice before conducting sweeps and to not destroy property during sweeps.[9]

Notwithstanding the City's promises, many of the problems raised in the *Kincaid* case persist, particularly as the unhoused population in Fresno grows and the City increases the frequency of its sweeps and abatements in publicly visible areas like parks and sidewalks. Martinez Decl. ¶ 18; Hernandez ¶ 5. Today, those targeted by sweeps still typically receive little to no notice before abatements takes place.[10] Juarez-Deleon Decl. ¶¶ 5–6, 10; Valdez ¶ 7; Martinez Decl. ¶ 18; Piombino Decl. ¶¶ 16–17. Abatement crews tend to start their work very early in the morning while unhoused individuals are just waking up and gathering their belongings. Hernandez Decl. ¶ 5; Juarez-Deleon Decl. ¶¶ 6, 10; Valdez Decl. ¶ 7; Martinez Decl. ¶¶ 21, 23. City staff and contractors bring heavy machinery into an abatement area while people are actively packing up, such that front loaders and dump trucks are often in close proximity to unhoused persons during a sweep. Juarez-Deleon Decl. ¶ 10; Alvarado Decl. ¶ 9; Martinez Decl. ¶ 20; McCloskey Decl. ¶ 7; Piombino Decl. ¶ 14. The process of an abatement is almost never linear such that machinery comes in only at the end of a sweep, when unhoused people have moved their belongings from the area and left the encampment.

Union members and other unhoused individuals describe how staff rush them to pack whatever they can carry in just a single trip and force them to leave behind what they cannot salvage immediately. Hernandez Decl. ¶ 5; Juarez-Deleon Decl. ¶¶ 5–6, 10; Valdez Decl. ¶¶ 7, 9; Martinez Decl. ¶¶ 21, 25. Many unhoused individuals have had to watch as the City throws away—without the safeguard of adequate due process—precious items, including tents, bedding, clothing, food, mobility devices, identification, and treasured family memorabilia. Hernandez Decl. ¶ 6; Juarez-Deleon Decl. ¶¶ 4–7, 10, 13; Valdez Decl. ¶ 10. These belongings sometimes go straight into waiting dump trucks. Hernandez Decl. ¶ 6; Juarez-Deleon Decl. ¶ 10; Valdez Decl. ¶ 9; Martinez Decl. ¶¶ 21, 23. One unhoused person and Union member who recently experienced an abatement sweep describes the experience as "hectic and traumatic," "like a tornado." Juarez-Deleon Decl. ¶ 13.

---

[8] Decl. of Liza Apper, *Kincaid* (Oct. 17, 2006), ECF No. 15.

[9] *See* Settlement Agreement, *Kincaid* (June 5, 2008), ECF No. 304-2.

[10] Because the amount of time to pack and prepare makes little difference to someone who has not been offered shelter and otherwise has no place to go, such notice, when provided, remains illusory. Martinez Decl. ¶ 18.

Today, the City also continues to use excessive force when clearing an area. For example, on a morning in February 2020, the City conducted a sweep and abatement of a large encampment known as the "180 Camp." Valdez Decl. ¶ 7. Without any advocates, organizers, or journalists present, the City gave people just 15 minutes to pack what they could carry. *Id.* When Lewis Brown, an unhoused person, allegedly did not pack fast enough during the sweep, he was brutally beaten by city law enforcement.[11] Fearing the same fate, Fred Valdez, a member of the Union also living in the Camp, tried to pack what he could; but before he was done, staff threw his tent filled with necessary survival items and a family heirloom into a dump truck. Valdez Decl. ¶¶ 9–10.

At the start of this year, the City began deploying a police-led Homeless Assistance Response Team ("HART") to serve as "compassionate, responsive, lawful and effective outreach leading unsheltered individuals and families to take the first step off the streets and into a new future."[12] HART has already had problems, however. One morning in February 2022, Mr. McCloskey observed HART officers conducting a daily sweep on the sidewalk in front of Poverello House, which provides meals and other services for those in need. McCloskey Decl. ¶ 9. He saw one officer aggressively tell a man to get up and then kick the pillow where the man's head was laying. *Id.* Mr. McCloskey documented this incident and, in response to Mr. McCloskey's advocacy, city officials pledged reform. *Id.* ¶¶ 10–12, 15.

**IV.    Encampments Provide a Stage for Community, Expressive Acts, and Collective Action**

Despite the hardships of being without permanent shelter, unhoused people form meaningful communities and "street families." Together, they find and create safer shelter, share resources and information, and, like any community, take care of one another. Plaintiffs are frequently present in encampments, organizing residents in support of their own interests, including by conducting "know your rights" trainings; protecting unhoused persons' physical safety and property; and sharing resources, prayer, rides, food, and information. Martinez Decl. ¶¶ 4–5; McCloskey Decl. ¶ 3; Piombino Decl. ¶¶ 3–4, 6, 11; Sanchez Decl. ¶¶ 8–9; Juarez-Deleon Decl. ¶¶ 9, 15–16; Valdez Decl. ¶ 4. As one member of the Homeless Union explains, "If we have it, we give it. The broader community stereotypes you when

---

[11] *Id.* ¶ 8. This incident is the subject of a separate, pending civil rights lawsuit against the City and other defendants. *See* Compl. ¶ 28, *Brown v. City of Fresno*, No. 1:22-cv-00216-JLT-SAB (E.D. Cal. filed Feb. 21, 2022), ECF No. 1.

[12] *See HART Report* at 6.

you're homeless. They think you're the lowest. We fight that by trying to build community, by cooking for one another." Juarez-Deleon Decl. ¶¶ 9, 15.

Unhoused people, including Union members, also form encampments to send a collective message about Fresno's housing crisis and to demonstrate their lived struggle with housing insecurity. They convey this message by living in public parks and other visible spaces, including Roeding Park and the sidewalk in front of Poverello House; by wearing apparel and posting signs bearing messages like "We Are Not Invisible" or "California Homeless Union"; and by using tents, a recognizable symbol of protest and the intensifying housing crisis. Martinez Decl. ¶¶ 6, 14–15, 18; Juarez-Deleon Decl. ¶ 12; Valdez Decl. ¶ 5; Sanchez Decl. ¶ 4. Plaintiffs, Union members, and other advocates, organizers, and journalists come together in encampments to convey solidarity with this message and to protest and resist the City's dehumanizing treatment of the unhoused community.

Attending encampment sweeps furthers Plaintiffs' message about Fresno's housing crisis. The visual symbol of mutual aid and solidarity during a sweep—that is, unhoused people organizing and helping other unhoused people—is particularly powerful. Union members explain that attending sweeps is their way of speaking up and advocating for their community and street family. As one Union member says, "I go to encampment sweeps to help protect my unhoused 'street family members'" and "give back" to the community. Juarez-Deleon Decl. ¶ 16. "I don't want people to be treated like I was treated." *Id.*; Martinez Decl. ¶ 5; Sanchez Decl. ¶ 10.

## V. Advocates, Union Members, and Reporters Play a Vital Role During Sweeps

Plaintiffs, other advocates, reporters, and organized unhoused persons play a number of important roles during the City's encampment sweeps and other abatement activity. They help prevent, as best they can, the City from seizing, damaging, and destroying unhoused persons' belongings. They do so by "standing guard" near tents and other property so that unhoused persons can make multiple trips to salvage their belongings from immediate destruction. Martinez Decl. ¶ 25. Without this assistance, unhoused persons risk forfeiting any belongings that they cannot carry on their first trip clearing an area. *Id.*; Alvarado Decl. ¶¶ 12–13. Advocates and organizers also frequently serve as representatives for the unhoused to clarify where the City is sending property for "storage" following an abatement. Martinez Decl. ¶ 26. Unhoused people would otherwise not be able to retrieve their

possessions. In fact, advocates often provide alternative arrangements for storing unhoused persons' belongings because the City's storage process has been so deficient and problematic. *Id.* ¶ 29.

Additionally, Plaintiffs help defuse potential negative interactions when city law enforcement, staff, and contractors act in such a way as to trigger unhoused persons' prior experiences of trauma. *Id.* ¶ 31; Piombino Decl. ¶¶ 6, 9, 13; Valdez Decl. ¶ 12. And they protect encampment residents when abatement crews disregard residents' physical safety in other ways—for example, by using heavy machinery in close proximity to the residents who are packing up. Alvarado Decl. ¶ 9; Martinez Decl. ¶ 20; Sanchez Decl. ¶ 10. Indeed, during a sweep in February 2022, an advocate with Christ Helping Hands Ministry saw the City park a dump truck inches away from an occupied tent. Piombino Decl. ¶ 14. She quickly intervened, asking the City for time to talk to the woman in the tent who was refusing to pack or leave and then using prayer to help calm her. *Id.* City staff thanked this advocate for her intervention and ultimately, the woman was able to access shelter in a motel. *Id.*

Plaintiffs and others assist by witnessing, documenting, and reporting on the City's actions, which helps them to push back on official narratives about how abatements are conducted. Alvarado Decl. ¶¶ 7–13; Martinez Decl. ¶¶ 7–9, 22, 36; McCloskey Decl. ¶¶ 2–4, 8, 11, 13–14; Piombino Decl. ¶¶ 6, 16; Sanchez Decl. ¶¶ 9–10. For example, despite the City's claimed focus on protecting the health and safety of the public, Ms. Martinez recorded City staff at a sweep in January 2022 drive a tractor and dump truck into an encampment in Roeding Park while unhoused people were still packing up. Martinez Decl. ¶ 20. Her video, which has been viewed approximately 1,400 times, shows the tractor driving towards a man moving his tent across the street. *Id.* These types of videos, as well as other documentation, inform the broader advocacy, community education, and organizing that Plaintiffs do. *Id.* ¶¶ 12–16, 22, 36; Alvarado Decl. ¶¶ 7, 16–18; McCloskey Decl. ¶¶ 4, 8, 14; Sanchez Decl. ¶ 9.

Finally, Plaintiffs' presence also serves as a powerful restraint against even more abuse and official misconduct. So long as heavy machinery is nearby to unhoused persons, advocates, organizers, and reporters also need to be present to offer protection, assistance, and representation. When witnesses are present, the City is also more likely to offer shelter and give time to pack, and less likely to seize or destroy property. Alvarado Decl. ¶¶ 13–14; Martinez Decl. ¶¶ 22–24, 28; McCloskey Decl. ¶¶ 5, 13; Piombino Decl. ¶¶ 6, 20; Hernandez Decl. ¶¶ 7, 9; Juarez-Deleon ¶¶ 4, 16, 18; Valdez ¶¶ 6, 11–13. As

one Union member observes: "These people would walk over us without Dez. When she is there, she gets out her camera phone and they behave. If someone's looking at you, you act different." Valdez Decl. ¶ 6.

Despite their vehement opposition to sweeps and other abatement activity, Plaintiffs do not interfere with the legitimate functions of city law enforcement, staff, and contractors consistent with the constitutional rights of those who are targeted during sweeps. Alvarado Decl. ¶ 15; Martinez Decl. ¶ 32; McCloskey Decl. ¶¶ 13, 17; Piombino Decl. ¶ 10. Nor do they endanger anyone by being present during sweeps. Instead, as the foregoing demonstrates, they make sweeps as safe as they are able.

## VI. Events Leading up to the Ordinance and its Adoption by the City Council

On January 4, 2022, Ms. Martinez learned that the City had swept several people near Kings Canyon and South Clovis Avenue. Martinez Decl. ¶ 33. When she arrived, she learned that these individuals had lost many of their belongings during the sweep and abatement, which was still ongoing. *Id.* ¶¶ 33–34. As is her practice, Ms. Martinez used her cell phone to record the abatement. *Id.* ¶ 34. She approached a city law enforcement officer to discuss the sweep and he referred her to the code enforcement officers still there. *Id.* When Ms. Martinez approached the men the officer had identified, they refused to acknowledge who was in charge or speak with her so long as she was recording the interaction. *Id.* ¶ 35. Ms. Martinez's footage shows that when she tried to engage them further, one man stated, "we don't talk to press" before laying his hands on Ms. Martinez and covering her camera. *Id.* This code enforcement officer was issued a Notice to Appear for misdemeanor battery. *Id.*

The day after the incident between Ms. Martinez and the code enforcement officer, the City Attorney initiated legislative action to propose amending Section 10-616 of the Fresno Municipal Code at the upcoming City Council meeting.[13] The section had not been amended for 20 years. *See* Fresno, Cal., Am. Ord. 2002-51, § 15 (eff. Oct. 31, 2002). Despite significant community opposition, including numerous public comments by Plaintiffs and other community members explaining the Ordinance's negative and chilling impact on their advocacy, speech, associational rights, and other protected

---

[13] *See* City of Fresno Legislation Details (With Text) File # ID 22-98 (last accessed Mar. 30, 2022), https://tinyurl.com/mwsmtzm7.

conduct,[14] the City Council adopted the Ordinance on February 17, 2022. *See* Compl., Ex. A. at 1. The Ordinance was approved on February 28, 2022 and goes into effect March 31, 2022. *Id.*

The Ordinance extends the City's nuisance abatement authority to public property and enlarges the authority of the "Director" to include "City employees or a contractor retained by the City." *Id.* § 10-616(b). It states that no person shall "obstruct, impede or interfere" with city staff and contractors who are "engaged in the work of abatement" or "performing any necessary act preliminary to or incidental to such work[.]" *Id.* The Ordinance further provides:

> (b)(1) To protect the health and safety of the public and city employees while an abatement is in progress, city employees or a retained contractor may designate a restricted area by erecting a barrier or cordon off an area of public or private property where an abatement is taking place. No person shall enter the restricted area without express authorization from city employees or contractor [sic] on site conducting the abatement.

> (b)(2) Subject to particular restrictions mandated by safety concerns or emergency procedures, prior to any abatement taking place at an occupied location, those persons providing services to the occupants or advocating on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured as provided herein.

The Ordinance makes punishable "[u]nauthorized entry" or any other violation "either as a misdemeanor for intentional violations, or as an administrative citation" with a fine of up to $250. *Id.* § 10-616(b)(3).

**ARGUMENT**

Plaintiffs are entitled to a preliminary injunction upon showing (1) a likelihood of "irreparable harm" in the absence of injunctive relief, (2) a likelihood of success on the merits, and (3) that "the balance of equities" and "public interest" weigh in their favor. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the "balance of hardships tips sharply" in Plaintiffs' favor, they need only demonstrate "serious questions going to the merits." *Id.* at 1135. And because the burdens at the preliminary injunction stage track the burdens at trial, Plaintiffs bear only "the initial burden of making a colorable claim that [their] First Amendment rights have been infringed, or are threatened with

---

[14] *See* Fresno City Council, Email/eComment Report re: File ID 22-200, 1-C (Jan. 27, 2022), https://tinyurl.com/fxdwwv76; City of Fresno Meeting Minutes at 7 (Jan. 27, 2022), https://tinyurl.com/mt9pr8ax; City of Fresno Meeting Minutes at 5 (Feb. 10, 2022), https://tinyurl.com/46m4f6nn; City of Fresno Meeting Minutes at 5 (Feb. 17, 2022), https://tinyurl.com/2p9x44bz.

infringement, at which point the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (citation omitted).

## I.    The Ordinance Exposes Plaintiffs to State-Created Danger and, Without an Injunction, Plaintiffs Are Likely to Suffer Imminent and Irreparable Harm

Plaintiffs will suffer immediate and irreparable harm from the Ordinance because it exposes them to state-created danger in the form of more frequent and destructive sweeps. *See Sausalito/Marin Cnty. Chapter of Cal. Homeless Union v. City of Sausalito*, 522 F. Supp. 3d 648, 657 (N.D. Cal. 2021). Plaintiffs satisfy the irreparable-injury prong of the preliminary injunction analysis for two additional reasons. The Ordinance infringes fundamental rights, the deprivation of which "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the Ordinance threatens "ongoing harms" to Plaintiffs' "organizational missions," which is likewise a well-recognized irreparable injury. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

*First*, as courts have recognized, there is substantial overlap between "analysis on irreparable injury" and analysis on the merits of a "state-created danger claim." *Sausalito/Marin Cnty. Chapter of Cal. Homeless Union*, 522 F. Supp. 3d at 657. Here, Plaintiffs are able to satisfy this analytical framework because the Ordinance "affirmatively places" Plaintiffs "in a position of danger" by exposing them to risks they "would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (cleaned up). The Ordinance removes two of the most powerful deterrents to misconduct by public officials: public scrutiny and personal liability. It also risks harm by restricting the ability to form and join organizations, like the Union, dedicated to preventing and protecting against such misconduct. In so doing, the City has acted with "deliberate indifference" to the health and safety of unhoused people who are the targets of the City's sweeps—giving rise to state-created danger. *Id.*

Specifically, the Ordinance gives the City the power to close to the public any area—including public parks and other communal spaces—where encampment sweeps and other abatement is "taking place." But it is precisely during these sweeps that access and association between Plaintiffs and the unhoused community are most vital. Plaintiffs and other advocates, reporters, and organized unhoused persons are fundamental to deterring, monitoring, and exposing official wrongdoing during sweeps and

other abatement activity, such as the destruction of personal property without the protections of sufficient due process. Evidence indicates that, when city law enforcement, staff, and contractors know they are being recorded or watched, they slow down, give people time to pack, stop tearing down tents and tarps with people still inside of those shelters, and are less likely to throw away unhoused peoples' possessions. Martinez Decl. ¶¶ 22–24, 28; McCloskey Decl. ¶ 13; Piombino Decl. ¶ 20; Hernandez Decl. ¶¶ 7, 9; Juarez-Deleon Decl. ¶¶ 4, 18; Valdez Decl. ¶¶ 6, 11–12. Evidence also reveals that advocates can help avert life-threatening situations when, for example, city workers persist in moving heavy machinery in close proximity to unhoused persons while they pack their belongings. Piombino Decl. ¶ 14; Alvarado ¶ 9.

The Ordinance, by design, shields from public scrutiny the City's abatement sweeps and removes from the scene those witnesses who would otherwise protect the rights and property of those most directly and negatively impacted by abatement. If the City is permitted to conduct sweeps and other abatement without witnesses to hold it accountable, Union members and other unhoused individuals are likely to suffer more frequent, aggressive, and ultimately destructive sweeps. *See* Alvarado Decl. ¶¶ 14, 19; Martinez Decl. ¶¶ 22–23, 39; McCloskey Decl. ¶¶ 5, 13; Piombino Decl. ¶¶ 18–20; Sanchez Decl. ¶¶ 11–12, 14; Hernandez Decl. ¶¶ 5, 8; Juarez-Deleon ¶¶ 4–6, 10, 17–18; Valdez Decl. ¶¶ 6–7, 12–13. This risk is all the more severe because the Ordinance gives city staff and contractors license to act with impunity, explicitly shielding them from personal liability for any wrongdoing while carrying out encampment sweeps and other abatement activity. *See* Compl., Ex. A § 10-616(b)(c). And because the City conducts abatement sweeps on a daily if not weekly basis, the threat of state-created danger is imminent. Martinez Decl. ¶ 18; Hernandez Decl. ¶ 5.

***Second***, the Ordinance interferes with constitutional rights. Plaintiffs, the organized unhoused, and other advocates and reporters regularly attend the City's sweeps for several reasons: to share resources, prayer, and support; to organize, represent, and protect unhoused people; and to observe, document, and report on the City's actions. *See* Alvarado Decl. ¶¶ 3, 7–15; Martinez Decl. ¶¶ 4–5, 7–9, 19, 22, 36; McCloskey Decl. ¶¶ 2–3, 5, 16; Piombino Decl. ¶ 6; Sanchez Decl. ¶¶ 8–10; Juarez-Deleon Decl. ¶¶ 15–16; Valdez ¶ 4. The First Amendment undoubtedly protects this type of core political speech, issue-based advocacy, information gathering, expressive conduct, and association, *see infra*, and

directs courts "to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011) (citation omitted).

By its very text, the Ordinance will impair, restrict, and chill these protected activities. Mr. McCloskey, for example, fears that the Ordinance will interfere with his right to witness and report on the City's response to the homelessness crisis and will make "impossible" the role he plays as "public advocate and journalist." McCloskey Decl. ¶ 16; *id.* ¶¶ 17–19. Advocates and organizers share these concerns and fear the repercussions of either a misdemeanor charge or $250 administrative fine. Alvarado Decl. ¶¶ 19–20; Martinez Decl. ¶¶ 36–39; Piombino Decl. ¶¶ 19, 21–22. The Union and its members also would like to continue attending sweeps, organizing unhoused residents, protecting others in need, and holding the City accountable. Sanchez Decl. ¶ 13; Juarez-Deleon ¶¶ 15–16; Valdez Decl. ¶ 4. But to do so, the Ordinance would force them to risk jail time or fines they cannot afford. Juarez-Deleon Decl. ¶¶ 17–18. The loss of these First Amendment rights constitutes further "irreparable injury." *Elrod*, 427 U.S. at 373; *Doe*, 772 F.3d at 583 ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief.") (internal quotation marks, citation omitted).

***Third***, the Ordinance harms both the organizational missions of Faith in the Valley and the Homeless Union, causing additional irreparable harm. *See Valle del Sol Inc.*, 732 F.3d at 1029. The Ordinance harms the Union's mission to organize, represent, and serve Fresno's unhoused community with the goal of achieving housing for all. Sanchez Decl. ¶ 6. It does so by barring Union organizers and officers from entering encampments during sweeps and other abatement activity, when it is necessary for the Union to assist, represent, and protect its members and to share information with the public about the abuse that occurs during sweeps and the role that the Union plays in preventing such abuse. *Id.* ¶ 13. More frequent and forceful encampment sweeps will also disrupt the Union's connections with those it represents and, thus, its ability to continue organizing. *Id.* ¶¶ 11–12; Valdez Decl. ¶ 4.

Similarly, the Ordinance interferes with Faith in the Valley's mission to serve, support, and uplift unhoused people. Alvarado Decl. ¶¶ 2–3, 6. The Ordinance prevents Faith in the Valley's organizers from being able to "bear witness" to the City's mistreatment of unhoused people during sweeps, which is necessary to build relationships with unhoused persons, "center" the organizing work around the

needs of the unhoused, and better advocate for the unhoused community. *Id.* ¶¶ 7, 14, 17–19.

Injunctive relief is therefore necessary to prevent these constitutional and organizational harms and, most particularly, the significant harms to person and property that will otherwise likely befall unhoused individuals, including Union members.

## II. Plaintiffs Are Likely to Succeed on the Merits of All Their Claims

As with their state-created danger claim, Plaintiffs are likely to succeed on the merits of their other claims, therefore satisfying the next requirement for a preliminary injunction. Plaintiffs can readily demonstrate that the Ordinance is unconstitutional because, on its face, it restricts a range of activities protected by the First Amendment. It also interferes with the right to move freely, lacks the specificity required to comport with Substantive Due Process, and is preempted by state law regarding liability.

### A. The Ordinance unconstitutionally restricts protected expression and activity.

Plaintiffs are likely to succeed on the merits of their claims that the Ordinance is facially invalid under the First Amendment because "a substantial number of its applications are unconstitutional," *see Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en banc) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)), and because it grants "unbridled discretion" to city law enforcement, staff, and contractors, *see Kaahumanu v. Hawaii*, 682 F.3d 789, 802 (9th Cir. 2012). The Ordinance implicates the First and Fourteenth Amendments by infringing protected expression and other activity. And regardless of whether the Court applies strict scrutiny because the Ordinance is content based or intermediate scrutiny because it regulates protected expression and activity in traditional public forums, the Ordinance does not pass constitutional muster.

### 1. The Ordinance interferes with First Amendment expression.

As noted above, Plaintiffs, Union members, and other advocates, organizers, and reporters regularly show up at sweeps to observe, monitor, and protest the manner in which the City conducts sweeps, to document and report on the City's actions, and to provide critical assistance, protection, spiritual support, and representation to the sweeps' targets. *See* Alvarado Decl. ¶¶ 7–15, 19; Martinez Decl. ¶¶ 4–5, 7–9, 19, 22, 36; McCloskey Decl. ¶¶ 2–3, 5, 16; Piombino Decl. ¶ 6; Sanchez Decl. ¶¶ 9–10; Juarez-Deleon Decl. ¶¶ 15–16; Valdez ¶ 4. By creating buffer zones around encampment sweeps and other abatement activity in Fresno, the Ordinance interferes with this wide range of protected First

Amendment activity.

First, the First Amendment undeniably protects core political speech, issue-based advocacy, and protest like that at issue here. *See, e.g.*, *United States v. Baugh*, 187 F.3d 1037, 1039–40, 1042 (9th Cir. 1999) (construing as protected speech a "prayer service" protest against demolition of housing for the unhoused). Indeed, "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotation marks, citation omitted). Plaintiffs attend encampment sweeps and other abatement activity in order to use their voices, their actions, and even their presence to express their views on one of the most pressing issues in Fresno: the housing and displacement crisis and the City's treatment of the unhoused.

Second, the First Amendment also protects the public's right to observe and document "matters of public interest," including public officers "engaged in the exercise of their official duties in public places," *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018), as well as the media's parallel right to gather news, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020). In light of the "limited time and resources" that most people have "to observe at first hand the operations of [] government," "the press has long been understood to play a vitally important role in holding the government accountable." *Id.* (citations omitted).

In California, press access to "document[] history and inform[] the public" enjoys yet further statutory protection so that all manner of newsworthy events, such as natural disasters and protests, may be observed and reported on without interference. Cal. Sen., Third Reading for 2021 Cal. S.B. 98, at 2 (Sept. 3, 2021); *see also* Cal. Penal Code §§ 409.5(d), 409.7(a). As one state court of appeal has observed: California law reflects that "the news media must be afforded special access to disaster sites in order that they may properly perform their function of informing the public." *Leiserson v. City of San Diego*, 184 Cal. App. 3d 41, 51 (1986) (citing Cal. Penal Code § 409.5(d)). Restricting reporters, like Mr. McCloskey, and members of the public—like Ms. Martinez, who regularly broadcasts footage of the City's conduct to her reported 14,000 social media followers, and the Union, which shares on social media news, videos, and other information about the City's conduct and the Union's organizing—from observing and documenting the City's encampment sweeps and other abatement activity flies in the face of these well-established democratic principles.

Third, advocacy and organizing activities like those engaged in by the Homeless Union are likewise protected as pure speech, expressive conduct, and expressive association. The First Amendment protects conduct when it is "sufficiently imbued with elements of communication," which means an "intent to convey a particularized message" and a "great" likelihood that "the message [will] be understood by those who view[] it." *Spence v. State of Wash.*, 418 U.S. 405, 409–11 (1974). It also protects the right to expressive association because "[e]ffective advocacy . . . is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) (describing "close nexus between the freedoms of speech and assembly").

Union members come together in solidarity at encampments, particularly during sweeps, to convey a shared message about Fresno's housing crisis and its dehumanizing treatment of unhoused individuals. Union members explain that attending sweeps is a powerful way to speak up and advocate for their own community and to show the general public and the City that unhoused people deserve to be treated with dignity and respect. Juarez-Deleon Decl. ¶¶ 15–16; Sanchez Decl. ¶ 10; Martinez Decl. ¶ 5; Acts of mutual aid and solidarity, such as when Union members share meals and other resources, similarly serve as powerful visual symbols of the unhoused community's empowerment and equality. Martinez Decl. ¶ 5; Juarez-Deleon Decl. ¶¶ 9, 15; Valdez Decl. ¶ 4. And while homeless encampments may be established initially out of necessity, their high visibility in open spaces also underscores for the public and the City the deepening housing crisis—a message furthered by the image of people living in tents, long-recognized symbols of protest as well as the housing crisis. *See Watters v. Otter*, 955 F. Supp. 2d 1178, 1182 (D. Idaho 2013) ("Occupy Boise's tent city is a political protest of income inequality. As such, it is express conduct covered by the First Amendment."). Indeed, the official logo for the California Homeless Union includes an image of a tent. Sanchez Decl. ¶ 4.

Union members also convey their messages of empowerment and solidarity by wearing clothing and displaying banners representing messages like the Union and We Are Not Invisible. Martinez Decl. ¶¶ 6, 14–15; Juarez-Deleon Decl. ¶ 12; Valdez Decl. ¶ 5. Importantly, these collective symbolic efforts occur against the backdrop of the City's longstanding mistreatment of the unhoused—a pressing "issue[s] of concern" in Fresno—which only reinforces the expressive and protected nature of the Union and other advocates' organizing efforts. *See Fort Lauderdale Food Not Bombs v. City of Fort*

*Lauderdale*, 901 F.3d 1235, 1238, 1240–43 (11th Cir. 2018) (nonprofit "does not serve food as a charity, but rather to communicate its message" of equality based on expressive indicia like public location of events, use of banners with logos, fact that events were open to all and involved sharing meals between housed and unhoused individuals).

### 2. The Ordinance is unconstitutional as either a content-based restriction or an unreasonable time, place, and manner restriction and prior restraint.

The City's ability to regulate this protected expression depends on how the regulation operates and where it applies. Content-based restrictions are "presumptively unconstitutional" and may be upheld only if the City proves the restriction is "narrowly tailored to serve compelling state interests" under strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The City's ability to impose content-neutral restrictions on the "time, place, or manner" of expression in traditional public forums is likewise "sharply circumscribed." *Askins*, 899 F.3d at 1044 (internal quotation marks, citation omitted). Such restrictions are permitted only if they (1) are "narrowly tailored to serve a significant government interest"; (2) "leave open ample alternative channels for communication"; and (3) do not delegate "overly broad" discretion to government officials. *Id.* (internal quotation marks, citation omitted). Finally, restrictions that operate as a "prior restraint" on speech—that is, they give "public officials the power to deny use of a forum in advance of actual expression," *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989) (citation omitted)—bear "a heavy presumption of unconstitutionality" and also must satisfy the "time, place, and manner" test. *Baugh*, 187 F.3d at 1042.

Plaintiffs are likely to prevail under either test. First, the Ordinance is content based and fails strict scrutiny. Second, even if considered content neutral, the protected expression here occurs in traditional public forums, including parks, sidewalks, and streets, *see* Hernandez Decl. ¶¶ 3–4; Juarez-Deleon Decl. ¶¶ 5–6, 9, 11–12; Valdez Decl. ¶ 5; Martinez Decl. ¶ 18; Piombino Decl. ¶¶ 8–9, and the Ordinance is not a reasonable time, place, and manner restriction. The Ordinance also therefore operates as an unconstitutional prior restraint.

### 3. The Ordinance is content based and fails strict scrutiny.

The Ordinance is "content based" for two reasons: it has a content-based "purpose" and is "content based on its face." *Reed*, 576 U.S. at 166. "A regulation is content-based if [] the underlying

purpose of the regulation is to suppress particular ideas." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) (citation omitted); *see also Reed*, 576 U.S. at 164 (law "considered content-based" when adopted "because of disagreement with [] message") (quoting *Ward*, 491 U.S. at 791). Here, the City adopted the Ordinance for a content-based purpose: preventing advocates, representatives, and reporters like Plaintiffs from exercising their First Amendment rights to oppose, observe, and document the City's conduct during encampment sweeps and other abatement activity. Indeed, both the timing and the text of the Ordinance make plain that the City adopted the Ordinance because it disagreed with Plaintiffs' message and wanted to suppress their expression. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (Kennedy, J., concurring) (opining that, "as in equal protection cases," a court considering First Amendment issues "may determine the city council's object from both direct and circumstantial evidence") (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

"The specific sequence of events leading to the challenged decision [] may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Here, the City had not revised Section 10-616 for more than two decades. *See* Fresno, Cal., Am. Ord. 2002-51, § 15 (eff. Oct. 31, 2002). Then, on January 5, 2022, just one day after a city code enforcement officer was cited for misdemeanor battery on Ms. Martinez while she filmed a sweep, the City Attorney suddenly initiated amendments seeking to insulate the City's sweep and other abatement activity from public scrutiny.[15] The new text in the Ordinance sheds more light on the City's purpose to specifically regulate Plaintiffs' activities during encampment sweeps because the Ordinance added to Section 10-616 terms like "occupied location," "occupants," and "advocate." Compl., Ex. A § 10-616(b)(2).

The Ordinance is also content based because it "singles out" specific categories of speakers "for differential treatment." *See Reed*, 576 U.S. at 169. The Ordinance states "prior to any abatement taking place," "persons providing services to the occupants or advocating on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured." Compl., Ex. A § 10-616(b)(2). In other words, this provision on its face singles out advocates and service

---

[15] *See* City of Fresno Legislation Details (With Text) File # ID 22-98, https://tinyurl.com/mwsmtzm7 (last accessed Mar. 30, 2022).

providers and grants them privileges not available to the public writ large. Thus, a reporter or other member of the news media or a pastor who wants to pray with someone being swept may not be allowed into an un-secured encampment facing an imminent sweep in order to interview or pray with an unhoused target of that sweep, but an "advocate" or "person providing services" would be. *See Hoye v. City of Oakland*, 653 F.3d 835, 853–54 (9th Cir. 2011) (holding that city violated First Amendment by allowing speech within 100 feet of clinics that facilitated access to clinics but not speech that discouraged access). Compounding the problem, the provision lacks any standards to guide city staff and contractors in determining who qualifies as an "advocate or service provider," thereby inviting arbitrary and discriminatory enforcement. *See Kaahumanu*, 682 F.3d at 806 (explaining that "unbridled discretion" doctrine, which requires that laws include adequate standards, protects against risk that officials "will favor or disfavor speech based on its content") (citation omitted).

As a content-based restriction, the Ordinance is unconstitutional unless the City proves that it satisfies strict scrutiny. *See Reed*, 576 U.S. at 163. Because the Ordinance is not narrowly tailored under intermediate scrutiny, *infra*, the City certainly cannot satisfy strict scrutiny's tailoring requirements.

### 4. Even if content neutral, the Ordinance unreasonably burdens protected expression and activity.

But even if the Ordinance is considered content neutral, it is not a reasonable time, place, and manner restriction. First, the City cannot satisfy its burden of showing that the Ordinance is narrowly tailored so that it does not "'burden substantially more speech than is necessary.'" *See Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (quoting *Ward*, 491 U.S. at 799). The burden on constitutional rights created by the Ordinance is substantial. The Ordinance's text alone authorizes complete closures of public areas to any speech, expression, and association at precisely the time and place where the interests in supporting unhoused residents, preventing abuse, and monitoring the City are strongest. Moreover, as explained *infra*, the Ordinance is vague as to its scope—it provides no notice as to when in the multi-stage process of a sweep the City will claim authority to cordon off an encampment where people are living or how wide a perimeter the City will establish. Thus, regardless of how it is enforced, the Ordinance is likely to chill a wide range of protected activities. *See Edge v. City of Everett*, 929 F.3d 657, 664–65 (9th Cir. 2019) (requiring "specificity and clarity of laws" when "First

Amendment freedoms are at stake" because uncertain rules "might have the effect of chilling protected speech or expression by discouraging participation") (citation omitted).

The City cannot show that this substantial burden on expression is necessary. The Ordinance baldly asserts that wholesale closures during abatement will "protect the health and safety of the public and city employees[.]" Compl., Ex. A § 10-616(b)(1). But a "complete ban can be narrowly tailored . . . only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). And witnessing and documenting encampment sweeps or protecting and supporting unhoused people avoid physical abuse and the destruction or seizure of personal property are not "evils" that undermine health and safety. Rather, these actions help defuse tense situations and hold officials accountable. *See* Hernandez Decl. ¶¶ 7, 9; Juarez-Deleon Decl. ¶¶ 4, 16, 18; Valdez Decl. ¶¶ 6, 11–12; Alvarado Decl. ¶¶ 9, 13–15, 19; Martinez Decl. ¶¶ 22–24, 31, 39; McCloskey Decl. ¶¶ 5, 16; Piombino Decl. ¶¶ 6, 9, 13–14, 16, 20. Indeed, City Councilmembers have thanked Plaintiffs for their work and said they keep the City "honest." *See* McCloskey Decl. ¶ 20. And the City "is not free to foreclose expressive activity in public areas on mere speculation about danger." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990).

Moreover, the City's stated interest in protecting health and safety, even if legitimate, can be achieved in ways that are far less restrictive on expressive activities. Specifically, the City could simply enforce the preexisting laws at its disposal. For example, to the extent members of the public unlawfully interfere with legitimate law enforcement and abatement functions, other laws, including California Penal Code section 148 prohibiting willful resistance, delay, or obstruction of public officers,[16] are sufficient to protect the City's interests.[17] *See Comite de Jornaleros*, 657 F.3d at 949–50 (finding ban on curbside speech not narrowly tailored where city could instead enforce existing laws, including rules

---

[16] Reflecting the importance of public accountability and transparency, even section 148 clarifies that "tak[ing] a photograph or mak[ing] an audio or video recording of a public officer or peace officer, while the officer is in a public place or the person taking the photograph or making the recording is in a place he or she has the right to be, does not constitute, in and of itself," resistance, delay, or obstruction. Cal. Penal Code § 148(g).

[17] The availability of other laws also explains why the Ordinance violates the right to move freely, which is "implicit in the concept of a democratic society." *See In re White*, 97 Cal. App. 3d 141, 148 (1979). Like time, place, and manner restrictions on expression, any restrictions on freedom of movement in public spaces should be "regarded with skepticism" and evaluated for narrow tailoring in light of "available alternative means." *Id.* at 150; *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (California law requiring identification from persons "who loiter or wander" in streets "implicates consideration of the constitutional right to freedom of movement").

against jaywalking and obstructing normal movement of traffic).

Second, the Ordinance does not leave open "ample alternative channels for communication." Alternatives are not adequate where the "expression depends in whole or part on the chosen location" or a speaker would be prevented from reaching their "intended audience." *Galvin v. Hay*, 374 F.3d 739, 748–49, 756 (9th Cir. 2004) (citation omitted); *see also, e.g.*, *Bay Area Peace Navy*, 914 F.2d at 1229–30 (plaintiffs lacked ample alternative channels because "intended audience" could neither see nor hear protesters from outside 75-yard "security zone" around naval display). The safety of those targeted by encampment sweeps, and the efficacy of Plaintiffs' protected expression and conduct, depend on being in encampments during sweeps. *See* Alvarado Decl. ¶¶ 7, 9, 13–18; Martinez Decl. ¶¶ 4–5, 7–9, 19, 22–24, 28, 36, 39; McCloskey Decl. ¶¶ 5, 16; Piombino Decl. ¶¶ 6, 19–20; Sanchez Decl. ¶¶ 10, 13; Hernandez Decl. ¶¶ 5, 7–9; Juarez-Deleon Decl. ¶¶ 4–6, 10, 16, 18; Valdez Decl. ¶¶ 4, 6–7, 11–13. But under the Ordinance, the City can establish a buffer zone around an encampment sweep so large as to completely sever the public from the unhoused community residing there and to completely prevent Plaintiffs and others from being able to meaningfully see or record the City's actions. Moreover, these buffer zones will prevent Plaintiffs from reaching their intended audiences: the public officials conducting the sweeps and the unhoused individuals they seek to organize, assist, and protect. For example, if Union members are not able to assist other unhoused people during sweeps, their message of equality and empowerment will be diluted and their ability to effectively organize curbed. *See* Sanchez Decl. ¶ 10; Martinez Decl. ¶¶ 5, 36; Juarez-Deleon Decl. ¶¶ 15–16; Valdez Decl. ¶ 4.

Third, the Ordinance contains no standards, let alone "reasonably specific and objective" ones, about when city law enforcement, staff, and contractors will grant the "express authorization" required to enter a buffer zone around a public abatement area, "leav[ing] the decision" about who gets to enter and exercise their First Amendment rights "to the whim" of law enforcement and abatement officers. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992)). The danger of abuse is acutely significant because much of the expression Plaintiffs seek to engage in—opposing, observing, and documenting the City's abatement sweeps—is directed at the very officials empowered to allow or bar entry.

Indeed, in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir.

2021), the Eleventh Circuit considered, and rejected, an ordinance prohibiting social-service food sharing in city parks with a similarly bare pre-authorization requirement: "unless authorized pursuant to a written agreement with the City." *Id.* at 1295. In the court's words, "That's it." *Id.* The requirement did not include "*any* standards to guide City officials' discretion[.]" *Id.* (emphasis in original). So too here. This type of "unbridled discretion presents too great a danger of censorship and of abridgement of our precious First Amendment freedoms." *Id.* (internal quotation marks, citation omitted).

For these three reasons, the Ordinance is an unreasonable time, place, and manner restriction and thus invalid. It is also, therefore, an unconstitutional prior restraint. *See Baugh*, 187 F.3d at 1042.

### B. The Ordinance is void for vagueness because it lacks specificity and standards.

Plaintiffs are equally likely to succeed on their claim that the Ordinance is unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To satisfy due process, a law must provide adequate "notice" of the conduct proscribed and "explicit standards" to "avoid 'arbitrary and discrimination enforcement.'" *Edge*, 929 F.3d at 664–65 (quoting *Grayned*, 408 U.S. at 108). When "[F]irst [A]mendment rights are at stake, an even greater degree of specificity and clarity of laws is required" to ensure that ambiguity does not "chill[] protected speech or expression by discouraging participation." *Id.* (citation omitted). This heightened scrutiny is also necessary to avoid the risk that public officials "might resort to enforcing the [law] only against" those "whose messages the officer or the public dislikes." *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998).

The Ordinance suffers from precisely the types of defects that threaten to chill speech and invite discrimination. The Ordinance is woefully vague as to how, where, and when in the often-chaotic process of an encampment sweep or other abatement activity it will apply. Section (b)(1) of the Ordinance prohibits unauthorized entry into a "restricted area" "where an abatement is taking place" and "while an abatement is in progress." But the Ordinance fails to define what activities constitute abatement, when that abatement "is in progress," and how wide a perimeter will be established around "where" abatement is "taking place."

The restriction on entry is particularly vague because the pre-amendment language in section (b) makes clear that the statute applies to "the work of abatement" as well as "any necessary act preliminary

to or incidental to such work"—an application so broad as to have no limits at all. That section also provides that persons shall not "obstruct, impede or interfere with" city staff and contractors engaged in this boundless range of work, but these terms are likewise not defined. Simply put, the statute leaves too many questions unanswered. It is unclear, for example, whether an unhoused person who leaves a restricted area during a sweep to move precious belongings will be allowed to reenter to continue packing, or whether someone would be permitted in to help them pack. *See* Martinez Decl. ¶ 37. Because the reach of the Ordinance is "sufficiently murky," Plaintiffs and others "will be compelled to steer too far clear of any forbidden area[s]," chilling protected speech and expression. *See Edge*, 929 F.3d at 664 (citation omitted); *see* Alvarado Decl. ¶¶ 19–20; Martinez Decl. ¶¶ 36–37; McCloskey Decl. ¶¶ 16–19; Piombino Decl. ¶¶ 20–22; Juarez-Deleon Decl. ¶ 17.

Moreover, the Ordinance invites arbitrary enforcement. Under the Ordinance's regime, city staff and contractors will be able to arbitrarily decide when to impose a buffer zone and whom to authorize, exclude, and punish for entering that area. As explained *supra*, the Ordinance vests city staff and contractors with sprawling authority to create buffer zones in public spaces to protect "health and safety." And the Ordinance provides no process for how to obtain the "express authorization" required for entry, no standards for how city staff and contractors are to exercise their authority in deciding whom to permit and whom to exclude, no guidance on when "health and safety" require closures at all, who qualifies as an advocate or service provider entitled to some limited access before an area is closed, or when that limited access can be constrained by undefined "restrictions mandated by safety concerns or emergency procedures." *See* Compl., Ex. A § 10-616(b), (b)(1) & (b)(2).

### C. The Ordinance is preempted because it conflicts with state law that regulates a subject of statewide concern.

Finally, Plaintiffs are likely to succeed on their preemption claim. Pursuant to Article XI of the California Constitution, a charter city like Fresno may adopt an ordinance that conflicts with general state laws only if the subject of that ordinance is one of "municipal affairs" rather than statewide concern. *See* Cal. Const. art. XI, § 5; *see also id.* § 7. Within this framework, it has "long been settled" that the liability of municipal workers and "'the liability of municipalities . . . for the tortious acts or omissions of their servants is a matter of general state concern'" set forth under the California

Government Tort Claims Act ("Government Claims Act" or "Act"). *Societa per Azioni de Navigazione Italia v. City of Los Angeles*, 31 Cal. 3d 446, 463 (1982) (quoting *Helbach v. City of Long Beach*, 50 Cal. App. 2d 242, 246 (1942)). The "general rule is that an employee of a public entity is liable for his torts to the same extent as a private person (§ 820, subd. (a)) and the public entity is vicariously liable for any injury which its employee causes (§ 815.2, subd. (a)) to the same extent as a private employer (§ 815, subd. (b))." *Id.* (quoting Gov't Claims Act).

Here, the Ordinance seeks to jettison the Government Claims Act's carefully wrought liability scheme in favor of its own. The Ordinance conflicts with the Act because subsection (c) purports to immunize city staff and contractors from "personal liability for any damage" alleged to have occurred "as a result of any act required, permitted or authorized" under the Ordinance. Compl., Ex. A § 10-616(c). But the City cannot do so. As the California Supreme Court has ruled repeatedly, the Government Claims Act "expressly denies [a] public entity the power to enact an ordinance abridging its statutory liabilities or expanding its statutory immunities." *Societa per Azioni de Navigazione Italia*, 31 Cal. 3d at 463; *see also Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 500 (2000) (rejecting "the notion that a local government can, by its own ordinance, exempt itself from liability under the state's Tort Claims Act").

Because the Ordinance impermissibly conflicts with the Government Claims Act, it is preempted under the California Constitution and Plaintiffs are likely to succeed on the merits of their claim that it should be struck down. *See Am. Fin. Servs. Ass'n v. City of Oakland*, 34 Cal. 4th 1239, 1251–52 (2005) (striking down ordinance as preempted because it invaded an area "fully occupied by general law").

### III. The Balance of Equities and Public Interest Favor an Injunction

The final factors in the preliminary injunction test—whether the public interest and the balance of equities favor an injunction—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). This merged inquiry takes into account and balances the public's interest, Plaintiffs' interest, and the City's interest and the relative harms to each should an injunction issue or not issue.

The balance of equities and interests here tips "sharply in favor" of an injunction. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation omitted). In particular, "courts have consistently recognized the significant public

interest in upholding First Amendment principles," *id.* (internal quotation marks, citation omitted),

because the "very existence" of an unconstitutional restriction on expression may chill and deter others

not before the court, *see Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997).

The public also has a specific interest in preserving the right to observe and document the City's

abatement sweeps. The legality and efficacy of the City's sweeps are hotly disputed and, as

demonstrated repeatedly, public scrutiny of the City's sweeps protects public safety by helping to

protect unhoused individual's physical safety and personal property, exposing wrongdoing, and

promoting accountability. *See supra*. Finally, enjoining the City from enforcing the Ordinance will spare

Plaintiffs from suffering the immediate irreparable harms detailed above, including not only the

violation of their First Amendment rights and interference with their missions, but also the experience of

traumatic and destructive abatement sweeps conducted with impunity.

These interests outweigh whatever burden the injunction would impose on the City. The City is

"in no way harmed by the issuance of an injunction that prevents [it] from enforcing unconstitutional

restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). And while the City

may have general interests in health and safety, it cannot establish the requisite narrowly tailored

relationship between the Ordinance and these goals, particularly because the City could readily maintain

health and safety by enforcing existing laws. Finally, even if the City contends that keeping the public at

bay for the entirety of an abatement will make that abatement easier, the City's interests in convenience

and efficiency cannot outweigh Plaintiffs' constitutional interests or the irreparable harm they face. As

the Supreme Court has commanded: "A painted line on the sidewalk is easy to enforce, but the prime

objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

## CONCLUSION[18]

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant Plaintiffs' motion for a

preliminary injunction and enjoin the City from enforcing Fresno Municipal Code Section 10-616.

---

[18] Plaintiffs ask this Court to waive the security bond requirement under Fed. R. Civ. P. 65(c). Courts have exercised discretion to not require a security bond where, as here, the balance of equities weighs strongly in favor of a plaintiff and there is a significant public interest in the underlying action. *See, e.g.*, *United Farm Workers v. U.S. Dep't of Labor*, 509 F. Supp. 3d 1225, 1255 (E.D. Cal. 2020). In addition, courts have not required bonds where, as here, a plaintiff seeks to vindicate constitutional rights. *See, e.g.*, *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008).

Dated:          March 30, 2022          Respectfully submitted,


                                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                        OF NORTHERN CALIFORNIA, INC.

                                        _____
                                        Chessie Thacher (SBN 296767)
                                        Hannah Kieschnick (SBN 319011)
                                        Angelica Salceda (SBN 296152)
                                        Shilpi Agarwal (SBN 270749)


                                        CALIFORNIA HOMELESS UNION STATEWIDE
                                        ORGANIZING COUNCIL,
                                        LAW OFFICES OF ANTHONY D. PRINCE


                                        */s/ Anthony Prince* **(Authorized on March 30, 2022)**
                                        Anthony Prince (SBN 202892)

                                        *Attorneys for Plaintiffs*