1

DAVID E. SNYDER, Cal. Bar No. 262001
JOHN DAVID LOY, Cal. Bar No. 229235
MONICA N. PRICE, Cal. Bar No. 335464
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Telephone: 415.460.5060
Email       dsnyder@firstamendmentcoalition.org
            dloy@firstamendmentcoalition.org
            mprice@firstamendmentcoalition.org

Attorneys for *Amici Curiae* FIRST AMENDMENT
COALITION, CALIFORNIA NEWS PUBLISHERS
ASSOCIATION, CALIFORNIANS AWARE,
NATIONAL PRESS PHOTOGRAPHERS
ASSOCIATION, NORTHERN CALIFORNIA
CHAPTER OF THE SOCIETY OF PROFESSIONAL
JOURNALISTS AND REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT

13

EASTERN DISTRICT OF CALIFORNIA

14

15

16

| | |
|---|---|
| DESIREE MARTINEZ, FRESNO HOMELESS UNION, FAITH IN THE VALLEY, and ROBERT MCCLOSKEY, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF FRESNO, <br><br> Defendant. | Case No. 1:22-cv-00307-DAD-SAB <br><br> **[PROPOSED] BRIEF OF AMICI CURIAE FIRST AMENDMENT COALITION, CALIFORNIA NEWS PUBLISHERS ASSOCIATION, CALIFORNIANS AWARE, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, NORTHERN CALIFORNIA CHAPTER OF THE SOCIETY OF PROFESSIONAL JOURNALISTS AND REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Crtrm.:   5 <br> Judge:   The Hon. Dale A. Drozd |

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

<u>Page</u>

STATEMENT OF INTEREST ........................................................................................................ 1

INTRODUCTION............................................................................................................................ 2

ARGUMENT ................................................................................................................................... 4

I.  THE FIRST AMENDMENT PROTECTS THE PRESS AND PUBLIC'S RIGHT TO
    GATHER INFORMATION TO DISSEMINATE TO THE PUBLIC ................................. 4

II.  PRESS ACCESS IS ESSENTIAL FOR GOVERNMENT TRANSPARENCY AND
     ACCOUNTABILITY........................................................................................................... 6

    A.  Press Coverage Inspires Legal and Public Policy Changes ................................. 7

    B.  A Picture is Worth a Thousand Words: The Unique Importance of Photojournalism......... 9

CONCLUSION ............................................................................................................................... 12

# TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*ACLU of Ill. v. Alvarez*
    679 F.3d 583 (7th Cir. 2012)..................................................................... 5

*Askins v. U.S. Dep't of Homeland Sec.*
    899 F.3d 1035 (9th Cir. 2018)................................................................... 5

*Branzburg v. Hayes*
    408 U.S. 665 (1972) ................................................................................ 4

*Butterworth v. Smith*
    494 U.S. 624 (1990) ................................................................................ 6

*Chestnut v. Wallace*
    947 F.3d 1085 (8th Cir. 2020)................................................................... 5

*City of Lakewood v. Plain Dealer Pub. Co.*
    486 U.S. 750 (1988) ................................................................................ 3

*Courthouse News Serv. v. Planet*
    750 F.3d 776 (9th Cir. 2014)..................................................................... 6

*Cox Broad. Corp. v. Cohn*
    420 U.S. 469 (1975) ................................................................................ 5

*Cutting v. City of Portland*
    802 F.3d 79 (1st Cir. 2015) ...................................................................... 3

*Fields v. City of Philadelphia*
    862 F.3d 353 (3d Cir. 2017)...................................................................... 5

*First Nat'l Bank of Bos. v. Bellotti*
    435 U.S. 765 (1978) ................................................................................ 4

*Gentile v. State Bar of Nevada*
    501 U.S. 1030 (1991) ........................................................................... 4, 6

*Glik v. Cunniffe*
    655 F.3d 78 (1st Cir. 2011) ...................................................................... 5

*Index Newspapers LLC v. United States Marshals Serv.*
    977 F.3d 817 (9th Cir. 2020)................................................................. 6, 7

*Kincaid v. City of Fresno*
    2006 U.S. Dist. LEXIS 93464 (E.D. Cal. Dec. 8, 2006)..................... 7, 11

*Leigh v. Salazar*
    677 F.3d 892 (9th Cir. 2012)........................................................................ 4, 6, 7

*Mills v. Alabama*
    384 U.S. 214 (1966) ........................................................................................ 4

*Reed v. Town of Gilbert*
    576 U.S. 155 (2015) ........................................................................................ 4

*Richmond Newspapers v. Virginia*
    448 U.S. 555 (1980) ........................................................................................ 5

*Sierra Club v. Superior Court*
    57 Cal. 4th 157 (2013)..................................................................................... 1

*Smith v. City of Cumming*
    212 F.3d 1332 (11th Cir. 2000) ...................................................................... 5

*Sorrell v. IMS Health Inc.*
    564 U.S. 552 (2011) ........................................................................................ 9

*Stanley v. Georgia*
    394 U.S. 557 (1969) ........................................................................................ 5

*United States v. Stevens*
    559 U.S. 460 (2010) ........................................................................................ 3

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
    425 U.S. 748 (1976) ........................................................................................ 5

STATUTES

Fresno Municipal Code § 10-616 ........................................................................ 3

Fresno municipal Code § 10-616(b)(2) ............................................................... 4

OTHER AUTHORITIES

Anne Trafton, *In the blink of an eye*, MIT News (Jan. 16, 2014) ...................... 9

Bob McCloskey, *Death, Corruption and Ideology*, Community Alliance (Mar. 3, 2021) ............ 7

David Folkenflik, *When police cracked down on reporters on one chaotic night in LA's Echo Park*, Nat. Public Radio (Mar. 31, 2022) ................................................ 8, 9

Gary Warth, *Number of tents, people drops dramatically after police crackdown at Midway homeless encampment*, The San Diego Union-Tribune (Feb. 18, 2022) .................. 8

Case No. 1:22-cv-00307-DAD-SAB
PROPOSED AMICUS BRIEF

Giuseppe Ricapito, *Marin DA: No charges for photographer in Sausalito arrest*, Marin Independent Journal (Dec. 28, 2021) ...................................................................... 8

Joe Fitzgerald Rodriguez, *What happens when SF takes homeless people's 'stuff'*, San Francisco Examiner (June 29, 2016) ...................................................................... 12

*Journalist detained by LAPD during Echo Park Lake protest*, Press Freedom Tracker (Mar. 25, 2021) .......................................................................................................... 8

Karah Rucker, *Project Off-Ramp expected to clean Fresno highways of homeless encampments in 6 months*, Your Central Valley (Feb. 5, 2021) ................................ 7

Mike Rhodes, *Aug. 6 Demolition of a Homeless Encampment*, Community Alliance (Sept. 3, 2021) ................................................................................................................ 10

Mike Rhodes, *Fresno Homeless Attacked and Insulted by City Workers*, Indy Bay (June 22, 2006) ................................................................................................................ 11

Mike Rhodes, *Fresno Homeless Under Attack*, Indy Bay (May 25, 2006) ............................ 7, 11

Mike Rhodes, *Police Brutality Will Be Put on Trial in Fresno*, Community Alliance (Mar. 1, 2022) ............................................................................................................... 10

Nuala Sawyer, *Homeless sweeps in SF: How do you report on an issue city leaders deny is happening?*, Center for Health Journalism (June 25, 2020) ................................... 8

Case No. 1:22-cv-00307-DAD-SAB

PROPOSED AMICUS BRIEF

## STATEMENT OF INTEREST

The *amici curiae* in this brief are a coalition of nonprofits and trade associations dedicated to free speech and a free press.  This case is of paramount importance to *amici* because it presents the Court with the opportunity to recognize and uphold the First Amendment rights of the press and public against unconstitutional regulations.

First Amendment Coalition ("FAC") is a nonprofit advocacy organization based in San Rafael, California, dedicated to freedom of speech and government transparency and accountability.  Founded in 1988, FAC's activities include free legal consultations on First Amendment issues, educational programs, and public advocacy, including extensive litigation and appellate work.  FAC's members include news media outlets, both national and California-based, traditional media and digital, together with law firms, journalists, community activists, and ordinary persons.

California News Publishers Association ("CNPA") is a nonprofit trade association representing more than 800 daily, weekly, digital, and student news publications in California.  Its members regularly use the California Public Records Act in reporting on government agencies, public employees, and the expenditure of public funds throughout the state.  CNPA has appeared as *amicus curiae* in several important public access decisions over the years, including *Sierra Club v. Superior Court*, 57 Cal. 4th 157 (2013).

Californians Aware ("CalAware") is a nonpartisan, non-profit advocacy group with a board comprised of journalists, current and former government officers and employees, and public interest advocates.  Its mission is to foster the improvement of, compliance with, and public understanding of open government laws throughout the State of California.

National Press Photographers Association ("NPPA") is a 501(c)(6) nonprofit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's members include video and still photographers, editors, students, and representatives of businesses that serve the visual journalism community.  Founded in 1946, the NPPA is the voice of visual journalists, vigorously promoting the constitutional and intellectual property rights of

journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

The Northern California Chapter of the Society of Professional Journalists ("SPJ NorCal") is dedicated to improving and protecting journalism.  It is a Chapter of the national Society of Professional Journalists, the nation's most broad-based journalism organization.  Founded in 1909 as Sigma Delta Chi, the Society of Professional Journalists promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists, and protects the First Amendment guarantees of freedom of speech and press.  SPJ NorCal has a Freedom of Information Committee of journalists and First Amendment lawyers, which assists in its free speech and government transparency advocacy.  Also, in collaboration with its Freedom of Information Committee, it hosts the annual James Madison Freedom of Information Awards and offers training to journalists on free press and access issues.

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, *amicus curiae* support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

Each of the above organizations is a nonprofit entity that offers no stock, and there are no parent corporations or publicly owned corporations that own 10 percent or more of any such entity's stock.  No party's counsel authored this brief, or any part of it.  No party's counsel contributed money to fund any part of the preparation or filing of this brief.

## INTRODUCTION

A free press is vital to a healthy democracy.  Transparency provides the public with a critical window into important issues and government misconduct.  Without information about the conduct of government officials acting in its name, the public would never be able to hold the government accountable.  The press and public thus must be able to document government officials who are performing their duties in public.

Section 10-616 of the Fresno Municipal Code (the "Ordinance") substantially impairs the recording of law enforcement and other government officials while they conduct controversial "abatements" of encampments where unhoused people are living.  Given the City of Fresno's checkered history of abusing the rights of unhoused persons and unjustifiably destroying their property, it is especially important that this Court safeguard the right to document the city's conduct.  By allowing city employees or officials to cordon off an area of any size surrounding any abatement in their unbridled discretion, the Ordinance impermissibly authorizes public servants to screen their conduct from public scrutiny.

At the outset, even if the Ordinance is styled as a prohibition on the conduct of entering an "abatement" area without permission, it is subject to a First Amendment challenge.  *Cutting v. City of Portland*, 802 F.3d 79, 83 n.4 (1st Cir. 2015) (noting that even if "styled as a restriction only on conduct," laws "aimed at restricting physical presence within a specified place" are "treated as restrictions on speech rather than merely conduct precisely because the laws necessarily prohibit persons from engaging in expressive activity in such places") (citing *McCullen v. Coakley*, 573 U.S. 464 (2014)).  Because the Ordinance "vests unbridled discretion in a government official over whether to permit or deny expressive activity" within the prohibited zone, Plaintiffs "may challenge it facially."  *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755 (1988).  Plaintiffs may also challenge the Ordinance as overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to" any "plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The First Amendment prohibits laws unjustifiably "abridging the freedom of speech, or of the press."  In particular, as Plaintiffs correctly note, the First Amendment prohibits laws that excessively restrict the right to document the government's conduct.  Yet the Ordinance does just that.  It strips the press of their ability to document encampment sweeps on the public's behalf, further silencing the already marginalized unhoused community.  This prevents the public from knowing what the government is doing in its name and allows the government to operate with impunity.  Although the First Amendment right to gather and disseminate the news is not absolute, and may be subject to reasonable time, place and manner restrictions, here, as Plaintiffs correctly

1  explain, the Ordinance does not meet the standard necessary to overcome the presumptive First

2  Amendment right, under either a strict scrutiny or intermediate scrutiny test.  Plaintiff's

3  Memorandum at 24-29.  *Amici* urge this Court to grant Plaintiffs' Motion for Preliminary

4  Injunction (ECF No. 6) to prevent further harm to the First Amendment and the unhoused

5  community in Fresno.  To the extent the arguments herein pertain to the City's recently filed

6  Motion to Dismiss (ECF No. 13), the Court is respectfully requested to consider them in deciding

7  whether Plaintiffs state a First Amendment claim.

8                                   **ARGUMENT**

9  **I.      THE FIRST AMENDMENT PROTECTS THE PRESS AND PUBLIC'S RIGHT TO
          GATHER INFORMATION TO DISSEMINATE TO THE PUBLIC**

10

11          The First Amendment protects freedom of the press and therefore safeguards the rights of

12  journalists and the general public alike to gather news and information.  *Branzburg v. Hayes*, 408

13  U.S. 665, 681 (1972); *see also, e.g.*, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 781 (1978)

14  (noting "special and constitutionally recognized role" of the press "in informing and educating the

15  public"); *Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the

16  press . . . to play an important role in the discussion of public affairs.").

17          Accordingly, the Ninth Circuit has confirmed, "[t]he free press is the guardian of the public

18  interest, and the independent judiciary is the guardian of the free press."  *Leigh v. Salazar*, 677

19  F.3d 892, 900 (9th Cir. 2012).  In addition, "speech critical of the exercise of the State's power lies

20  at the very center of the First Amendment."  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034

21  (1991).  The press has historically "strengthened our government by exposing its flaws."  *Leigh*,

22  677 F.3d at 897.  By excluding the press from access to encampment sweeps, the Ordinance

23  prevents the press from performing its critical function in our democracy.

24          As Plaintiffs note, Section (b)(2) of the Ordinance restricts access to persons other than

25  advocates and service providers, which impermissibly disadvantages the press in a content-based

26  fashion.  This cannot stand under the First Amendment.  *See* Plaintiffs' Memorandum at 25-26;

27  *see also, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Content-based laws—those

28  that target speech based on its communicative content—are presumptively unconstitutional.").

To the extent it is content neutral, the Ordinance nonetheless violates the First Amendment rights of the press and public.  While the press dedicates its time covering the news, the right to record is universal.  The media are "surrogates for the public," and both the press and the public enjoy the same First Amendment rights.  *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980).  The press stands in for the public for practical purposes.  "In a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."  *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975).

The "First Amendment protects the right to photograph and record matters of public interest" in a traditional public forum.  *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018); *see also, e.g.*, *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) ("[A] person has the right to record police activity in public."); *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017) ("[T]he First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public."); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.").  "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs."  *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (cleaned up).  The public is unable to discuss and debate events that are kept secret.

The First Amendment also guarantees the right to receive the news, which strengthens the democratic process more broadly.  "Free speech carries with it some freedom to listen."  *Richmond Newspapers*, 448 U.S. at 576; *see also, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both."); *Stanley v. Georgia*, 394 U.S. 557, 564

1   (1969) ("It is now well established that the Constitution protects the right to receive information

2   and ideas.").  "By guaranteeing that the individual citizen can effectively participate in and

3   contribute to our republican system of self-government, the First Amendment … ensures that the

4   constitutionally protected discussion of governmental affairs is an informed one."  *Courthouse*

5   *News Serv. v. Planet*, 750 F.3d 776, 785 (9th Cir. 2014) (cleaned up).  Press and public access

6   permits the public to make informed decisions about the government.  If the press and public are

7   unable to document an incident, the harm can never be undone.  There is no way to go back and

8   capture the photograph or story to accurately depict what occurred.  Firsthand, immediate accounts

9   of government abuses with photographic evidence are highly persuasive, but secondhand

10  recollections are a pale comparison.  Stories of unhoused individuals are particularly fleeting in

11  the case of a sweep as they are shuffled around town and possibly arrested.

12  **II.     PRESS ACCESS IS ESSENTIAL FOR GOVERNMENT TRANSPARENCY AND
        ACCOUNTABILITY**

13

14          Courts have recognized several significant public policy rationales behind the First

15  Amendment right to record government activity, including the ability to hold public officials

16  accountable for misconduct and the promotion of trust in the community that comes with such

17  transparency.  "Open government has been a hallmark of our democracy since our nation's

18  founding."  *Leigh*, 677 F.3d at 900.  "Transparency assures that the government's response is

19  carried out fairly to all concerned, and public access discourages misconduct of participants, and

20  decisions based on secret bias or partiality."  *Index Newspapers LLC v. United States Marshals*

21  *Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (cleaned up).  "When wrongdoing is underway, officials

22  have great incentive to blindfold the watchful eyes of the Fourth Estate."  *Leigh*, 677 F.3d at 900.

23  "[T]he publication of information relating to alleged governmental misconduct" is core protected

24  speech, *Butterworth v. Smith*, 494 U.S. 624, 632 (1990), because "contemporaneous review in the

25  forum of public opinion is an effective restraint on possible abuse of . . . power," *Gentile*, 501 U.S.

26  at 1035 (cleaned up).  Here in particular, the history leading up to the Ordinance's adoption,

27  including the alleged battery of Plaintiff Dez Martinez by a city worker during an abatement

28  sweep, raises significant concerns that the city's "real motive may be to prevent the gathering of

1   information about government abuses or incompetence." *Leigh*, 677 F.3d at 900 (quoting

2   Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV.

3   927, 949 (1992)); *see also* Plaintiffs' Memorandum at 16-17.

4       **A.     Press Coverage Inspires Legal and Public Policy Changes**

5           Throughout our country's history, the press has aided the public by shedding light on false

6   government narratives, especially in recent times where contemporaneous recording has been

7   essential to exposing misconduct and brutality.  For example, "the public became aware of the

8   circumstances surrounding George Floyd's death because citizens standing on a sidewalk

9   exercised their First Amendment rights and filmed a police officer kneeling on Floyd's neck until

10  he died."  *Index Newspapers LLC*, 977 F.3d at 831.  The full social and legal ramifications of Mr.

11  Floyd's death and the subsequent protests are still in progress, but it is clear that the video of the

12  incident galvanized the nation in a way no other report could have done.

13          Transparency is particularly important when it comes to the issue of encampment sweeps.

14  The City of Fresno has an unfortunate history of trampling on the rights of unhoused persons.  *See,*

15  *e.g.*, *Kincaid v. City of Fresno*, 2006 U.S. Dist. LEXIS 93464, at *108 (E.D. Cal. Dec. 8, 2006)

16  (reviewing city's abuses and enjoining it "from seizing and immediately destroying the property of

17  homeless persons").  The government's self-serving description of sweeps is often at odds with

18  reporting on the ground.  Before the *Kincaid* lawsuit, news coverage described how tents and

19  belongings were unceremoniously tossed into the trash by city employees even though the city

20  denied destroying property without due process.  *See, e.g.*, Mike Rhodes, *Fresno Homeless Under*

21  *Attack*, Indy Bay (May 25, 2006), perma.cc/583A-MZEK.  More recently, Fresno Mayor Jerry

22  Dyer's office announced that Project Off-Ramp would move unhoused people from encampments

23  near the freeway into housing.  However, activists and unhoused individuals on the ground

24  streamed video of unhoused people being "put out in the cold rain."  *See* Karah Rucker, *Project*

25  *Off-Ramp expected to clean Fresno highways of homeless encampments in 6 months*, Your Central

26  Valley (Feb. 5, 2021), perma.cc/6VDE-X69M; Bob McCloskey, *Death, Corruption and Ideology*,

27  Community Alliance (Mar. 3, 2021), perma.cc/D52H-RPBV.

28

1    This problem is not unique to Fresno—conflicting narratives permeate the discourse

2    around encampment sweeps in other areas as well.  While the City of San Diego credits its

3    encampment sweeps as "progressive enforcement" because people are offered shelter beds,

4    advocates on the ground report "aggressive enforcement, with several police vehicles arriving at a

5    time and officers warning people that they would be arrested if they stayed."  Gary Warth, *Number*

6    *of tents, people drops dramatically after police crackdown at Midway homeless encampment*, The

7    San Diego Union-Tribune (Feb. 18, 2022), bit.ly/3LNDqG3.  Writing for the Center for Health

8    Journalism, Nuala Sawyer noted that the City of San Francisco refused to admit that it conducts

9    "sweeps," instead referring to "encampment resolutions," "[d]espite hundreds of photos and

10   videos showing city employees tossing tents, backpacks, and walkers into the back of dump

11   trucks—plus countless testimonies from homeless people and their neighbors—city leaders

12   repeatedly denied to me over and over again that homeless sweeps were even happening."  Nuala

13   Sawyer, *Homeless sweeps in SF: How do you report on an issue city leaders deny is happening?*,

14   Center for Health Journalism (June 25, 2020), perma.cc/2KC3-7PYX.

15   As seen in the record, journalists are already concerned that they will be unable to

16   document abatements as a result of the Ordinance without risking arrest or injury from law

17   enforcement.  Plaintiffs' Memorandum at 19-20.  These fears are not unfounded.  In the case of

18   photojournalist Jeremy Portje, documenting encampments and unhoused persons' interactions

19   with law enforcement in Marin County resulted in an unlawful arrest and illegal search and seizure

20   of his newsgathering materials and cell phone.  Giuseppe Ricapito, *Marin DA: No charges for*

21   *photographer in Sausalito arrest*, Marin Independent Journal (Dec. 28, 2021),

22   bayareane.ws/3ui4ZBn.  In March 2021, at least 20 journalists were arrested, detained, or

23   assaulted by law enforcement while documenting demonstrations near an encampment sweep at

24   Echo Park in Los Angeles.  *See, e.g.*, *Journalist detained by LAPD during Echo Park Lake*

25   *protest*, Press Freedom Tracker (Mar. 25, 2021), perma.cc/K59H-DU69.  Reporters were shot with

26   rubber bullets and zip-tied at the scene as well.  *See* David Folkenflik, *When police cracked down*

27   *on reporters on one chaotic night in LA's Echo Park*, Nat. Public Radio (Mar. 31, 2022),

28   perma.cc/T7EJ-EM6A.  As is common, the city proclaimed that it would provide housing and

1   social services, a claim that activists and a recent University of Los Angeles report dispute.  *Id.*;

2   Roy Ananya, et al., *(Dis)Placement: The Fight for Housing and Community After Echo Park Lake*

3   (2022), escholarship.org/uc/item/70r0p7q4.

4       **B.    A Picture is Worth a Thousand Words: The Unique Importance of Photojournalism**

5

6       Journalism is a deeply visual medium of expression—photographs and videos

7   communicate in ways words simply cannot.  The human brain can process and interpret images in

8   less than a second, where reading takes much longer.  Anne Trafton, *In the blink of an eye*, MIT

9   News (Jan. 16, 2014), perma.cc/P4J2-NNC6.  Photographs and videos convey facts as they are

10  seen by the journalist, without gloss or spin, showing facts in ways that words cannot.  However,

11  we do live in a world where photos can be doctored and deep-faked.  This means that "live

12  streaming" video, is particularly important because it shows events in real time, adding another

13  layer of veracity.  "Facts, after all, are the beginning point for much of the speech that is most

14  essential to advance human knowledge and to conduct human affairs."  *Sorrell v. IMS Health Inc.*,

15  564 U.S. 552, 570 (2011).

16      Many of the most compelling and effective news stories use photography or video.

17  Photojournalists and members of the public often capture iconic and historic photographs or

18  videos that change perceptions and public policy, as recently exemplified by videos of police

19  brutality against George Floyd and others.  The housing crisis in California is particularly

20  newsworthy, and photojournalism plays a central role in bringing public awareness to this crisis.

21      On that note, photographs and video documenting encampment sweeps force the public

22  and the courts to confront the reality and pain of seeing all of one's worldly possessions—tents,

23  blankets, photographs, birth certificates, medications, and mobility devices—unceremoniously

24  thrown into a dumpster.  Members of the press and public, including Plaintiffs, regularly attend

25  encampment sweeps capturing such images and scenes.  Without the ability of the press and

26  public to document abuses, the city could easily declare that its sweeps are both humane and

27  effective when the reality is quite different.  What the city refers to as a beneficial "clean-up"

28  involves bulldozers and garbage trucks, while intentionally displaced people flee with whatever

they can carry, depicted in the photo below.  Mike Rhodes, *Aug. 6 Demolition of a Homeless Encampment*, Community Alliance (Sept. 3, 2021), perma.cc/E34M-5HVR.



Photo by Peter Maiden of a 2021 encampment sweep.  *Id.*

In one instance, an unhoused man from Fresno, Lewis Brown, was assaulted by police at an encampment sweep in 2020.  Mike Rhodes, *Police Brutality Will Be Put on Trial in Fresno*, Community Alliance (Mar. 1, 2022), perma.cc/5HLJ-KHLC.  Footage of the incident is part of a class action lawsuit filed against the City of Fresno.



Photo by Dez Martinez of Mr. Brown after encampment sweep.  *Id.*

Journalist Mike Rhodes also captured these images of encampment sweeps in Fresno in 2006, which helped inform the Court during the *Kincaid* litigation:



In this photo by Mike Rhodes, Liza Apper stood between a bulldozer and tent, preventing the city from seizing and destroying the tent along with the possessions inside.  Mike Rhodes, *Fresno Homeless Under Attack*, Indy Bay (May 25, 2006), perma.cc/583A-MZEK.



This photo by Mike Rhodes shows City workers illegally dumping possessions that were specifically set aside in accordance with City procedures.  Mike Rhodes, *Fresno Homeless Attacked and Insulted by City Workers*, Indy Bay (June 22, 2006), perma.cc/KU5N-8XL2.

In San Francisco, a similar photograph of the Department of Public Works throwing unhoused man Neil Taylor's walker into a trash compactor went viral and led to public outrage

-11-

1   and assurances from the Mayor's office that they were reviewing the situation and that items must

2   be "bagged and tagged" instead of trashed.  Joe Fitzgerald Rodriguez, *What happens when SF*

3   *takes homeless people's 'stuff'*, San Francisco Examiner (June 29, 2016), perma.cc/L4EG-DUGW.

4

5

6

7

8   

9

10

11

12

13

14

15   Photo by Kelley Cutler of Mr. Taylor's walker in the trash compactor.  *Id.*

16

17       These photos tell a vital story about the illegal and senseless seizure and destruction of

18   unhoused persons' possessions.  There is a huge difference between reading about a sweep and

19   seeing the pain, desperation and senselessness in photographs.  It is not possible to tell these

20   stories the same way or capture these images without access to encampment sweeps.  The

21   Ordinance will prevent the press and public from capturing similar photos in the future, preventing

22   the public from witnessing and discussing the truth about encampment sweeps.

23                                        **CONCLUSION**

24       The First Amendment protects the press and public's right to witness and document

25   government officials in public, particularly at encampment sweeps.  The Ordinance will prevent

26   the press and public from exercising these rights by permitting the government to arbitrarily block

27   access to "restricted areas" of undetermined size for undetermined lengths of time.  This

28   unconstitutional infringement is not in the public's interest and will prevent the press from

1  providing vital information to the community about the government's activities.  Therefore, we

2  urge this Court to grant Plaintiffs' Motion for a Preliminary Injunction.

3  Dated:  April 11, 2022

4                              FIRST AMENDMENT COALITION

5                   By

6                              _____
                                                 /s/ Monica N. Price
                                        DAVID E. SNYDER

7                                       JOHN DAVID LOY
                                        MONICA N. PRICE

8                              Attorneys for *Amici Curiae* FIRST AMENDMENT
                              COALITION, CALIFORNIA NEWS PUBLISHERS

9                              ASSOCIATION, CALIFORNIANS AWARE,
                              NATIONAL PRESS PHOTOGRAPHERS

10                             ASSOCIATION, NORTHERN CALIFORNIA
                              CHAPTER OF THE SOCIETY OF

11                             PROFESSIONAL JOURNALISTS AND
                              REPORTERS COMMITTEE FOR FREEDOM OF

12                             THE PRESS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28