1   Douglas T. Sloan, City Attorney (State Bar #194996)
    Tina Griffin, Chief Assistant City Attorney (State Bar #210328)
2   CITY OF FRESNO
    2600 Fresno Street, Room 2031
3   Fresno, California 93721-3602

4   BETTS & RUBIN, A Professional Corporation
    James B. Betts (State Bar #110222)
5   Joseph D. Rubin (State Bar #149920)
    907 Santa Fe Avenue, Suite 201
6   Fresno, California 93721
    Telephone: (5559) 438-8500
7   Facsimile: (559) 438-6959
    br@bettsrubinlaw.com
8

9   WHITNEY, THOMPSON & JEFFCOACH LLP
    Mandy L. Jeffcoach, #232313
10  mjeffcoach@wtjlaw.com
    Jessica L. Thomason, #340704
11  jthomason@wtjlaw.com
    970 W. Alluvial Ave.
12  Fresno, California 93711
    Telephone:    (559) 753-2550
13  Facsimile:    (559) 753-2560

14  Attorneys for Defendant City of Fresno

15

16

17              UNITED STATES DISTRICT COURT

18     EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

19

20  DESIREE MARTINEZ, FRESNO          Case No. 1:22-cv-00307-DAD-SAB
    HOMELESS UNION, FAITH IN THE
21  VALLEY, and ROBERT MCCLOSKEY,     **CITY OF FRESNO'S MEMORANDUM
                                      OF POINTS AND AUTHORITIES IN
22            Plaintiff,              OPPOSITION TO MOTION FOR
                                      PRELIMINARY INJUNCTION**
23        v.
                                      Date:    May 17, 2020
24  THE CITY OF FRESNO,               Time:    9:30 a.m.
                                      Crtrm.:  5, 7th Floor
25            Defendant.
                                      The Hon. Dale A. Drozd
26

27

28

    CITY OF FRESNO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR
                            PRELIMINARY INJUNCTION

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.    PRELIMINARY STATEMENT ...................................................................................1

4   II.    BACKGROUND FACTS ........................................................................................1

5      A.    Introduction ...............................................................................................1

6      B.    The City's Efforts to Address Homelessness ...........................................2

7      C.    Administrative Order 6-23 .......................................................................3

8      D.    The City's HTF and HART Teams ..........................................................5

9   III.    LAW AND ARGUMENT .......................................................................................6

10      A.    Standards for Issuance Of An Injunction. ...............................................6

11          1.    Plaintiffs Can Not Establish A Likelihood of Success On The Merits. .................................................................................8

12

13          2.    Plaintiffs Have Failed to Establish A Threat of Irreparable Injury. ...............9

14          3.    A Balance of Hardships Clearly Favors The City. .......................................10

15          4.    The Public Interest Favors Denial Of The Requested Injunction. ...............12

16      B.    Plaintiffs' Proposed Preliminary Injunction Is Impermissibly Vague. .....................12

17   IV.    CONCLUSION .....................................................................................................13

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>CASES</u>

4

Alliance for the Wild Rockies v. Cottrell,
    632 F.3d 1127, 1135 (9th Cir. 2011)..................................................................... 7

5

Amoco Production Co. v. Village of Gambell, AK.,
    480 U.S. 531, 542 (1987) .................................................................................. 10

6

7

Benda v. Grand Lodge of Int'l Ass'n of Machinists,
    584 F.2d 308, 315 (9th Cir. 1978)...................................................................... 7

8

Bernhardt v. Los Angeles County,
    339 F.3d 920, 931 (9th Cir. 2003)...................................................................... 12

9

10

California v. Azar,
    911 F.3d 558, 575 (9th Cir. 2018)...................................................................... 8

11

Campbell Soup Co. v. ConAgra, Inc.,
    977 F.2d 86, 91 (3rd Cir. 1992)......................................................................... 9

12

13

City of Los Angeles v. Lyons,
    461 U.S. 95, 102 (1983) .................................................................................... 7

14

Clear Channel Outdoor, Inc. v. City of L.A.,
    340 F.3d 810, 813 (9th Cir. 2003)...................................................................... 7

15

16

Dhillon v. Municipal Court
    4 Cal.3d 860, 865 (1971).................................................................................... 8

17

Disney Enters., Inc. v. VidAngel Inc.,
    859 F.3d 848, 866 (9th Cir. 2017)...................................................................... 8

18

19

Dudum v. City and County of San Francisco,
    Case No. 10-00504-RS, 2010 WL 1532365, *11 (N.D.Cal. Apr. 16, 2010) ........ 8

20

Duncan v. Bonta,
    19 F.4th 1087, 1101 (9th Cir. 2021)................................................................... 8

21

22

Dymo Industries, Inc. v. Tapeprinter, Inc.
    326 F.2d 141, 143 (9th Cir. 1964)...................................................................... 6

23

Farris v. Seabrook,
    677 F.3d 858, 864 (9th Cir. 2012)...................................................................... 7

24

25

FoodComm Int'l v. Barry,
    328 F.3d 300, 304 (7th Cir. 2003)...................................................................... 9

26

Indep. Living Ctr. of S. Cal., Inc. v. Maxwell - Jolly,
    572 F.3d 644, 659 (9th Cir. 2009)...................................................................... 12

27

28

ii

1

## TABLE OF AUTHORITIES
### (Continued)

2

Page

3

*Johnson v. Couturier,*
572 F.3d 1067, 1093 (9th Cir. 2009) ............................................................ 7

4

*Kincaid, et al. v. City of Fresno,*
USDC Case No. 06-CV-14450WW (2006) ................................... 3, 4

5

6

*Lopez v. Brewer,*
680 F.3d 1068, 1072 (9th Cir. 2012) ............................................ 6

7

*Lopez v. Heckler*
713 F.2d 1432, 1437 (9th Cir. 1983) ........................................... 12

8

9

*Martin v. International Olympic Committee,*
740 F.2d 670, 675 (9th Cir. 1984) ............................................... 7

10

*Mazurek v. Armstrong,*
520 U.S. 968, 972 (1997) ............................................................ 6

11

12

*National Wildlife Federation v. Coston,*
773 F.2d 1513, 1517 (9th Cir. 1985) ........................................... 7

13

*Nken v. Holder,*
556 U.S. 418, 435 (2009) ............................................................ 12

14

15

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
762 F.2d 1374, 1377 (9th Cir. 1985) ........................................... 7

16

*Orantes-Hernandez v. Thornburgh,*
919 F.2d 549, 557 (9th Cir. 1990) ............................................... 7

17

18

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
102 F.3d 12, 18 (1st Cir. 1996) ................................................... 9

19

*Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc*
80 F.Supp.3d 1058, 1075 (C.D. Cal. 2015) ................................. 8

20

21

*Schmidt v. Lessard*
414 U.S. 473,476 (1974) ............................................................. 13

22

*Siegel v. Lepore,*
234 F.3d 1163, 1176 (11th Cir. 2000) ......................................... 9

23

24

*Sierra Forest Legacy v. Rey,*
577 F.3d 1015, 1022 (9th Cir. 2009) ........................................... 11

25

*Simula, Inc. v. Autoliv, Inc.,*
175 F.3d 716, 725 (9th Cir. 1999) ............................................... 9

26

27

*Sports Form, Inc. v. United Press Intern., Inc.,*
686 F.2d 750, 753 (9th Cir. 1982) ............................................... 7

28

# TABLE OF AUTHORITIES
### (Continued)

**Page**

Stormans. Inc. v. Selecky,
    586 F.3d 1109, 1138–39 (9th Cir.2009) .......................................................... 11

Timbisha Shoshone Tribe v. Salazar,
    697 F.Supp.2d 1181, 1187 (E.D. Cal. 2010) ...................................................... 8

U.S. Bank Nat. Ass'n v. Friedrichs
    924 F.Supp.2d 1179, 1186 (S.D. Cal. 2013) .................................................... 11

Watkins, Inc. v. Lewis,
    346 F.3d 841, 844 (8th Cir. 2003) ...................................................................... 9

Weinberger v. Romero–Barcelo,
    456 U.S. 305, 312 (1982) .................................................................................. 12

Winter v. Nat. Res. Def. Council, Inc.,
    555 U.S. 7, 24 (2008) ................................................................................. *passim*

Young v. Hawaii,
    992 F.3d 765 (9th Cir. 2021) .............................................................................. 8

## STATUTES

Federal Rules Evidence Section, Rule 401 ................................................................. 2

Federal Rules of Civil Procedure, Rule 65(d) ......................................................... 13

iv

Defendant, CITY OF FRESNO (the "City") hereby submits the following Memorandum of Points and Authorities in Opposition to Plaintiffs DESIREE MARTINEZ, FRESNO HOMELESS UNION, FAITH IN THE VALLEY, and ROBERT MCCLOSKEY's ("Plaintiffs") Motion for Preliminary Injunction.

## I.
## PRELIMINARY STATEMENT

Plaintiffs are asserted advocates and/or service providers to the Fresno homeless community and three (3) homeless individuals who oppose the City of Fresno's recent amendment to Fresno Municipal Code ("FMC") Section 10-616. By their actions, Plaintiffs assert wide ranging, but purely facial, challenges to the statute.

Plaintiffs' motion should be denied. First, as set forth in the City's concurrently calendared Motion to Dismiss, Plaintiffs' facial challenges to FMC Section 10-616 fail to state viable claims. Second, the asserted statute does not pose the risk of irreparable harm, which is purely conjectural at this juncture. Third, a balance of hardships weighs against enjoining the City's ability to utilize the public safety provisions recently added to the subject statute, which extends far beyond homeless encampment clean-ups. Finally, Plaintiffs' requested injunction is vague and overbroad.

As a result, Plaintiffs' motion should be denied.

## II.
## BACKGROUND FACTS

**A.**   **Introduction**

NOTE: By the instant opposition, and in an abundance of caution, the City submits the following detailed response to Plaintiffs' mischaracterization of the City's interactions with its homeless residents, as well as multiple supporting declarations. However, as set forth in the City's concurrently calendared Motion to Dismiss, neither parties' factual recitations are material to the resolution of Plaintiffs' multiple facial challenges to FMC Section 10-616. Rather, the City's cited authorities establish that this Court's determination of both the Motion to Dismiss and Motion for Preliminary Injunction should be decided exclusively on the language of the challenged statute. As such, the City objects to the entirety of the declarations offered in support of Plaintiffs' request for

1

1  injunctive relief as immaterial to any issue presented.  Fed. R. Evid. Section 401.

2  **B.**     **The City's Efforts to Address Homelessness**

3        Plaintiffs' motion seeks to color the City's relationship with its unhoused community as

4  "hostile". Presumably, Plaintiffs do so in an attempt to convince this Court that recent amendments

5  to FMC Section 10-616 are simply one in a string of punitive acts directed at the homeless.

6  Plaintiffs' argument is both disingenuous and incorrect.

7        First, between July, 2019 and December, 2021, the City spent in excess of $59,000,000.00

8  on preventing and addressing homelessness in our community. These figures include:

9        •        Over $30,000,000.00 in the construction or improvement of emergency shelters;

10       •        Approximately $4,500,000.00 in bridge housing;

11       •        Approximately $3,000,000.00 in supportive services;

12       •        $2,176,000.00 in street outreach;

13       •        Over $13,000,000.00 in rental assistance; and

14       •        Nearly $900,000.00 in preventive/rapid rehousing.

15  (See Declaration of H. Spees, ¶ 4)

16       Second, the City does not cite or arrest homeless individuals who sleep at night on sidewalks,

17  streets or in parks. However, the City does request that individuals who do so refrain from blocking

18  public access to those areas during daylight hours. Thus, individuals who set up tents on sidewalks

19  or in parks to sleep at night are often required to disassemble those temporary shelters during the

20  day. (Declaration of J. Betts, ¶ 15)

21       Third, in instances in which the City cleans up homeless encampments, it assigns a legal

22  representative to monitor the process and to physically attend each clean-up to ensure that the

23  requirements of the City's Administrative Ordinance 6-23 are followed, which include:

24       •        Advance notice of the clean-up by way of a prescribed written form set forth in
                  AO6-23; and
25

26       •        If homeless individuals are unable to manage the relocation of their personal
                  property of value, or if a homeless person is not present for a clean-up, the City will
27                collect and store such property for 90 days free of charge.

28       (Declaration of J. Betts, ¶ 9, Declaration of T. Stokes ¶ 4)

Fourth, in preparation for, and during, the clean-up of the homeless encampments, the City has historically coordinated the provision of, and assigns multiple individuals to provide, outreach services to match homeless individuals with available homeless services. In fact, as a result of these efforts, in 2021, over 8,000 unhoused residents were matched with services; over 510 new beds have been created; and nearly 2,800 individuals have been provided with overnight, triage or bridge housing. Consequently, Fresno has made and continues to make massive expenditures of time, effort and resources to provide homeless services, including housing. (Declaration of H. Spees, ¶ 5)

## C.   **Administrative Order 6-23**

In Plaintiffs' complaint and in the instant motion, Plaintiffs conflate the City's clean-up of homeless encampments with morning wake-up calls to maintain open access to City sidewalks, streets and parks. Some background is in order.

In 2006, the City of Fresno and other individual City Defendants, were sued in a class-action lawsuit entitled <u>Kincaid, et al. v. City of Fresno</u>, et al., USDC Case No. 06-CV-1445OWW. Plaintiffs in that lawsuit were represented by, among others, Plaintiffs' counsel herein, the ACLU. (Declaration of J. Betts, ¶ 2)

Following the issuance of a preliminary injunction in <u>Kincaid</u> which prohibited the City from conducting the clean-up of homeless encampments in a manner which did not ensure Constitutional protections, the City created a proposed Administrative Order to ensure that future clean-ups would, among other things, pass Constitutional muster. The draft Administrative Order was provided to Plaintiffs' counsel in <u>Kincaid</u> to obtain their input. One of Plaintiffs' counsels' proposed modifications was a specific itemization of what was referred to as "property of value" which would be collected and stored during a clean-up. Specifically, Plaintiffs' counsels' proposed language for inclusion in AO6-23, included:

> "Personal property of value shall include but not be limited to clothing, shoes, jackets, tents, sleeping bags, bed rolls, blankets, backpacks, duffel bags, bicycles, tools, watches, jewelry, audio and video equipment, medications, toiletries, eyeglasses, purses, handbags, personal papers, camping equipment, photographs, books, shopping carts, carts, buggies, baby strollers, and recycling materials such as aluminum cans that have been bagged or gathered for recycling purposes."

3

(Declaration of J. Betts, ¶ 4)

The City elected to include this proposed language (sans the reference to shopping carts, carts, buggies and recycling materials) in the final version of AO6-23, a copy of which is attached as Exhibit 2.[1] (Declaration of J. Betts, ¶ 4)

The City of Fresno voluntarily adopted AO6-23 on August 30, 2007, and it has remained in place over the ensuing 14 plus years. It bears noting that AO6-23 was not adopted as part of any settlement of the <u>Kincaid</u> lawsuit, and there was no quid pro quo of any kind associated with its implementation.  Rather, the City took Judge Wanger's ruling regarding the constitutionality of the City's clean-ups of homeless encampment seriously, and worked with Plaintiffs' counsel, including the ACLU, to draft an appropriate protocol. As a measure of its success, at the request of Plaintiffs' counsel AO6-23 was made a part of the parties' settlement of the <u>Kincaid</u> litigation, whereby the City agreed to follow AO6-23 for a period of five (5) years. Since its inception, AO6-23 has remained continuously in effect. (Declaration of J. Betts, ¶ 6)

Following the adoption of AO6-23, the City has assigned legal counsel to work alongside City employees to monitor the clean-up of homeless encampments. In each instance, the attorney's objective was, and is, to monitor the City's clean-up of homeless encampments to ensure that they were conducted in a manner that was consistent with the requirements of AO6-23, and more specifically, to work with homeless individuals and to inspect homeless shelters to insure that personal property of value (as defined in AO6-23) was collected and stored by the City. (Declaration of J. Betts, ¶ 7; Declaration of T. Stokes, ¶ 2)

By its terms, AO6-23 only deals with the clean-up of homeless encampments, or the removal of accumulated trash adjacent to homeless encampments, which involve ten (10) or more people who have been present in a specific location for ten (10) or more days. In such instances, AO6-23 requires advance notice to the occupants of a homeless encampment and to a number of specified service providers, and for the collection and storage of personal property of value for at least ninety

---

[1] The City requests that this Court take Judicial Notice of AO6-23, a true and correct copy of which is attached hereto, and to the Declaration of J. Betts, as Exhibit A.

4

1  (90) days. (Declaration of J. Betts, ¶ 8; Declaration of T. Stokes, ¶ 3)

2  **D.     The City's HTF and HART Teams**

3      In approximately 2013, the City formed its Homeless Task Force ("HTF"), which was
4  comprised of five Fresno Police Officers who were tasked with addressing homeless issues and to
5  respond to related calls for service associated with the City's homeless. (Declaration of J. Betts, ¶
6  14)

7      One of the significant issues that the HTF sought to address was overnight camping on City
8  sidewalks, streets and other public or private areas. For example, the City does not target or seek to
9  criminalize homeless individuals who sleep at night on City sidewalks. However, the City does
10  request that individuals who do so, including those that construct tents or temporary shelters in
11  which to sleep, pack up their belongings each morning so as not to block sidewalks, streets or other
12  public areas such as parks. Thus, HTF routinely required homeless individuals to, for example,
13  disassemble tents or other structures blocking city sidewalks each morning.  For obvious reasons,
14  HTF activities have focused on areas where sidewalk "camping" is the most prevalent, such as in
15  and around the Poverello House and Rescue Mission (i.e. Santa Clara, E, F, G and H Streets).
16  (Declaration of J. Betts, ¶15)

17      The day-to-day activities of the HTF did not involve clean-ups conducted pursuant to AO6-
18  23, although HTF officers have been assigned to provide security to assist City crews during
19  encampment clean-ups.  Rather, on a day to day basis HTF officers interacted with the homeless in
20  order to, among other things, ensure that City sidewalks, streets and parks remained open and
21  available to the public during the day. Depending on circumstances, HTF would encourage homeless
22  individuals with significant personal property to take advantage of the opportunity to store personal
23  property of value with the City for 90 days, and coordinate their work with the City's Community
24  Sanitation Division to do so.  Also as part of the daily wake-up calls, Community Sanitation often
25  picks-up the voluminous refuse and trash that remained. However, because the daily wake-up calls
26  did not seek to de-encamp any unhoused individuals, HTF did not provide advance notice of its
27  activities.  Rather, HTF simply provided daily (typically, morning) reminders to those sleeping on
28  City sidewalks or in parks of the need to arise and to collect their property in order to avoid blocking

CITY OF FRESNO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1   public areas. (Declaration of J. Betts, ¶ 16)

2          In support of their contentions, Plaintiffs assert that interactions between City employees

3   and the homeless are materially different when advocates are present and recording those events.

4   However, this argument ignores the fact that the City records contact between Fresno Police Officers

5   and the homeless on police body cameras.   Moreover, the City Attorney's office retains a

6   videographer to record all AO6-23 encampment clean-ups. (Declaration of J. Betts, ¶ 9; Declaration

7   of T. Stokes, ¶ 4)

8          Effective January 1, 2022, the City replaced HTF with the Homeless Assistance Response

9   Team ("HART"). HART is comprised of employees from the Poverello House, the City's Code

10  Enforcement division and Fresno Police Officers, who collectively work to conduct AO6-23 clean-

11  ups and to address issues associated with the City's homeless community. (Declaration of J. Betts,

12  ¶ 18)

13         Thus, Plaintiffs' description of the City's commitment to addressing homelessness in our

14  community is simply untrue. The City has made, and continues to make, substantial efforts to assist

15  its homeless residents, and has directed tremendous resources uniquely focused on housing issues.

16                                          **III.**
                                    **LAW AND ARGUMENT**
17

18  **A.      Standards for Issuance Of An Injunction.**

19         "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v.

20  Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Dymo Industries, Inc. v. Tapeprinter, Inc. 326

21  F.2d 141, 143 (9th Cir. 1964) ["The grant of a preliminary injunction is the exercise of a very far

22  reaching power never to be indulged in except in a case clearly warranting it."]   It "should not be

23  granted unless the movant, by a *clear showing*, carries the burden of persuasion." Lopez v. Brewer,

24  680 F.3d 1068, 1072 (9th Cir. 2012); quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)

25  (emphasis in original).

26         A plaintiff seeking a preliminary injunction must show: (1) a strong likelihood of success on

27  the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the

28  balance of equities tips in the moving party's favor; and (4) that an injunction is in the public interest.

1  Winter, supra, 555 U.S. at 20.

2  The Ninth Circuit has "also articulated an alternate formulation of the Winter test." Farris v.

3  Seabrook, 677 F.3d 858, 864 (9th Cir. 2012). That formulation is referred to as the "serious

4  questions" or the "sliding scale" approach: "'serious questions' going to the merits and a balance of

5  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so

6  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

7  is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir.

8  2011). Provided the Court considers all four parts of the Winter test, the Court may supplement its

9  preliminary injunction inquiry using the sliding scale test. Id. at 1132; Clear Channel Outdoor, Inc.

10  v. City of L.A., 340 F.3d 810, 813 (9th Cir. 2003). The two tests are not, however, separate and

11  unrelated. Each presents the "extremes of a single continuum." Benda v. Grand Lodge of Int'l Ass'n

12  of Machinists, 584 F.2d 308, 315 (9th Cir. 1978). Under the alternative test, "even if the balance of

13  hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum

14  that there is a fair chance of success on the merits.'" National Wildlife Federation v. Coston, 773

15  F.2d 1513, 1517 (9th Cir. 1985) (citing Martin v. International Olympic Committee, 740 F.2d 670,

16  675 (9th Cir. 1984); Sports Form, Inc. v. United Press Intern., Inc., 686 F.2d 750, 753 (9th Cir.

17  1982).) "No chance of success at all, however, will not suffice." Benda v. Grand Lodge of Intern.

18  Ass'n of Machinists and Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978).

19  A stricter standard is applied to the required imminency of the threatened harm when

20  injunctive relief is sought against the actions of the government or its agencies. See Orantes-

21  Hernandez v. Thornburgh, 919 F.2d 549, 557 (9th Cir. 1990). "The injury or threat of injury must

22  be both real and immediate, not conjectural or hypothetical." City of Los Angeles v. Lyons, 461

23  U.S. 95, 102 (1983).

24  Traditionally, in ruling on a motion for preliminary injunction, the court may rely on

25  declarations, affidavits and exhibits, among other things. Johnson v. Couturier, 572 F.3d 1067, 1093

26  (9th Cir. 2009). The weight to be given such evidence is a matter for the court's discretion, upon

27  consideration of the competence, personal knowledge and credibility of the affiant. Oakland

28  Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985). However, in the

7

CITY OF FRESNO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

instant case, Plaintiffs cannot rely upon extrinsic evidence to demonstrate the probability of success on the merits of their claims. Specifically, under both Federal and State law, extrinsic evidence is immaterial when ruling upon a facial challenge to a statute:

- Under Federal law, a court's review of a facial challenge is "limited to the text of the statute itself," and "Plaintiffs' ...individual circumstances do not factor into [the] analysis." <u>Duncan v. Bonta</u>, 19 F.4th 1087, 1101 (9th Cir. 2021) (en banc). Citing <u>Young v. Hawaii</u>, 992 F.3d 765 (9th Cir. 2021) (en banc); and

- Under State law, a facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. <u>Dhillon v. Municipal Court</u> (1971) 4 Cal. 3d 860, 865.

1. <u>**Plaintiffs Can Not Establish A Likelihood of Success On The Merits.**</u>

"[L]ikelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' [a court] need not consider the other factors." <u>California v. Azar</u>, 911 F.3d 558, 575 (9th Cir. 2018), citing <u>Disney Enters., Inc. v. VidAngel Inc.</u>, 859 F.3d 848, 866 (9th Cir. 2017). The "relevant inquiry" of whether plaintiffs have shown a likelihood of success on the merits is "whether they are likely to prevail on the causes of action they assert in their complaint." <u>Timbisha Shoshone Tribe v. Salazar</u>, 697 F.Supp.2d 1181, 1187 (E.D. Cal. 2010). Irrespective of which version of the preliminary injunction test this Court employs, the requirement that Plaintiff present a prima facie case remains paramount. As a threshold matter under <u>Winter</u>, the moving party must establish a likelihood of success on the merits of his claims before a court can grant a preliminary injunction. As noted, in the Ninth Circuit, this threshold showing can be made by demonstrating that there are serious questions going to the merits of the claims. If the moving party is unable to establish this element, the request for a preliminary injunction must be denied and the court need not review whether the remaining requirements for issuance of a preliminary injunction are satisfied. See <u>Dudum v. City and County of San Francisco</u>, Case No. 10-00504-RS, 2010 WL 1532365, *11 (N.D.Cal. Apr. 16, 2010)." <u>Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc.</u> 80 F.Supp.3d 1058, 1075 (C.D. Cal. 2015).

In appraising Plaintiffs' claims, and as extensively set forth in the City's Motion to Dismiss, Plaintiffs have failed to present a prima facie case, much less established a probability of success on the merits. To avoid duplication, the City incorporates herein its Memorandum of Points in Support of Motion to Dismiss, which provides a detailed legal analysis of the deficiencies in Plaintiffs' multiple facial challenges to the constitutionality of FMC Section 10-616, and which demonstrates that Plaintiffs cannot establish a likelihood of success on the merits.

### 2. **Plaintiffs Have Failed to Establish A Threat of Irreparable Injury**.

Unless Congress provides otherwise, a preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury irrespective of the magnitude of the injury. Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999). Plaintiffs seeking preliminary injunctive relief are required to demonstrate that irreparable injury is *likely* in the absence of an injunction. Winter, supra, 555 U.S. at 21-22. Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000); Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiffs must demonstrate immediate threatened harm, and that such harm cannot be redressed by legal remedy following trial. The preliminary injunction must be the only way of protecting the plaintiffs from harm. Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3rd Cir. 1992); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996). The legal remedy need not be wholly ineffectual. Rather, it must be seriously deficient as compared to the harm suffered. FoodComm Int'l v. Barry, 328 F.3d 300, 304 (7th Cir. 2003).

In this case, Plaintiffs cannot establish any threat or irreparable injury as the amended provisions of the ordinance have not been employed by the City in its abatement efforts. Further, even if put into practice, the harms that Plaintiffs claim will result are speculative. By way of example, Plaintiffs state that FMC 10-616 harms both the organizational missions of Faith in the Valley and the Homeless Union by harming the mission to organize, represent, and serve Fresno's unhoused community with the goal of achieving housing for all, by barring Union organizers from entering encampments during abatement activity and preventing organizers from being able to "bear

9

witness" during an abatement proceeding which Plaintiffs state is necessary to build a relationship with unhoused person.   (Memorandum of Points and Authorities in support of Motion for Preliminary Injunction ("Motion P's & A's"), p. 20:16-28.)  However, such harm is unfounded, and Plaintiffs' allegation that the creation of a buffer zone will result in organizers being cut off from the unhoused community is inaccurate.  (Complaint, ¶¶ 56, 61.)  FMC Section 10-616 will not operate to separate Plaintiffs and organizers from the unhoused person they represent, rather it is a safety measure which mandates that no person shall enter the abatement zone without express authorization; therefore, the speculated impact on Plaintiffs' ability to continue organizing is at best theoretical.

As set forth in the Declaration of Fresno City Attorney Douglas Sloan (who participated in drafting the contested provisions) Plaintiffs misconstrue Section 10-616.  As Mr. Sloan explains:

> "Plaintiffs assert that the statute threatens to cut them off from the homeless clients they serve.  This concern is misplaced.  The new ordinance expressly states that advocates and service providers will be provided the opportunity to work with occupants prior to the area being secured.  In dealing with homeless encampment clean-ups, per the ordinance the abatement area will only be secured when that has occurred and the occupants have taken their belongings they wish to keep or have stored, or specified items they wish to keep or do not wish to keep and may be disposed of.  The language of the statute plainly established that if City employees establish a restricted zone during an abatement, "[n]o person shall enter the restricted area…".  (FMC § 10-616(b)(1)).  The term "[n]o person" is used in its literal sense, and means what it says.  In instances in which the City elects to establish a temporary "restricted area" all non-City employees are excluded.  This applies to Plaintiffs as well as all other non-City employees, including the homeless in instances of an abatement in or around a homeless encampment."

(Declaration of D. Sloan, ¶ 6)

Thus, Section 10-616 does not "cut-off" Plaintiffs from their clients, and does not expose Plaintiffs' to any injury, much less irreparable injury.

**3.    A Balance of Hardships Clearly Favors The City.**

The Supreme Court has recognized that courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." _Amoco Production Co. v. Village of Gambell, AK._, 480 U.S. 531,542 (1987).  The Supreme Court in _Winter_ established that the balancing of hardships is to occur within the context of the particular

CITY OF FRESNO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  relief that is sought.  Winter, supra, 555 U.S. at 23.  There, the Court balanced the harms by

2  evaluating the same within the parameters of the particular relief that Plaintiffs requested.

3       In Winter, the district court's original preliminary injunction imposed six restrictions
         on Navy sonar training exercises off the coast of Southern California to prevent harm

4       to marine life nearby. After obtaining an exemption from the executive branch, the
         Navy filed a motion to vacate the injunction, but challenged *only two* of the six

5       restrictions. [Citation.] The Supreme Court explained that "[t]he District Court did
         not reconsider the likelihood of irreparable harm in light of the four restrictions not

6       challenged by the Navy. This failure is significant in light of the District Court's own
         statement that ... one of the unchallenged mitigation restrictions ... would bar use of

7       MFA sonar in a significant portion of important marine mammal habitat." [Citation,
         internal quotation marks omitted.] Put more simply, the district court in Winter took

8       an all-or-nothing approach to assessing the harms instead of addressing the options
         actually on the table—four restrictions versus six restrictions.

9

10  Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022 (9th Cir. 2009).  Stated another way, the

11  specific conduct that plaintiffs are seeking to enjoin must guide the Court's analysis and balancing

12  of hardships.  Here, Plaintiffs are not seeking to enjoin only the City's activity pursuant to the newly

13  adopted sections of FMC Section 10-616 as they relate to the homeless, rather, Plaintiffs seek an

14  injunction requiring the City to immediately cease enforcement of FMC Section 10-616 in its

15  entirety, and without regard to the various and distinct abatements in which it could be employed.

16  Specifically, Plaintiffs' request that this Court "further direct the City to cease all efforts to conduct

17  nuisance abatements pursuant to Section 10-616."  (Plaintiffs' Notice of Motion and Motion for

18  Preliminary Injunction, p. 2:1-6.)  As such, Plaintiffs' request would enjoin the City from both

19  conducting any abatement activities pursuant to the statute or from utilizing the newly enacted safety

20  protocol set forth in Section 10-616 in cases involving Fire Code violations, blighted vacant

21  buildings or the removal of large accumulations of rubbish which are unrelated to homeless

22  encampments.

23       In situations in which an injunction is narrow and limited in scope, the court may find that

24  the public interest is a neutral factor. See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138–39 (9th

25  Cir.2009) (citation omitted) (public interest factor is a neutral factor when the reach of an injunction

26  is narrow and limited to the parties).  U.S. Bank Nat. Ass'n v. Friedrichs (S.D. Cal. 2013) 924

27  F.Supp.2d 1179, 1186.  Here however, Plaintiffs' proposed preliminary injunction is impermissibly

28  overbroad resulting in a greater harm to the City if the relief were granted, than to Plaintiffs in the

11

1   absence of the same.

2          This is especially true where, as here, the City possesses a compelling interest in enforcing

3   statutes which seek to protect the health and safety of the public during abatement proceedings.

4          **4.      The Public Interest Favors Denial Of The Requested Injunction.**

5          Finally, this Court considers "whether there exists some critical public interest that would be

6   injured by the grant of preliminary relief." <u>Indep. Living Ctr. of S. Cal., Inc. v. Maxwell - Jolly</u>, 572

7   F.3d 644, 659 (9th Cir. 2009). "In exercising their sound discretion, courts of equity should pay

8   particular regard for the public consequences in employing the extraordinary remedy of

9   injunction." <u>Weinberger v. Romero–Barcelo</u>, 456 U.S. 305, 312 (1982).   "The public interest

10  inquiry primarily addresses impact on non-parties rather than parties." <u>Bernhardt v. Los Angeles</u>

11  <u>County</u>, 339 F.3d 920, 931 (9th Cir. 2003).[2]

12         Here, the public has a clear interest in the safe conduct of abatement projects. The City is

13  furthering that interest by enacting the provisions of FMC 10-616 which serve to keep *all* members

14  of the public out of an active abatement zone and safe from the operation of heavy machinery and

15  equipment.   For the reasons discussed above, the competing public interests in dealing with the

16  homeless and enforcing public health and safety concerns are best served by the City's existing

17  policies, which should not be enjoined. The City's existing practices are rationally related to serving

18  the public interest, and any impairment of those practices would have a chilling effect on the City's

19  enforcement efforts.

20  **B.    Plaintiffs' Proposed Preliminary Injunction Is Impermissibly Vague.**

21         The Federal Rules of Civil Procedure require that every order granting an injunction shall

22

---

23  [2] Plaintiffs cite to <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009) ("<u>Nken</u>") for the proposition that the
    public interest and balance of equities prongs of the preliminary injunction test merge when the
24  government is a party.  However, the Supreme Court in <u>Nken</u> was evaluating the factors which
    govern a stay of removal pending appeal and not preliminary injunctions.   Though there is
25  substantial overlap between the test for a request for a stay pending appeal and preliminary
    injunctions, the principle of law with respect to the merging of the public interest inquiry to which
26  Plaintiffs cite is not mandatory in the context of a request for a preliminary injunction.  See <u>Lopez</u>
    <u>v. Heckler</u> (9th Cir. 1983) 713 F.2d 1432, 1437.
27

28

1 | be specific in terms, and shall describe in reasonable detail the act or acts sought to be restrained.
2 | Federal Rules of Civil Procedure, Rule 65(d). Thus, when determining the propriety of an
3 | application for injunctive relief, the Court is to consider the clarity of the terms of the proposed
4 | injunction. The purpose of the rule is to prevent uncertainty and confusion on the part of those faced
5 | with injunctive orders, and to avoid the possible founding of a contempt citation too vague to be
6 | understood. Basic fairness requires that those enjoined receive explicit notice of what precisely what
7 | conduct is outlawed. Schmidt v. Lessard (1974) 414 U.S. 473,476.

8 |      The proposed injunction is extremely vague and Plaintiffs' proposed language imposes an
9 | unreasonable burden.

## IV.
## CONCLUSION

12 |      Based on the foregoing, Plaintiffs have not adequately demonstrated a likelihood of success
13 | on the merits of their Constitutional challenges or even that serious questions going to the merits
14 | exist, as Plaintiffs' multiple facial challenges to the statute fail to state a claim and Plaintiffs have
15 | not pled a prima facie case.  Plaintiffs have not established the likelihood that they will suffer harm
16 | in the absence of preliminary relief, in fact the City has not yet even applied the new provisions of
17 | FMC Section 10-616.  The balance of equities when evaluated in the context of the preliminary
18 | relief sought by Plaintiffs weighs heavily in favor of the City, and an injunction is not in the public
19 | interest as it would frustrate the City's ability to exercise its discretion to create a bufferzone to
20 | safely conduct abatement proceedings.  Accordingly, Plaintiffs have failed to establish bases for
21 | interlocutory relief and the City respectfully requests that the Court deny Plaintiffs' motion.

Dated:  April 13, 2022

BETTS & RUBIN

By: _____

James B. Betts
Attorneys for Defendant CITY OF FRESNO

<u>PROOF OF SERVICE</u>

     I am a citizen of the United States of America, a resident of Fresno County, California, over the age of 18 years and not a party to the within-entitled cause or matter.  My business address is 907 Santa Fe Avenue, Suite. 201, Fresno, CA.  On April 13, 2022, I served **CITY OF FRESNO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** on the parties in this action by placing an original/a true copy in an envelope and delivering it as follows:

\_\_\_\_  **(By Overnight Courier)** I caused such envelope with postage fully prepaid, to be sent by _____.

\_\_\_\_  **(By Mail)** I deposited the envelope, with postage fully prepaid, with the United States Postal Service at Fresno, Fresno County, California.

 X   **(By Mail)** I placed the envelope for collection and processing for mailing following this business' ordinary practice with which I am readily familiar.  On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service with postage fully prepaid.

 X   **(By E-Mail)** I caused each document to be sent by e-mail.

Each envelope was addressed as follows:

| | |
|---|---|
| Chessie Thacher<br>Hannah Kieschnick<br>Angelica Salceda<br>Shilpi Agarwal<br>American Civil Liberties Union Foundation<br>of Northern California, Inc.<br>39 Drumm Street<br>San Francisco, CA 94111 | Anthony Prince<br>Law Offices of Anthony D. Prince<br>General Counsel, California Homeless Union<br>2425 Prince Street, Suite 100<br>Berkeley, CA 94705 |
| Douglas T. Sloan,<br>Tina Griffin,<br>City of Fresno<br>2600 Fresno Street, Room 2031<br>Fresno, California 93721-3602 | Whitney, Thompson & Jeffcoach LLP<br>Mandy L. Jeffcoach,<br>Jessica Thomason<br>970 W. Alluvial Ave.<br>Fresno, California 93711 |

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on April 13, 2022, at Fresno, California.

                                     <u>/s/ Adriana Garcia</u>
                                        Adriana Garcia

# EXHIBIT A



City of

**ADMINISTRATIVE ORDER**

| Subject: | Garbage Removal; Clean-up of Temporary Shelters; and Code Enforcement Abatement Procedures | **Number:** 6-23 |
| --- | --- | --- |
| | | **Date Issued:** 08/30/07 |
| | | **Date Revised:** |
| **Responsible Department:** | **City Manager** | **Approved:** |

## Purpose

The City of Fresno receives regular complaints from citizens and businesses throughout the City which relate to health and safety, and other concerns arising in and around areas in which individuals have erected temporary shelters.

By this Administrative Order, the City of Fresno sets forth its policies and procedures for cleaning up areas in which individuals have constructed temporary shelters, and expresses its intention to implement these policies in a manner which balances the needs and rights of all of its citizens, including the residents of such temporary shelters. This policy does not establish any individual right to erect temporary shelters or otherwise encroach on public or private property.

## Policy

The City of Fresno shall respond to complaints and concerns arising in and around areas in which individuals have erected temporary shelters in a manner that protects the public health and safety and which complies with applicable state and federal laws.

## Procedures

Procedures applicable to garbage removal, enforcement of trespass laws and the clean-up of encampments are set forth In Sections I, II and III, below.  Procedures applicable to code enforcement activities are set forth in Section IV, below.

I.    **Garbage Removal.**

    A.    **City-Owned Property.**

        (1)    The City of Fresno Community Sanitation Division regularly receives requests to remove trash and debris which has accumulated in or around City owned property.  The Community

| Subject: | Garbage Removal; Clean-up of Temporary Shelters; and Code Enforcement Abatement Procedures | Number: **6-23** |
| --- | --- | --- |
| | | Date Issued/Revised: **8/30/07** |
| **Responsible Department:** | **City Manager** | Approved |

**Purpose:**

The City of Fresno receives regular complaints from citizens and businesses throughout the City which relate to health and safety, and other concerns arising in and around areas in which individuals have erected temporary shelters.

By this Administrative Order, the City of Fresno sets forth its policies and procedures for cleaning up areas in which individuals have constructed temporary shelters, and expresses its intention to implement these policies in a manner which balances the needs and rights of all of its citizens, including the residents of such temporary shelters. This policy does not establish any individual right to erect temporary shelters or otherwise encroach on public or private property.

**Policy:**

The City of Fresno shall respond to complaints and concerns arising in and around areas in which individuals have erected temporary shelters in a manner that protects the public health and safety and which complies with applicable state and federal laws.

**Procedures:**

Procedures applicable to garbage removal, enforcement of trespass laws and the clean-up of encampments are set forth in Sections I, II and III, below. Procedures applicable to code enforcement activities are set forth in Section IV, below.

I.    **Garbage Removal.**

    A.    **City-Owned Property.**

        (1)    The City of Fresno Community Sanitation Division regularly receives requests to remove trash and debris which has accumulated in or around City owned property. The Community Sanitation Division shall continue to receive and act upon these requests for service consistent with its historical practice. However, when the Community Sanitation Division determines that a request for service involves the removal of trash or debris occurring within 200 feet of an area which contains temporary shelters, and absent exigent circumstances, such as an immediate threat to public health or safety, such trash or debris removal shall not occur until at least three (3) days after the posting

- 1 -

Sanitation Division shall continue to receive and act upon these requests for service consistent with its historical practice. However, when the Community Sanitation Division determines that a request for service involves the removal of trash or debris occurring within 200 feet of an area which contains temporary shelters, and absent exigent circumstances, such as an immediate threat to public health or safety, such trash or debris removal shall not occur until at least three (3) days after the posting and/or service of written notice in a form substantially similar to the Notice attached hereto as Exhibit A.

(2)     The posting and/or service of said notice shall be performed in a manner which is reasonably calculated to provide effective notice to any residents of the adjacent temporary shelters. Where possible, the notice shall describe the area subject to garbage removal as clearly as possible (e.g., the east side of the 400 block of Olive Avenue.)

(3)     As part of the removal of any trash and/or debris, the City of Fresno shall not destroy any materials of apparent value which appear to be the personal property of any individual. Personal property of apparent value may include clothing, shoes, jackets, tents, sleeping bags, bed rolls, blankets, backpacks, duffel bags, bicycles, tools, watches, jewelry, audio and video equipment, medications, toiletries, eyeglasses, purses, handbags, personal papers, equipment, photographs, books and baby strollers.

(4)     Trash and debris includes property that appears to have been discarded by its owner, but the fact that property is unattended does not necessarily mean that it has been discarded. Reasonable doubt about whether property is "trash or debris" or valuable property should be resolved in favor of the conclusion that the property is valuable and has not been discarded.

B.     **Private Property, Including Public Property Not Owned by the City.**

The City will not respond to requests by private property owners, or owners of public property not owned by the City, to remove junk, trash and/or debris accumulated on private property unless a clean-up effort has been approved, in advance, by the City Manager's Office. In instances in which such approval is granted, and the request for services involves the removal of trash or debris occurring within 200 feet of an area which contains temporary shelters, the City will follow the notice procedure set forth in Section I, A, above.

II.   **Clean-Up(s)**

A.   **Private Property, Including Public Property Not Owned by the City.**

The City of Fresno regularly receives complaints from residents and business owners regarding the existence of temporary encampments constructed by individuals that have no legal right or permission to occupy the property. These complaints include a broad range of issues, including, but not limited to, loitering, trespass, drug sales and use, prostitution, assault and the accumulation of trash and debris.

(1)   In situations where the City of Fresno has received complaints regarding alleged criminal activity at temporary encampments established on private property, the Police Department will respond to and handle the situation in accordance with current policy.

(2)   The City will not respond to a request by private property owner to remove junk, trash and/or debris left behind on private property unless a clean up effort has been approved, in advance, by the City Manager's Office. In instances in which such approval is granted, the removal of trash and debris on private property shall be performed as set forth in Section III, A, below.

B.   **City-Owned Property.**

(1)   In situations in which the City of Fresno has received complaints regarding alleged criminal activity at temporary encampments established on City-owned property, the Police Department will respond to and handle the situation in accordance with current policy.

(2)   If a clean-up involves the collection of personal property value, then the procedures set forth in Section III below will be followed. If the City desires to remove garbage in conjunction with any such action, it shall follow the procedures in Section I above.

III.   **Clean-up of Encampments.**

For encampments of ten (10) or more individuals which have been in place for more than ten (10) days, the City shall seek to provide the residents of such encampments at least seven days advance notice of the need to vacate said property by posting and serving written notice in a form substantially similar to the Notice attached hereto as Exhibit B.

A.   **Clean-up of Encampments on City-Owned Property.**

        (1)    In situations in which the City of Fresno intends to clean areas where an encampment is located on City-owned property, the City will provide written notice of the intended clean-up in a form substantially similar to the Notice attached as Exhibit C. The City of Fresno will collect and dispose of any junk, garbage and/or debris in the area and will also collect and store any unattended personal property of value (as described in Section II, B(2) above). Personal property collected by the City will be stored for ninety (90) days without charge, during which time said property shall be available to be reclaimed by the subject owner. After the expiration of ninety (90) days, any unclaimed property will be destroyed.

    (2)    The posting and service of said notice shall be performed in a manner which is reasonably calculated to provide effective notice to the residents of the temporary shelters, and to the extent possible, the notice shall describe the area subject to the clean-up effort as clearly as possible. The notice shall also be served by hand delivery and/or facsimile on the organizations that assist residents of temporary shelters including, but not limited to: The Fresno Rescue Mission, The Poverello House, St. Benedict Catholic Workers, Central California Legal Services and the Community Alliance Newspaper.

B.   **Clean-up of Encampments on Private Property, Including Public Property Not Owned by the City.**

Request by property owners to enforce trespass laws may be reported to the Police Department or the City Manager's Office. The Police Department will respond to and handle the situation in accordance with current policy. However, the City will not respond to a request by a private property owner to clean-up encampments located on private property unless the clean-up request has been approved, in advance, by the City Manager's Office. In instances in which such approval is granted, clean-up of encampments on private property shall be performed as set forth in Section III, A, above.

IV.   **Code Enforcement.**

A.   It is anticipated that the City of Fresno will, from time to time, pursue code enforcement activities concerning the abatement of a public nuisance which includes temporary encampments constructed by individuals. These activities may include, but are not limited to, weed abatement, the

collection and disposal of junk, garbage and/or debris, as well as the collection and disposal of personal property in and around the area of encampments.

B.   In situations where code enforcement activities to abate a public nuisance involve the collection of personal property of value (as described in Section II, B(2) above) which reasonably appears to belong to an individual, the City will provide at least a three to seven day written notice of the intended clean-up in a form substantially similar to the Notice attached hereto as Exhibit D, and which, to the extent possible, shall describe the areas subject to the code enforcement activities as clearly as possible.

C.   At the time the City abates the subject nuisance, it will collect and dispose of any junk, garbage and/or debris in the area and will also collect and store any unattended personal property which reasonably appears to belong to an individual.  Personal property collected by the City as part of an abatement effort will be stored for ninety (90) days without charge, during which time it shall be available to be reclaimed by the subject owner.  After the expiration of ninety (90) days, any unclaimed property will be destroyed.

FMK:tlc [40608tlc/fmk]

# NOTICE OF GARBAGE REMOVAL

## PLEASE TAKE NOTICE:

That on [_____insert date_____] at [__insert time__], the City of

Fresno will remove and destroy garbage that has accumulated in the area

of [_____insert address_____].

The City will not remove or destroy the personal property of any

individuals.  However, to avoid any confusion, please move any personal

property you may have away from any garbage piles located in this area.

If you have any concerns or comments, please contact [_____person

and title_____] at [_____address and phone number_____].

*EXHIBIT A*

# NOTICE OF TRESPASS

## PLEASE TAKE NOTICE:

The City of Fresno has received complaints concerning individuals who are loitering near or residing in temporary shelters that have been constructed in the vicinity of [_____insert address_____]. Any individual loitering or residing in this area may be trespassing, and must immediately move off this site and remove any personal property they own.

On [_____insert date_____], at [__insert time__], the City of Fresno will seek the voluntary cooperation of any individuals who remain on site to relocate, and will enforce trespass laws against any individual who fails or refuses to move off this site.

If you have any questions or comments, please contact [_____person and title_____] at [_____address and phone number_____].

EXHIBIT B

Administrative Order 6-23
August 30, 2007
Page 8 of 11

# NOTICE OF TRESPASS AND CLEAN-UP

## PLEASE TAKE NOTICE:

The City of Fresno has received complaints concerning individuals who are loitering near or residing in temporary shelters that have been constructed in the vicinity of [_____insert address_____].

Any individuals loitering or residing in this area may be trespassing, and will need to immediately move off this site and remove any personal property they own.

On [_____insert date_____], at [____insert time____], the City of Fresno will conduct a clean-up of the area, including the removal of all individuals, personal property, temporary shelters, junk and/or garbage from this area. Individuals wishing to reclaim personal property collected by the City as part of the clean-up project may do so by contacting [person and title_____] at [_____address and phone number ] for a period of ninety (90) days following [____date of clean-up____]. Personal property collected by the City shall be stored, without charge, for ninety (90) days. After ninety (90) days, any unclaimed property will be thrown away.

EXHIBIT C

If you have any questions or comments, please contact [_____ person

and title_____] at [_____ address and phone number_____].

EXHIBIT C

# NOTICE OF CODE ENFORCEMENT AND CLEAN-UP

## PLEASE TAKE NOTICE:

The City of Fresno will be enforcing the Fresno Municipal Code which requires the removal of accumulated junk, property and/or garbage in the vicinity of [_____insert address_____], including any temporary shelters.  Any individuals who are residing or storing property in this area are in violation of the Fresno Municipal Code and will need to immediately move off this site and remove any personal property they own.

On [_____insert date_____], at [__insert time__], the City of Fresno will conduct a clean-up of the area, including the removal of all individuals, personal property, temporary shelters, junk and/or garbage from this area.  Individuals wishing to reclaim personal property collected by the City as part of the clean-up project may do so by contacting  [ person and title_____] at  [_____address and phone number ] for a period of ninety (90) days following [__date of clean-up__].

Personal property collected by the City shall be stored, without charge, for

EXHIBIT D

ninety days.  After ninety (90) days, any unclaimed property will be thrown

away.

If you have any questions or comments, please contact [_____person

 and title_____] at [_____address and phone number_____].

EXHIBIT D