UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESIREE MARTINEZ, et al., | No. 1:22-cv-00307-DAD-SAB |
| Plaintiffs, | |
| v. | ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| THE CITY OF FRESNO, | (Doc. No. 6.) |
| Defendant. | |

This matter came before the court on May 11, 2022, for a hearing on the motion for a preliminary injunction filed on March 30, 2022 on behalf of plaintiffs Desiree Martinez, Faith in the Valley, Fresno Homeless Union, and Robert McCloskey ("plaintiffs"), seeking injunctive relief against defendant The City of Fresno ("defendant"). (Doc. No. 6.) Attorneys Anthony Prince, Hannah Kieschnick, Chessie Thacher, and Angelica Salceda appeared by video for plaintiffs. Attorney James Betts appeared by video on behalf of defendant. For the reasons explained below, the court will grant plaintiffs' motion for a preliminary injunction.

/////
/////
/////
/////
/////

1

1

**BACKGROUND**[1]

2      This case concerns the continued efforts by defendant City of Fresno ("the city") to

3   address its growing housing crisis and plaintiffs' purported efforts to ensure that the city is held

4   accountable for the manner in which it treats the unhoused community in Fresno.  The city

5   regularly engages in abatements or "sweeps" of encampments where unhoused individuals live.

6   (Doc. No. 1 at ¶ 1.)  Plaintiffs frequent such encampments to share resources, offer support,

7   document and report on conditions, and represent and organize unhoused people in defense of

8   their rights.  (*Id.*)  Recently, the city passed an amended ordinance that plaintiffs assert

9   impermissibly limits their access to unhoused community campsites during government-

10  sanctioned abatements.  (*Id.* at ¶ 2.)  Plaintiffs contend that this ordinance infringes on their

11  constitutional rights in a myriad of ways.  Most relevant to his order, however, is plaintiffs'

12  assertion that the amended ordinance violates their First Amendment rights.  (*Id.* at ¶¶ 63–71.)

13  Plaintiffs therefore seek a preliminary injunction enjoining the city from enforcing the amended

14  ordinance.

15  **A.      Plaintiffs**

16      The four plaintiffs who have brought this action are identified and described, in their own

17  words, below.

18      1.      <u>Fresno Homeless Union</u>

19      Plaintiff Fresno Homeless Union (the "Union") is an unincorporated association of

20  unhoused and housing-insecure families, individuals, and advocates.  (*Id.* at ¶ 8.)  It is a local

---

21
22
23
24
25
26
27
28

[1]  This factual background is derived from plaintiffs' verified complaint and the declarations filed in support of the pending motion for a preliminary injunction.  (Doc. Nos. 1, 7-1, 7-8.)  Defendant also filed declarations in support of its opposition to the pending motion (Doc. Nos. 17-1–17-4), but those declarations do not substantially controvert the crucial factual allegations set forth in plaintiffs' verified complaint, which may serve as the basis for plaintiffs' motion for a preliminary injunction.  *See McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("There is no disputing that an affidavit and a complaint may be the basis for a preliminary injunction unless the facts are substantially controverted by counter-affidavits.").  The court has not relied on any of plaintiffs' factual assertions that are controverted by the declarations filed in support of defendant's opposition to the pending motion.  For example, the court does not rely on the factual allegations pertaining to how the city allegedly abused its authority in the past when dealing with homeless encampments because those allegations are contested by defendant through the declarations it has submitted in opposition to the pending motion.

member of the California Homeless Union and is affiliated with the National Union of the Homeless. (*Id.*) The Union's mission is to organize, represent, and serve Fresno's unhoused community. (*Id.*) The majority of the Union's officers and members live in homeless encampments. (*Id.*) The Union brings this lawsuit on behalf of itself and its members. (*Id.*)

### 2. Desiree "Dez" Martinez

Plaintiff Martinez, a Fresno resident, is the president of the Union and the founder of the Fresno-based groups "Homeless in Fresno" and "We Are Not Invisible." (*Id.* at ¶ 7.) Martinez regularly visits homeless encampments, where she organizes residents and distributes food, hygiene supplies, and other needed aid to unhoused people. (*Id.*) She also frequently attends encampment sweeps, where she represents and assists people targeted by those sweeps and documents how law enforcement, abatement officers, and other city workers and contractors conduct their official business. (*Id.*) Martinez often "livestreams" abatement activity in posts to her "Homeless in Fresno" Facebook page, which has 14,000 followers. (*Id.*) Martinez advocates for improved living conditions for unhoused people, sets up safe protest camps, organizes overnight vigils and rallies, and communicates with city leadership. (*Id.*) During public debate, Martinez submitted public comments in opposition to the amended ordinance, explaining that its limitation on access to unhoused community campsites during government-sanctioned abatements would have a negative and chilling impact on her advocacy, speech, and associational rights. (*Id.*)

### 3. Faith in the Valley

Plaintiff Faith in the Valley is a faith-based, non-profit organization located in the Central Valley of California that uses grassroots organizing and advocacy to address what plaintiffs describe as problems of equity encompassing safe and decent housing, jobs and poverty, environmental justice, parks, and police accountability. (*Id.* at ¶ 9.) Faith in the Valley organizers regularly attend the city's encampment sweeps; spearhead mass public comments advocating for affordable housing and an end to sweeps; lead rallies and listening sessions to encourage elected officials to address Fresno's housing crisis; and work to educate city residents about the city's practices in these areas. (*Id.*) The conditions that Faith in the Valley organizers

observe during sweeps and the relationships that they build with unhoused people set the course of their work.  (*Id.*)

### 4.   Robert McCloskey

Plaintiff McCloskey, a Fresno County resident, is a reporter for Community Alliance, a monthly newspaper that has been published since 1996 and that has run multiple articles addressing the city's actions and policies regarding housing and homelessness in Fresno.  (*Id.*)  As a reporter and advocate for the unhoused, plaintiff McCloskey has observed the city's sweeps of numerous homeless encampments and has advocated on behalf of the unhoused during those sweeps.  (*Id.*)  During the city's sweeps, McCloskey regularly interviews unhoused people and city officials and thereafter has written articles describing the conditions and conduct that he has observed.  (*Id.*)  He also assists unhoused people during sweeps by documenting any alleged mistreatment and helping to preserve their belongings.  (*Id.*)

**B.     Plaintiffs' Allegations**

In their complaint, plaintiffs allege the following.  Defendant City of Fresno, like many other cities, is suffering from a housing and displacement crisis.  (*Id.* at ¶ 12.)  As a result of Fresno's housing crisis, many people have nowhere to live but in tents and other makeshift shelters in public parks, on public sidewalks, and in other public spaces.  (*Id.* at ¶ 15.)  Defendant has attempted to address its housing and displacement issues by proposing various policies.  (*Id.* at ¶ 16.)  One such policy is routine encampment sweeps.  (*Id.* at ¶ 17.)  These systematic sweeps and other abatement activities involve law enforcement and other city officials forcing unhoused residents to leave their resting and sleeping places by threatening criminal citation, arrest, and the destruction or seizure of their property.  (*Id.* at ¶ 18.)

In 2006, defendant's manner of conducting encampment sweeps was challenged in a class action lawsuit brought in this court, *Kincaid v. City of Fresno*, No. 1:06-cv-01445-LJO-SKO.  (*Id.* at ¶ 19.)  In that case, a group of unhoused persons alleged that city officials "regularly engage[d] in what amount to raids of areas where homeless people live, during which defendants intentionally and indiscriminately take and destroy personal property owned by homeless people in the area and immediately destroy that property."  (*Id.*)  The plaintiffs in *Kincaid* obtained

4

injunctive relief prohibiting the City of Fresno from seizing the personal property of homeless persons without lawful cause and, later, achieved a favorable settlement of that action.  (Doc. No. 1 at ¶ 20.)  Part of that lawsuit's purported success was due to the fact that the plaintiffs obtained declarations from unhoused people, advocates, and reporters, who were able to witness the sweeps and other abatement activities from a near vantage point.  (*Id.*)  Under the terms of the *Kincaid* settlement agreement, defendant agreed to provide between three- and seven-days' notice before conducting such sweeps and agreed to not destroy personal property during any sweep. (*Id.* at ¶ 21.)

At the beginning of 2022, defendant began sending out a police-led Homeless Assistance Response Team ("HART") to serve as "compassionate, responsive, lawful and effective outreach leading unsheltered individuals and families to take the first step off the streets and into a new future."  (*Id.* at ¶ 22.)  Defendant, apparently through HART, generally performs sweeps and other abatement activity on a near-weekly basis in publicly visible areas where the unhoused reside.  (*Id.* at ¶ 24.)

Plaintiffs allege that the presence of public observers such as themselves at locations where abatement sweeps take place "is credited by the unhoused community and others with de-escalating conflict, compelling workers to act with greater care, and ensuring that proper procedures are followed with a reasonable amount of time given to pack up."  (*Id.* at ¶ 25.)  Plaintiffs are frequently present in the encampments, organizing residents in support of the residents' own interests and sharing food, water, prayer, transportation, assistance, and information.  (*Id.* at ¶ 29.)  Plaintiffs assert that they are instrumental in addressing the ongoing housing crisis in Fresno.  (*Id.* at ¶ 30.)  According to plaintiffs, plaintiff Martinez, for example, "has been able to build trust over many years by advocating on behalf of her unhoused neighbors and family."  (*Id.*)  Despite their opposition to encampment sweeps, advocates and reporters like plaintiffs do not interfere with the legitimate functions of law enforcement, abatement officers, and other city workers and contractors during the conducting of sweeps.  (*Id.* at ¶ 34.)  In addition to protecting the physical wellbeing of unhoused individuals and their personal belongings,

*/////*

plaintiffs and other advocates allegedly make sweeps safer by witnessing and documenting the actions of officials.  (*Id.*)

**C.      Events Leading Up to the Ordinance's Enactment**

On January 4, 2022, plaintiff Martinez learned that defendant had directed a small group of unhoused individuals to pack up and leave a site near the corner of Kings Canyon and South Clovis Avenue in Fresno.  (*Id.* at ¶ 35.)  Martinez reportedly arrived at the location to find the unhoused individuals in a parking lot a short distance from the location they had previously been occupying.  (*Id.*)  Although the abatement activity appeared to still be taking place, the site did not appear to be off-limits to the public.  (*Id.*)  Martinez then began to use her cell phone to record what was taking place.  (*Id.* at ¶ 36.)  She approached an officer with the Fresno Police Department in order to complain about the manner in which the sweep had occurred.  (*Id.*)  The officer directed Martinez to raise her concerns with the "code enforcement officers" who were on site at the time.  (*Id.*)  Martinez approached two men whom the officer had identified, but both men refused to acknowledge who was in charge and declined to speak with her so long as she continued to record the interaction.  (*Id.* at ¶ 37.)  Martinez attempted to further engage the men, at which point one of them allegedly "laid his hands on Ms. Martinez and covered her camera, forcefully stating, 'we don't talk to the press.'"  (*Id.*)  The man who did so was later identified and issued a "Notice to Appear" for misdemeanor battery in violation of California Penal Code § 242.  (*Id.*)

**D.      The Ordinance and Plaintiffs' Claims**

On January 5, 2022, the day after the incident involving plaintiff Martinez, the City Attorney for the City of Fresno initiated legislative action to propose amending § 10-616 of the Fresno Municipal Code.  (*Id.* at ¶ 38.)  Fresno Municipal Code § 10-616 addresses the administrative abatement of a nuisance.  (Doc. No. 13-2 at 24.)  This ordinance had last been amended twenty years earlier, in 2002.  (Doc. No. 1 at ¶ 38.)

The amended version of Fresno Municipal Code § 10-616 ("the ordinance"), in pertinent part states as follows, with the underlined language being newly added:

/////

(b) <u>City employees or a contractor retained by the City</u> may enter upon private <u>or public</u> property to abate the nuisance pursuant to the provisions of this article.  No person shall obstruct, impede or interfere with any officer, employee, contractor or authorized representative of the city whenever such person is engaged in the work of abatement, pursuant to the provisions of this article, or in performing any necessary act preliminary to or incidental to such work or authorized or directed pursuant to this article.

<u>(1) To protect the health and safety of the public and city employees while an abatement is in progress, city employees or a retained contractor may designate a restricted area by erecting a barrier or cordon off an area of public or private property where an abatement is taking place.  No person shall enter the restricted area without express authorization from city employees or contractor on site conducting the abatement.</u>

<u>(2) Subject to particular restrictions mandated by safety concerns or emergency procedures, prior to any abatement taking place at an occupied location, those persons providing services to the occupants or advocating on their behalf shall be permitted a reasonable time to make contact with the occupants and assist prior to the area being secured as provided herein;</u>

<u>(3) Unauthorized entry into the restricted area or other violation of this section shall be punishable either as a misdemeanor for intentional violations, or as an administrative citation with administrative penalty of up to $250 pursuant to Section 1-308, at the election of the City Attorney; prior to any person being cited for either a misdemeanor or administrative citation, first a verbal warning shall be provided to vacate the area with opportunity to comply.</u>

(*Id.* at 34–35.)  In the previous version of the ordinance that had been in place for over twenty years, only a "Director" was permitted to enter "private" property to abate a nuisance and the ordinance contained no explicit reference to public property, "occupants," or "occupied locations."  (*Id.* at ¶¶ 39, 44.)  As amended, the ordinance allows city employees or contractors retained by the city to enter and have access to both private and public property.  (*Id.* at 34–35.)

At the various City Council meetings where the proposed amended ordinance was discussed, plaintiffs—among others—expressed their concerns during the public comment period.  (*See, e.g.*, *id.* at ¶ 48.)  In particular, they expressed concerns that the ordinance was so vague and overbroad that, to avoid criminal sanctions and imposition of financial penalties, "they would have to restrain themselves from exercising their fundamental rights and engaging in important and protected activities during sweeps, like associating with and advocating for unhoused

7

1    community members and observing and documenting law enforcement, abatement officers, and

2    other city workers and contractors performing their duties in public." (*Id.*)

3         The amended ordinance was scheduled for a final vote at the City Council meeting held

4    on February 17, 2022, and was passed as an item on the "Consent Calendar." (*Id.* at ¶ 52.) The

5    Mayor of Fresno did not take specific action following the City Council's vote and thus, by

6    operation of the Fresno City Charter § 605(d), the ordinance was approved on February 28, 2022,

7    and became effective on March 31, 2022. (*Id.*)

8         On March 16, 2022, plaintiffs filed their verified complaint in this action asserting claims

9    against defendant and seeking to enjoin enforcement of the amended ordinance. (Doc. No. 1.)

10   Plaintiffs contend that the ordinance is unconstitutional under both state and federal law because

11   it restricts protected expression and activity, exposes plaintiffs to state-created danger, and limits

12   their rights to movement and travel. (*Id.* at 20–32.) Additionally, plaintiffs assert that the

13   ordinance is void for vagueness and is preempted because it conflicts with California state law.

14   (*Id.*) Specifically, plaintiffs assert the following nine causes of action in their complaint: (1) a

15   Fourteenth Amendment state-created danger claim; (2) a state-created danger claim brought

16   pursuant to Article I, § 7 of the California Constitution; (3) a First Amendment freedom of speech

17   and assembly claim; (4) a freedom of speech and assembly claim brought pursuant to Article I, §§

18   2, 3 of the California Constitution; (5) a Fourteenth Amendment void for vagueness substantive

19   due process claim; (6) a void for vagueness substantive due process claim brought pursuant to

20   Article I, § 7 of the California Constitution; (7) a Fourteenth Amendment right to free movement

21   and travel claim; (8) a right to free movement and travel claim brought pursuant to Article I, §§ 7,

22   24 of the California Constitution; and (9) a preemption claim under Article XI, §§ 5, 7 of the

23   California Constitution. (*Id.* at 20–30.)

24        On March 30, 2022, plaintiffs filed the pending motion for a preliminary injunction,

25   requesting that the court "enjoin the City from enforcing Fresno Municipal Code Section 10-

26   616." (Doc. No. 7 at 32.) On April 8, 2022, defendant moved to dismiss plaintiffs' complaint.

27   (Doc. No. 13.) Subsequently, on April 13, 2022, defendant filed its opposition to plaintiffs'

28   motion for a preliminary injunction, in which defendant incorporated its arguments made in

8

support of its motion to dismiss.  (Doc. No. 17.)  On April 22, 2022, plaintiffs filed their opposition to defendant's motion to dismiss (Doc. No. 18) and on April 25, 2022, plaintiffs filed their reply in support of their motion for a preliminary injunction (Doc. No. 19).[2]  Lastly, on May 2, 2022, defendant filed its reply to plaintiffs' opposition to defendant's motion to dismiss.  (Doc. No. 21.)

## LEGAL STANDARD

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7).[3]  The party seeking the injunction bears the burden of proof as to each of these elements.  *Klein v.*

---

[2]  A motion for leave to file an *amicus* brief in support of plaintiffs' motion for a preliminary injunction was filed on April 12, 2022, on behalf of the First Amendment Coalition, California News Publishers Association, Californians Aware, National Press Photographers Association, Northern California Chapter of the Society of Professional Journalists, and Reporters Committee for Freedom of the Press.  (Doc. No. 16.)  On April 26, 2022, defendant filed an opposition to the motion for leave to file an *amicus* brief.  (Doc. No. 20.)  On May 3, 2022, the proposed *amici* filed a reply to defendant's opposition.  (Doc. No. 22.)

[3]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

1   *City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v.*

2   *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege

3   imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

4   injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an

5   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

6   to such relief."  *Winter*, 555 U.S. at 22.

7   <center>**ANALYSIS**</center>

8   **A.      Likelihood of Success on the Merits**

9          Plaintiffs bear the burden of demonstrating that they are likely to succeed on the merits of

10  their claims or, at the very least, that "serious questions going to the merits were raised."  *All. for*

11  *the Wild Rockies*, 632 F.3d at 1131.  Here, plaintiffs contend that they are likely to succeed on the

12  merits of each of the nine causes of action asserted in their complaint.  (Doc. No. 7 at 21.)  For the

13  reasons stated below, the court concludes that plaintiffs have shown a likelihood of success on

14  their First Amendment freedom of speech and their void for vagueness claims.  Because the court

15  will grant plaintiffs' request for injunctive relief on that basis, the court will not address in this

16  order the parties' arguments with regard to plaintiffs' other claims.

17          1.      <u>Plaintiffs' First Amendment Claim</u>

18          "The First Amendment, applicable to the States through the Fourteenth Amendment,

19  prohibits laws that abridge the freedom of speech."  *Nat'l Inst. of Family & Life Advocates v.*

20  *Becerra*, ––– U.S. –––, 138 S. Ct. 2361, 2371 (2018).  The First Amendment also protects the

21  public's right to observe and document "matters of public interest," including public officers

22  "engaged in the exercise of their official duties in public places," *Askins v. U.S. Dep't of*

23  *Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018), as well as the media's parallel right to

24  gather news, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).

25          "When the Government restricts speech, the Government bears the burden of proving the

26  constitutionality of its actions."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816

27  (2000).  In a facial challenge to an enactment's validity under the First Amendment, the "law may

28  be invalidated as overbroad if 'a substantial number of its applications are unconstitutional,

<center>10</center>

1    judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S.

2    460 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6

3    (2008)).  The overbreadth doctrine exists "out of concern that the threat of enforcement of an

4    overbroad law may deter or 'chill' constitutionally protected speech—especially when the

5    overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

6    Additionally, "the Supreme Court and the Ninth Circuit have repeatedly allowed facial attacks

7    premised on the grant of unbridled discretion to a licensing official." *Kaahumanu v. Hawaii*, 682

8    F.3d 789, 802 (9th Cir. 2012) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,

9    759 (1988)).  Here, plaintiffs challenge the amended ordinance as both overbroad and as granting

10   unbridled discretion to city officials.[4]

11          "The protections afforded by the First Amendment are nowhere stronger than in streets

12   and parks, both categorized for First Amendment purposes as traditional public fora." *Berger v.*

13   *City of Seattle*, 569 F.3d 1029, 1035–36 (9th Cir. 2009).  Public ways, sidewalks, and streets

14   "have developed as venues for the exchange of ideas," and "[s]uch areas occupy a 'special

15   position in terms of First Amendment protection' because of their historic role as sites for

16   discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *United States v.*

17   *Grace*, 461 U.S. 171, 180 (1983)).  The government's right to limit expressive activity in a public

18   forum "is 'sharply' circumscribed." *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th

19   Cir.), *amended by*, 160 F.3d 541 (9th Cir. 1998) (citing *Perry Educ. Ass'n v. Perry Local*

20   *Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

21          Under the First Amendment, a government "has no power to restrict expression because

22   of its message, its idea, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S.

23

24   [4]  In their briefing, plaintiffs take the position that they "bring facial *and* as-applied challenges" to
       the amended ordinance.  (*See* Doc. No. 19 at 7.)  The relief they seek, however, would suggest
25     somewhat otherwise.  Plaintiffs request that the court enjoin the enforcement of the ordinance in
       its entirety, not just against plaintiffs.  (Doc. No. 19 at 20.)  This relief—which would bar
26     enforcement of the ordinance against anyone, not just plaintiffs—suggests that plaintiffs are
       seeking a facial invalidation of the ordinance.  The court finds plaintiffs' claims regarding the
27     facial unconstitutionality of the ordinance to be persuasive.  Thus, for purposes of this order, the
28     distinction between an as-applied or facial challenge is one without a difference.

                                                      11

155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

"Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.*  To determine whether a law is content based, i.e., a law that targets speech on its communicative content, courts consider "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (citing *Reed*, 576 U.S. at 163).  "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification or lack of 'animus toward the idea contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).  Courts consider whether a law is content based or content neutral "on its face *before* turning to the law's justification or purpose," because a government's assertion of "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 167.

"[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).  Content-based laws are "presumptively unconstitutional." *Reed*, 576 U.S. at 163.  To overcome this presumption, a content-based law must survive strict scrutiny, which requires the government to prove that the content-based law is "narrowly tailored to serve compelling state interests." *Id.*  In contrast, content-neutral restrictions on speech (reasonable time, place, and manner restrictions that are justified without reference to the protected speech's content) must be "narrowly tailored to serve a significant government interest, leaving open ample alternative channels of expression." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

This tailoring requirement guards not only against "an impermissible desire to censor" based on disagreeable content but also against a government conveniently silencing speech as "the path of least resistance" in addressing associated problems. *McCullen*, 573 U.S. at 486.  "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* (quoting *Riley v. Nat'l*

*Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).  The closeness of the fit required depends on whether the restriction on speech is content based or content neutral.

For a content-based restriction to be narrowly tailored, the government "must demonstrate that its law is necessary to serve the asserted [compelling] interest."  *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  "[T]he 'danger of censorship' presented by a facially content-based statute requires that that weapon be employed only where it is '*necessary* to serve the asserted [compelling] interest.'"  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992) (quoting *Burson*, 504 U.S. at 199).  "The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute."  *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988) ("[T]he availability of alternatives . . . amply demonstrates that the display clause is not crafted with sufficient precision to withstand First Amendment scrutiny.  It may serve an interest in protecting the dignity of foreign missions, but it is not narrowly tailored; a less restrictive alternative is readily available.")); *see, e.g.*, *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 747 (9th Cir. 2012) (a law forbidding political parties from endorsing judicial candidates was not narrowly tailored because less restrictive and content-neutral alternatives were available).  In other words, "a content-based regulation of constitutionally protected speech must use the least restrictive means to further the articulated interest."  *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) (citing *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("It is not enough to show that that Government's ends are compelling; the means must be carefully tailored to achieve those ends.")).

Alternatively, for content-neutral time, place, and manner restrictions to be narrowly tailored, the restriction "must not burden substantially more speech than is necessary to further the government's legitimate interests," but unlike a content-based restriction, it "need not be the least restrictive or least intrusive means of serving the government's interests."  *McCullen*, 573 U.S. at 486 (citation and internal quotation marks omitted).  However, even under this less stringent tailoring standard, the government still "may not regulate expression in such a manner

*/////*

13

1    that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v.*

2    *Rock Against Racism*, 491 U.S. 781, 799 (1989).

3        In their pending motion for a preliminary injunction, plaintiffs argue that Fresno

4    Municipal Code § 10-616 as recently amended is unconstitutional as either a content-based

5    restriction on speech *or* a content-neutral time, place, and manner restriction.  (Doc. No. 7 at 24–

6    29.)  For the purposes of this order and as explained below, the court concludes that plaintiffs are

7    likely to succeed on the merits of their claim that the amended ordinance is an impermissible

8    content-neutral time, place, and manner restriction.[5]

9            a.      *Whether § 10-616 is an Unconstitutional Content-Neutral Restriction*

10       As discussed above, a narrowly tailored time, place, and manner content-neutral

11   restriction on speech is one that does not burden substantially more speech than is necessary to

12   achieve a substantial government interest.  *Berger*, 569 F.3d at 1041 (citing *Ward*, 491 U.S at

13   799).  "It must 'target[] and eliminate[] no more than the exact source of the "evil" it seeks to

14   remedy.'"  *Id.* (quoting *Frisby*, 487 U.S. at 485).

15       Section 10-616(b)(1) of the amended ordinance offers what appears to be a time, place,

16   and manner restriction.  (Doc. No. 1 at 34.)  Section (b)(1) states that during an abatement, city

17   employees may designate a restricted area and "[n]o person shall enter the restricted area without

18   express authorization from city employees" conducting the abatement.  (*Id.*)  Section (b)(3) then

19   adds that any unauthorized entry into the restricted area "shall be punishable either as a

20   misdemeanor for intentional violations, or as an administrative citation with administrative

21   penalty of up to $250."  (*Id.* at 35.)  On its face, this language may appear content-neutral.

22            i.      Whether § 10-616 Achieves a Substantial Government Interest

23       Viewing the amended ordinance as a content-neutral time, place, and manner restriction,

24   the court must first determine whether it addresses a substantial government interest.  Defendant's

25

26   [5]  The court pauses to note that it sees some merit to plaintiffs' arguments that the amended
     ordinance is actually a content-based restriction aimed at homeless encampments based on the
27   language added by the amended ordinance directly targeting "occupants" of an abatement
     location.  (Doc. No. 1 at 35.)  Nonetheless, the court will not issue a decision on that argument in
28   this order because it is unnecessary to do so in ruling on the pending motion.

justification for the amended ordinance is at best vague and at worst completely undefined.  The ordinance itself states that the restrictions provided for therein are intended:  "[t]o protect the health and safety of the public and city employees while an abatement is in progress."  (Doc. No. 1 at 34.)  However, defendant has offered no examples of specific health or safety concerns placed at risk during abatement activities either currently or in the past.  Rather, in its brief in opposition to the pending motion, defendant cites only to the allegations of plaintiffs' complaint in an attempt to identify a "substantial risk of harm" purportedly posed by its abatement actions.  (Doc. No. 13-1 at 9.)  Specifically, defendant merely repeats plaintiffs' allegations that the conditions at some abatement locations are unsanitary and unsafe; that the city sometimes uses heavy machinery to clear encampments while unhoused persons are nearby; and that the abatement process is "hectic and traumatic . . . like a tornado."  (*Id.* at 9–10) (citing Doc. No. 1.)  Defendant sums up its conclusory assertion that a substantial government interest is at stake by pronouncing that the amended ordinance "seek[s] to address these safety risks by giving the City the discretion under certain circumstances to implement a 'buffer zone' during abatement proceedings to ensure the safety of all involved."  (*Id.* at 10.)

In short, defendant has failed to sufficiently articulate what the city's substantial interest is here.  Nothing in the language of the amended ordinance or in defendant's briefing explains what health and safety related state interests are meant to be remedied by excluding the public from observing abatement activities, in particular those occurring in public places.  While health and safety are certainly noble goals in general, defendant has offered no evidence, argument, or authority even vaguely suggesting how this amended ordinance promotes those goals in particular.  It cannot be disputed that "[g]overnmental authorities have the duty and responsibility to keep their streets open and available for movement," *Cox v. Louisiana*, 379 U.S. 536, 554–55 (1965), and it is also true that "a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective," *Heffron v. Int'l Soc'y for Krishna Consciousness Inc.*, 452 U.S. 640, 650 (1981).  As plaintiffs point out in their reply brief, however, here "the City . . . has identified no public health or safety incidents to justify the extreme measure of prohibiting the public from observing, monitoring, and reporting on city

workers and contractors discharging their duties in public." (Doc. No. 19 at 19.) The court agrees.

At the hearing on the pending motion and in its briefing, defendant has *post-hoc* contended that the intended purpose of the amended ordinance is simply to fully clear people out of encampment areas before the city begins cleaning up, or "sweeping them," in order to avoid any risk either to occupants of the location or to the city employees or others conducting the sweeps. (Doc. No. 13-1 at 19) (stating that "no one, advocate or occupant, is allowed in the restricted area"). Defendant argues that its interests in health and safety are advanced by the total exclusion of occupants prior to the commencement of abatement activities and that unhoused individuals will be given sufficient time and opportunity to gather their personal property prior to the establishment of any restricted area permitted by the ordinance. However, while defendant's counsel now promises that the abatement areas will only be secured once occupants have left and taken away any belongings that they wish to keep or have stored, nothing in the ordinance suggests as much. Certainly the ordinance, by its terms, offers no such explicit protections. Indeed, the ordinance says the opposite by providing defendant with the authority to restrict an area "*while* an abatement is in progress." (Doc. No. 1 at 34.) Moreover, at the hearing, counsel for defendant suggested that under the amended ordinance a restricted zone could be established mid-abatement if incidents or events took place during the abatement triggering public safety concerns, such as threats of or actual acts of physical violence. This attempted explanation, however, cuts against defendant's *post-hoc* asserted clarification that a restricted zone will only be established pursuant to the ordinance *after* all unhoused individuals have been removed from an abatement area.

Although defendant now argues that the amended ordinance is intended to protect the public by fully clearing out abatement zones prior to a sweep and the asserted dangers accompanying those sweeps, both the language of the ordinance itself, as well as the reasoning presented by defendant, contradict this advanced interest. Instead, the amended ordinance and the arguments made in support of its application suggest that the intention of the ordinance is in reality simply to avoid public scrutiny. As counsel for defendant stated at the hearing on this

16

1   motion, the amended ordinance offers another "arrow in its quill" with regard to the city's efforts

2   to abate homeless encampments.  Of course, the court "cannot simply 'presume[] the [city] will

3   act in good faith and adhere to standards absent from the ordinance's face.'"  *Comite de*

4   *Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946–47 (9th Cir. 2011)

5   (quoting *City of Lakewood*, 486 U.S. at 770); *see also Reno v. ACLU*, 521 U.S. 844, 884 (1997)

6   ("In considering a facial challenge, this Court may impose a limiting construction on a statute

7   only if it is 'readily susceptible' to such a construction.") (citation omitted).

8           For all of these reasons, plaintiffs have established that they are likely to succeed on their

9   claim that the amended § 10-616, as written, does not seek to achieve a substantial state interest.

10  Nevertheless, even if the court were to assume that the state's ephemeral interest in promoting

11  health and safety were substantial here, for the reasons detailed below the court also concludes

12  that plaintiffs have shown they are likely to succeed on their claim that § 10-616 is not narrowly

13  tailored to serve that interest.

14                          ii.      Whether § 10-616 is Narrowly Tailored

15          Even if defendant had advanced a substantial government interest, the court would next be

16  required to determine whether the amended ordinance is narrowly tailored to achieve that interest.

17  Plaintiffs argue that § 10-616 is not narrowly tailored because it is clearly overbroad on its face

18  and burdens substantially more speech than is necessary, thereby chilling protected speech or

19  expression.  (Doc. No. 7 at 26) (citing *Berger*, 569 F.3d at 1041; *Edge v. City of Everett*, 929 F.3d

20  657, 664–65 (9th Cir. 2019)).  Plaintiffs contend that although the amended ordinance is directed

21  at health and safety concerns, "witnessing and documenting encampment sweeps or protecting

22  and supporting unhoused people avoid physical abuse and the destruction or seizure of personal

23  property are not 'evils' that undermine health and safety.  Rather, these actions help defuse tense

24  situations and hold officials accountable." (*Id.* at 27.)  Moreover, plaintiffs suggest that the city

25  could reasonably achieve any appropriate goals in ways that are less restrictive on expressive

26  activities.  (*Id.*)  For example, to the extent members of the public interfere with legitimate law

27  enforcement functions, other existing laws prohibit willful resistance, delay, or obstruction of

28  public officers.  (*Id.*)  Plaintiffs also argue that defendant has not left open "ample alternative

1   channels for communication" because—in light of the apparently unfettered discretion granted to

2   city staff and contractors to "designate a restricted area"—the city "can establish a buffer zone

3   around an encampment sweep so large as to completely sever the public from the unhoused

4   community residing there and to completely prevent Plaintiffs and others from being able to

5   meaningfully see or record the City's actions." (*Id.* at 28) (citing *Galvin v. Hay*, 374 F.3d 739,

6   748–49 (9th Cir. 2004)). Lastly, plaintiffs argue that the ordinance contains no specific and

7   objective standards as to "when city law enforcement, staff, and contractors will grant the

8   'express authorization' required to enter a buffer zone around a public abatement area." (*Id.*)

9        In its opposition, defendant contends that the ordinance is narrowly tailored to meet its

10   goal of limiting safety risks during abatement proceedings because the "buffer zone" ensures the

11   safety of all involved. (Doc. No. 13-1 at 10.) Defendant notes that, under the ordinance,

12   plaintiffs are "expressly provided a reasonable time period to interact with individuals present in

13   an occupied location" and that "even after a buffer zone is created, anyone can request

14   authorization to re-enter the area." (*Id.*) Defendant also argues that no citation or fine will issue

15   absent an individual's "non-compliance with a verbal warning to vacate the area." (*Id.*)

16   Defendant does not substantively respond to plaintiffs' arguments that the ordinance is overbroad

17   and vague on its face, or that the ordinance targets those seeking to observe and document the

18   city's abatements, despite those actions having no discernable impact on the "health and safety"

19   concerns espoused by defendant. Neither does defendant meaningfully explain why the previous,

20   less restrictive ordinance and enforcement of other current laws do not suffice to achieve the same

21   goals that it now claims the amended ordinance was enacted to advance.

22        To begin with, defendant's arguments assume that the only risk to plaintiffs' First

23   Amendment rights here is the potential bar on interactions between plaintiffs and the unhoused

24   community, a risk that is alleviated according to defendant by the fact that the ordinance allows

25   advocates access to a subject area before abatement activity starts. But restrictions on the

26   interactions between the unhoused and plaintiffs are clearly not the only asserted infringement on

27   plaintiffs' First Amendment rights posed by the amended ordinance. Plaintiffs also allege in their

28   complaint that they observe, document, and report on the city's conduct so that the public may be

informed, and the city held accountable for its actions.  (Doc. No. 1 at ¶¶ 7, 9–10, 24, 29.)  In this regard, the amended ordinance is not narrowly tailored and unnecessarily infringes on the First Amendment rights of plaintiffs, the press, and the public to observe and record abatement activities for the four reasons discussed.

First, the ordinance only marginally, if at all, promotes defendant's asserted interests in "health and safety," suggesting that the city's valid interests would not "be achieved less effectively absent the [ordinance.]"  *Ward*, 491 U.S. at 799 (internal quotation marks and citations omitted); *see also Courthouse News Serv. v. Planet*, 947 F.3d 581, 602 (9th Cir. 2020) (noting that a policy "may fail the requirement for 'narrow tailoring' if the burdens imposed serve *no* purpose.") (J. Smith concurring).  Here, although defendant argues that keeping the public at bay during abatement activities will make those activities easier and more efficient, defendant's interest in efficiency cannot outweigh the constitutional interests at stake.  "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."  *McCullen*, 573 U.S. at 495 ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.")  Other than asserting that such is the case in conclusory fashion, defendant has not offered any evidence explaining how the designating of a restricted area by erecting a barrier or cordoning off an area of public property where an abatement is taking place promotes health and safety.

Second, less intrusive measures exist by which defendant could achieve the goals it now argues it seeks to accomplish, and defendant offers no substantive rebuttal as to why the ordinance is not far too restrictive of a measure to achieve those goals.  As plaintiffs point out in their briefing, nothing suggests that existing laws prohibiting interference with law enforcement activity are insufficient to achieve the same goals defendant claims to have here.  *See, e.g.*, Cal. Pen. Code § 148(a) ("[E]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . shall be punished by a fine . . . or by imprisonment in a county jail."); *cf. Burson v. Freeman*, 504 U.S. 191, 206–207 (1992)

1    (approving of a buffer zone as a valid prophylactic measure in the context of polling places on

2    election day, noting that " [i]ntimidation and interference laws fall short of serving a State's

3    compelling interests because they 'deal with only the most blatant and specific attempts' to

4    impede elections.'") (citing *Buckley v. Valeo*, 424 U.S. 1, 28 (1976)).  Defendant has offered no

5    argument suggesting that it has pursued less restrictive enforcement measures nor has defendant

6    demonstrated that employment of those measures would have been ineffective.

7            Third, any such ordinance must leave open ample alternative channels of communication.

8    *McCullen*, 573 U.S. at 477; *A.C.L.U. of Nev.*, 466 F.3d at 792.  Defendant's amended ordinance

9    does not do so because it completely bars public access to an abatement area.  Defendant objects

10   that the amended ordinance does leave open ample alternative channels because "in those

11   circumstances when a restricted area is contemplated, the statute allows for [p]laintiffs to have

12   reasonable access to occupants in the abatement area prior to it being secured."  (Doc. No. 13-1 at

13   17) (citing § 10-616(b)(2)).  Section 10-616(b)(2), which defendant's argument in this regard

14   rests upon, states in relevant part that "prior to an abatement taking place . . . those persons

15   providing services to the occupants or advocating on their behalf shall be permitted a reasonable

16   time to make contact with the occupants and assist prior to the area being secured . . . ."  (Doc.

17   No. 1 at 35.)  To the extent defendant argues that § 10-616(b)(2) allows plaintiffs to access

18   abatement locations prior to them being secured, defendant provides no standards governing the

19   evaluation of when plaintiffs or other members of the public may be allowed to do so.  Nor does

20   defendant explain what qualifies as "secured" in the context of abatement locations.  From the

21   face of the amended ordinance, it is entirely unclear when an abatement proceeding begins, when

22   the public is no longer allowed access to an abatement area, or when the "advocates" and "service

23   providers" explicitly referred to in § 10-616(b)(2) are allowed "reasonable time to make contact

24   with the occupants and assist prior to the area being secured."  (*Id.*)  Instead, the ordinance

25   appears to grant the city and its private contractors the unfettered authority to establish an

26   indeterminate barrier surrounding an encampment that completely severs the public from the

27   unhoused community and their belongings, thus preventing the public and the press from being

28   able to meaningfully observe defendant's actions during a sweep.  Defendant offers no

substantive arguments to the contrary.  Defendant's shifting and developing arguments about the actual purpose of the amended ordinance and how it will be enforced are so vague that at the very least it is clear that the ordinance is susceptible to different and conflicting interpretations as to what conduct is even prohibited or allowed by its terms.  *See Right to Life of Cent. Cal. v. Bonta*, No. 21-cv-01512-DAD-SAB, 2021 WL 5040426, at *12 (E.D. Cal. Oct. 30, 2021).  Because of this, the amended ordinance cannot be said to leave open ample alternative channels of communication as is required.

Fourth, the amended ordinance on its face applies to an "extraordinarily broad group of individuals," the vast majority of whom are not responsible for the alleged harms that the city seeks to remedy—i.e., the risks posed to the health and safety of the public during abatement sweeps.  *Berger*, 569 F.3d at 1041 (citing *Frisby*, 487 U.S. at 485).  As alluded to above, the amended ordinance grants defendant complete discretion to establish an undefined barrier either during or before any abatement activity.  The amended ordinance applies to reporters and the media in general, who are not by its terms even granted any opportunity to enter the "buffer zones" afforded to persons providing services to the occupants or advocating on their behalf. More importantly, the amended ordinance applies to the public writ large, and of course the public often serves as a source for the press.  As recently stated by the Ninth Circuit, "public access plays a significant positive role in the functioning of our democracy . . . . Indeed, the public became aware of the circumstances surrounding George Floyd's death because citizens standing on a sidewalk exercised their First Amendment rights and filmed a police officer kneeling on Floyd's neck until he died." *Index Newspapers LLC*, 977 F.3d at 830–31.  Yet, under the amended ordinance, no unauthorized person may enter a restricted area to observe or report on the city's abatement activity.  Defendant has simply offered no explanation as to how having the press on the location of abatement activities it carries out would interfere with defendant's health and safety goals.  The only parties the amended ordinance apparently grants some limited degree of access to are advocates providing services to the unhoused community, and that access is only *prior* to an abatement area being secured.  (*See* Doc. No. 1 at 35) (FMC § 10-616(b)(2)).  But even these individuals are subject under the ordinance to "particular restrictions mandated by

21

1  safety concerns or emergency procedures," neither of which is defined.  Consequently, the

2  amended ordinance limits the First Amendment rights of far more people than just those

3  responsible for the asserted "evil" or harm the city alleges it is seeking to remedy.  *Berger*, 569

4  F.3d at 1029; *cf. Frisby*, 487 U.S. at 475 (finding that an ordinance was narrowly tailored to serve

5  a government interest "since, although its ban is complete, it targets and eliminates no more than

6  the exact source of the 'evil' it seeks to remedy").

7          For all of these reasons, the court concludes that plaintiffs have made a compelling

8  showing at this stage of the litigation that the amended ordinance is not narrowly tailored to serve

9  defendant's interest in ensuring the health and safety of the public during homeless encampment

10  sweeps carried out on public property.  Accordingly, plaintiffs have established their likelihood of

11  success on the merits of their First Amendment freedom of speech claim to the extent it is based

12  on a content-neutral time, place, and manner restriction.

13          2.          Plaintiffs' Void for Vagueness Claim

14          For many of the same reasons discussed above, the court also concludes that the amended

15  ordinance must be enjoined because plaintiffs have shown that they are likely to prevail on their

16  contention that it is void for vagueness.  "It is a basic principle of due process that an enactment is

17  void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408

18  U.S. 104, 108 (1972).  The vagueness doctrine reflects two related requirements.  First, "laws

19  [must] give the person of ordinary intelligence a reasonable opportunity to know what is

20  prohibited, so that he may act accordingly."  *Id.* at 108.  Ordinarily, all that is required to satisfy

21  this due process concern is "'fair notice' of the conduct a statute proscribes."  *Sessions v. Dimaya*,

22  —— U.S. ——, 138 S. Ct. 1204, 1212 (2018).  However, "where [F]irst [A]mendment freedoms are

23  at stake, an even greater degree of specificity and clarity of laws is required."  *Kev, Inc. v. Kitsap*

24  *County*, 793 F.2d 1053, 1057 (9th Cir. 1986).  Thus, courts in the First Amendment context must

25  ask whether language is sufficiently unclear such that "speakers will be compelled to steer too

26  clear of any forbidden area[s.]"  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998)

27  (internal quotation marks omitted).  "This enhanced standard protects against laws and

28  regulations that might have the effect of chilling protected speech or expression by discouraging

1    participation." *Edge*, 929 F.3d at 664–665.  Second, the vagueness doctrine demands that laws

2    "provide explicit standards for those who apply them" in order to avoid "arbitrary and

3    discriminatory enforcement." *Grayned*, 408 U.S. at 108.  Accordingly, a law that relies on a

4    subjective standard is constitutionally suspect.  *Id.* at 113.

5            Here, the amended ordinance is vague on its face and, even if unintentionally, would chill

6    speech that is protected.  As stated above, the ordinance provides no clear delineation of when a

7    restricted area may be established, how a restricted area is to be established, or when advocates,

8    the press, or the public in general are allowed or not allowed into an abatement area.  For

9    example, the text of the ordinance provides that defendant may designate a restricted area by

10   erecting a barrier or cordoning off an area where an abatement action is taking place, at which

11   point "no person shall enter the restricted area without express authorization."  FMC § 10-

12   616(b)(1).  However, § 10-616(b)(2) then states that "those persons providing services to the

13   occupants or advocating on their behalf shall be permitted a reasonable time to make contact with

14   the occupants and assist *prior to the area being secured* as provided herein."  FMC § 10-

15   616(b)(2).  This language suggests that advocates and service providers will be allowed to assist

16   occupants *prior* to the establishment of any restricted area, although this is not entirely clear

17   either since the ordinance employs the term "secured" instead of "restricted."  However, if the

18   court's reading is the city's intended meaning of the ordinance, the court cannot discern what

19   purpose § 10-616(b)(2) serves, since presumably advocates and service providers—along with

20   *any other member of the public*—would have to be allowed to enter public abatement areas prior

21   to a restricted area being established in any event.  For instance, the court cannot identify any

22   other law that would prevent advocates, service providers, or anyone else from assisting homeless

23   individuals on public property absent the restrictions the ordinance imposes.

24           On the other hand, § 10-616(b)(2) could be read as applying only *after* a restricted area is

25   established around an abatement site by barrier, thus allowing advocates and service providers

26   (but not others including the press) access to the location after a barrier is put in place.  That

27   application of § 10-616(b)(2) would seem somewhat more logical in practice, but again, nothing

28   in the language of the ordinance clarifies when or how the provision appearing in section (b)(2)

operates.  Furthermore, the situation described in § 10-616(b)(2) is "[s]ubject to particular restrictions mandated by safety concerns or emergency procedures."  (Doc. No. 1 at 35.)  What those concerns or procedures may entail is left entirely to guesswork.  As plaintiffs note in their motion for preliminary injunction, the amended ordinance "is woefully vague as to how, where, and when in the often-chaotic process of an encampment sweep or other abatement activity it will apply."  (Doc. No. 7 at 29.)

The risk of chilling protected First Amendment activities runs high here because advocates, unhoused individuals, the public, and the press cannot meaningfully understand when they are or are not allowed to be within an abatement zone.  Moreover, an incorrect interpretation of the ordinance could result in the imposition of criminal sanction pursuant to § 10-616(b)(3).  For these reasons, the court concludes that plaintiffs have established they are likely to succeed on the merits of their void for vagueness claim.

**B.    Irreparable Harm**

Having found that plaintiffs have shown a likelihood of success on the merits of their First Amendment freedom of speech and void for vagueness claims, the court now turns to the likelihood that plaintiffs will suffer irreparable harm in the absence of the granting of preliminary injunctive relief.  Of course, the risk of irreparable harm must be "likely, not just possible."  *All. for the Wild Rockies*, 632 F.3d at 1131.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F. 2d 668, 674 (9th Cir. 1988).

Plaintiffs argue that they will suffer irreparable harm because the ordinance deprives them of their freedom of speech.  (Doc. Nos. 7 at 20; 19 at 11.)  Defendant does not meaningfully contest plaintiffs' showing that they are likely to suffer irreparable harm in the absence of the granting of preliminary injunctive relief.  Rather, defendant merely argues that the alleged harms are speculative because, according to the city, the ordinance may not even be "put into practice." (Doc. No. 17 at 14.)  The court is not reassured by the suggestion of that possibility.[6]

---

[6]  As has been recognized, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."  *Smith v. Henry's Holdings, LLC*, 2021 WL 4993065, at *1 (E.D.

In any event, it is enough that plaintiffs' First Amendment rights are clearly threatened by the amended ordinance. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought."). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373). It is also well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, 'unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, — U.S. —, 141 S. Ct. 63, 67 (2020) (quoting *Elrod*, 427 U.S. at 373).

For these reasons, the court concludes that plaintiffs have shown a likelihood that they will suffer irreparable harm in the absence of the requested preliminary injunctive relief.

## C.    Balance of Equities / Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc.*, 586 F.3d at 1138 (internal quotation marks and alteration omitted). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

"Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). "It is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC*, 977 F.3d at 838 (citation omitted). "When

Cal. Oct. 27, 2021) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Otherwise "the courts would be compelled to leave 'the defendant free to return to his old ways.'" *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

weighing public interests, courts have 'consistently recognized the significant public interest in upholding First Amendment principles.'" *Id.* (citing *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)).

In their pending motion for a preliminary injunction, plaintiffs argue that the balance of equities and the public interest weigh in their favor because the public's specific interest in preserving the right to observe and document the city's abatement sweeps outweighs whatever burden an injunction would impose on defendant. (Doc. No. 7 at 32.)

In its opposition, defendant argues that plaintiffs' requested injunction goes too far in that plaintiffs seek an order requiring the city to immediately cease enforcement of § 10-616 in its entirety, and not just in the context of homeless camp abatements. (Doc. No. 17 at 16.) According to defendant, "[a]s such, Plaintiffs' request would enjoin the [city] from both conducting any abatement activities pursuant to the statute or from utilizing the newly enacted safety protocol set forth in Section 10-616 in cases involving Fire Code violations, blighted vacant buildings or the removal of large accumulations of rubbish which are unrelated to homeless encampments." (*Id.*) Defendant also argues that consideration of the public interest weighs in its favor because "the public has a clear interest in the safe conduct of abatement projects." (*Id.* at 17.) According to defendant, the city's existing practices "are rationally related to serving the public interest, and any impairment of those practices would have a chilling effect on the City's enforcement efforts." (*Id.*)

In their reply, plaintiffs contend that while defendant's "clear interest in the safe conduct of abatement projects" is paramount, "the City overlooks the health and safety interests of the unhoused persons it targets." (Doc. No. 19 at 19.) Plaintiffs advance that they have "submitted voluminous, largely unrebutted evidence that, if encampment sweeps and other abatement activity are to occur, the health and safety of unhoused persons are best protected by public scrutiny." (*Id.*) Finally, plaintiffs argue that the amended ordinance should be enjoined in its entirety because it is not a "lawful, narrowly tailored means of promoting" defendant's interests. (*Id.* at 20.) Nonetheless, plaintiffs concede that to the extent the court "is instead inclined to grant relief on Plaintiffs' as-applied claims, the Court could fashion an order enjoining the City from

1  enforcing the Ordinance only during abatement activity involving unhoused people or their

2  temporary shelters."  (*Id.* at 20) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310,

3  331 (2010)).

4          The court concludes that, under the applicable legal standards, plaintiffs have satisfied

5  their burden of showing that the balance of the equities and the public interest weighs in favor of

6  granting their request for preliminary injunctive relief.  Although the court agrees that protecting

7  the safety and health of the public, city employees, and city contractors during abatement sweeps

8  is a laudable goal, defendant has simply offered no persuasive argument or authority supporting

9  its contention that the amended ordinance addresses the achievement of that goal in a

10  constitutional manner.  Defendant has not explained how the amended ordinance could go into

11  effect without drastically infringing on both the plaintiffs' and the general public's First

12  Amendment rights.  Accordingly, despite whatever good intentions defendant may claim to have

13  had, the court will grant plaintiffs' pending motion and issue a preliminary injunction order,

14  enjoining the enforcement of Fresno Municipal Code § 10-616 as amended.

15  **D.      Scope of Injunction**

16          Because the court has determined that plaintiffs are likely to succeed on their claims that

17  the ordinance as amended is facially invalid under the First Amendment and void for vagueness,

18  the court will enjoin the amended ordinance in its entirety.  If, however, the parties alert the court

19  to any changed circumstances warranting a tailoring of the injunction, the court is at liberty to do

20  so.  *See Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 859 (9th Cir. 2004) ("The proposition that

21  a court has the authority to alter the effect of an injunction in light of changes in the law or the

22  circumstances is well established.") (citing *System Federation No. 91 v. Wright*, 364 U.S. 642,

23  647 (1961)); *see also Dank v. Miller*, 365 F.3d 159, 164–65 (2d Cir. 2004) (vacating an injunction

24  because the court's determination on the merits removed the factual and legal predicates for the

25  injunction).  Finally, as the parties acknowledged at the hearing on this motion, the version of

26  FMC § 10-616 that was in effect prior to its amendment on March 31, 2022, has not been

27  challenged in this action.  Therefore, defendant may continue to act within the parameters of that

28  pre-amendment version of the ordinance if it wishes to do so.

**CONCLUSION**

For all of the reasons explained above:

1.   Plaintiffs' motion for a preliminary injunction (Doc. No. 6) is granted;

2.   The court hereby restrains and enjoins defendant City of Fresno from enforcing Fresno Municipal Code § 10-616 as amended on March 31, 2022;

3.   No bond shall be required to be posted by plaintiffs pursuant to Rule 65(c) of the Federal Rules of Civil Procedure;

4.   This preliminary injunction is issued without prejudice to plaintiffs or defendant seeking additional discovery or other equitable or legal relief as appropriate; and

5.   This preliminary injunction is effective immediately and shall remain in full force and effect through the date on which judgment, if any, as to the enjoined defendant is entered in this case.

IT IS SO ORDERED.

Dated:   **May 24, 2022**

_____
UNITED STATES DISTRICT JUDGE